**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 17-30242 |
| *Plaintiff-Appellee*, | D.C. No. 3:16-cr-00051-BR-10 |
| v. | |
| DUANE LEO EHMER, | OPINION |
| *Defendant-Appellant*. | |

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 17-30246 |
| *Plaintiff-Appellee*, | D.C. No. 3:16-cr-00051-BR-22 |
| v. | |
| DARRYL WILLIAM THORN, | |
| *Defendant-Appellant*. | |

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.18-30025 |
| *Plaintiff-Appellee*, | D.C. No. 3:16-cr-00051-BR-26 |

v.

JAKE RYAN,

     *Defendant-Appellant.*

---

UNITED STATES OF AMERICA,

     *Plaintiff-Appellee,*

v.

JASON PATRICK,

     *Defendant-Appellant.*

No. 18-30042

D.C. No. 3:16-cr-00051-BR-9

---

UNITED STATES OF AMERICA,

     *Plaintiff-Appellee,*

v.

JASON PATRICK; DUANE LEO EHMER; DARRYL WILLIAM THORN; JAKE RYAN,

     *Defendants-Appellants.*

No.19-30077

D.C. No. 3:16-cr-00051-BR-9
D.C. No. 3:16-cr-00051-BR-10
D.C. No. 3:16-cr-00051-BR-22
D.C. No. 3:16-cr-00051-BR-26

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted June 1, 2020
Submission Vacated June 4, 2020
Resubmitted September 13, 2023
Portland, Oregon

Filed December 7, 2023

Before: Marsha S. Berzon, Daniel P. Collins, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge Collins;
Partial Concurrence by Judge Berzon

---

## SUMMARY[*]

---

### Criminal Law

The panel affirmed four defendants' convictions and sentences for various offenses arising from their participation in the January 2016 occupation of the Malheur National Wildlife Refuge in eastern Oregon, and remanded with respect to sealing and discovery issues.

The panel held the district court properly added to the formal record under Fed. R. App. P. 10(e)(2)(B) certain

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

email exchanges between the district judge and all counsel concerning jury selection procedures.

Appellants contended that the district court erred in excusing individual jurors without soliciting or receiving any input from the parties or counsel concerning those individual decisions.

The panel agreed with the Government that pre-screening and excusing potential jurors "for hardship" is an administrative task that "cannot reasonably be considered a part of the criminal trial" and may therefore be conducted by court or its staff—even in person—without the participation of the parties or their lawyers. Accordingly, to the extent that Appellants challenge the district court's *sua sponte* and *ex parte* excusal of jurors on *hardship* grounds, the panel rejected that contention.

The panel rejected as foreclosed by *United States v. Bordallo*, 857 F.2d 519 (9th Cir. 1988), the Government's argument that exclusion of other jurors *for cause* likewise falls within the permissible scope of routine administrative pre-screening that can be undertaken by the court acting *sua sponte* and *ex parte* and without hearing at all from the parties or their counsel. The panel wrote that by making case-specific determinations of potential bias based on prospective jurors' written comments about this specific case, the district court went well beyond the sort of administrative screening that may be conducted on an *ex parte* basis under *United States v. Calaway*, 524 F.2d 609 (9th Cir. 1975). The district court's case-specific excusal of particular jurors for cause constituted a "critical stage" of the proceedings with respect to which, at the very least, Appellants had the right to counsel and the right to be heard. The panel wrote that nothing in the Jury Selection

and Service Act or the District of Oregon's Juror Management Plan authorized the district court's actions here, much less confirms that they may be deemed to be purely administrative for constitutional purposes.

Because Appellants agreed to a procedure whereby the jurors would initially be screened based *solely* on their answers to a paper questionnaire, the panel rejected Appellants' contention that the district court was required to receive the input of the parties and their counsel at an *in-person hearing*.

Appellants contended that even if an in-person hearing was not required, the district court's *sua sponte* and *ex parte* for-cause excusals (1) amounted to a complete denial of the assistance of counsel at a critical stage of trial proceedings, requiring automatic reversal without any harmless error inquiry, under *United States v. Cronic*, 466 U.S. 648 (1984); and (2) deprived them of a sufficient opportunity to be heard in violation of their due process rights. The panel rejected these contentions. After undertaking a retrospective review of the juror questionnaires in this case in which defense counsel had the opportunity to review the complete paper record and to identify any jurors whose excusal was questionable, the panel concluded that there is no reasonable doubt that the identified jurors removed for cause were properly excluded. The panel wrote that the district court's failure to consult with counsel or the parties in advance thus did not make any difference, and there was no prejudicial impingement on the right to counsel or on the due process right to be heard with respect to these strikes. Accordingly, there is no reversible error. The panel wrote that it should nonetheless be clear that the panel cannot and does not endorse what the district court did. To make case-specific excusals of prospective jurors for cause without having first

obtained the input of parties and counsel is improper and unnecessarily risks injecting reversible error into the proceedings.

The panel held that binding precedent requires rejection of Appellants' argument that the Sixth Amendment entitled them to a jury trial even if the charged misdemeanor offenses were properly classified as "petty" offenses. In this case in which (1) the charged offenses involve violations of regulations that Congress has made it a crime to disobey, (2) the parties disagreed as to which criminal statutes underlie the relevant regulations, and (3) the competing alternatives do not have the same maximum penalty, the panel concluded that both of the respective statutes cited by Appellants and the Government apply to the relevant regulations, and that, as a result, the Government had the prosecutorial discretion to invoke either statute in charging a violation of the regulations. Because the charging information here makes clear that the Government invoked a statute, § 4 of the Refuge Recreation Act, that defines only a petty offense, the panel concluded that Appellants had no right to a jury trial for these regulatory violations.

The panel held that there was sufficient evidence to support (1) Ryan's misdemeanor conviction for knowingly trespassing on the Malheur National Wildlife Refuge; (2) Ryan's and Ehmer's misdemeanor convictions for knowingly using, without authorization, an excavator that was the property of the United States Government; and (3) Patrick's misdemeanor conviction for knowingly entering and starting, without authorization, an all-terrain vehicle that was the property of the United States Government.

Concerning Patrick's and Thorn's convictions for conspiracy to impede an officer of the United States in

violation of 18 U.S.C. § 372, the panel held (1) the district court did not err in declining to instruct the jury that the phrase "person . . . holding any office, trust, or place of confidence under the United States" refers only to "Officers of the United States" whose appointments are governed by the Constitution's Appointments Clause; (2) the district court's instructions correctly defined the scope of "threats" and "intimidation" required by § 372; and (3) none of the asserted evidentiary errors warrants reversal.

Concerning Ryan's and Ehmer's convictions for depredation of government property in violation of 18 U.S.C. § 1361, the panel held (1) the district court properly declined to instruct the jury as to self-defense; (2) the district court did not abuse its discretion in excluding as cumulative four of Ryan's six proffered character witnesses; and (3) even if there was a technical violation of Ehmer's rights under the Speedy Trial Act in the setting of the trial date for a depredation charge included in a freestanding separate indictment, Ehmer was not prejudiced.

Concerning Thorn's sentence, the panel held that the district court properly applied the preponderance-of-the-evidence standard rather than the clear-and-convincing-evidence standard in determining whether to apply various enhancements in calculating Thorn's sentencing range under the sentencing guidelines. The panel held that the district court did not err in applying a three-level enhancement under U.S.S.G. § 2A2.4(b)(1)(B) for threatened use of a firearm.

The panel rejected Thorn's and Patrick's challenges to an adjustment under application note 4 of U.S.S.G. § 3A1.4, which addresses terrorism-related offenses.

The panel held that the district court did not abuse its discretion in applying a two-level aggravating-role enhancement to Patrick under U.S.S.G. § 3B1.1(c).

Appellants challenged various orders by which the district court precluded access to certain sealed materials. They also renewed their motion in this court to unseal certain materials that were included in a volume of the Government's supplemental excerpts of record that was filed *ex parte* and under seal. The panel held that the district court did not abuse its discretion in concluding that Thorn failed to justify a requested order allowing *only* his counsel to review a cooperation agreement between the Government and a non-testifying co-defendant. The panel also rejected Appellants' contention that the district court improperly denied discovery of certain memoranda concerning information learned from Government informants. The panel concluded that, while a district court order that is contained in the Government's supplemental excerpts of record should remain under seal at this time, that document should be disclosed to Appellants' counsel under an appropriate protective order on remand. With respect to the other challenged items, the panel wrote that at this time they should remain under seal and should not be disclosed to Appellants or their counsel. The panel wrote that this ruling is without prejudice to reconsideration on remand in the district court after the disclosure of the sealed order.

Judge Berzon concurred in part and concurred in the judgment in part. She agreed with the majority opinion in full except for the part addressing defendants' claims that the district court's *ex parte* dismissal of 430 prospective jurors violated defendants' rights to counsel and to presence. She wrote separately principally to clarify the parameters of the right-to-counsel and right-to-presence claims. She also

wrote that she agreed with the majority's conclusion that automatic reversal is not required, but for reasons other than those relied upon by the majority. Because defendants do not allege that any empaneled juror (or jury venire) was not impartial, and do not contend that the district court's excusals impermissibly skewed the jury venire or the empaneled jury, she concluded that the district court's errors did not, beyond a reasonable doubt, affect the verdict.

## COUNSEL

Jesse Merrithew (argued), Levi Merrithew Horst PC, Portland, Oregon, for Defendant-Appellant Jake Ryan.

Jay A. Nelson (argued), Law Office of Jay A. Nelson, McMinnville, Oregon, for Defendant-Appellant Darryl W. Thorn.

Robert M. Stone (argued), Robert M. Stone PC, Medford, Oregon; Tonia L. Moro, Tonia L. Moro Attorney at Law PC, Talent, Oregon; for Defendant-Appellant Duane L. Ehmer.

Andrew M. Kohlmetz (argued), Law Office of A.M. Kohlmetz, Portland, Oregon, for Defendant-Appellant Jason Patrick

Geoffrey A. Barrow (argued), Ethan D. Knight, Suzanne Miles, Amy E. Potter, and Craig Gabriel, Assistant United States Attorneys; Kelly A. Zusman, Appellate Chief; Billy J, Williams, United States Attorney, District of Oregon; United States Department of Justice, United States Attorney's Office, Portland, Oregon; for Plaintiff-Appellee USA.

Roger I. Roots, Roger Roots Attorney at Law, Livingston, Montana, for Amicus Curiae Idaho Political Prisoner Foundation and The Real 3%ers of Idaho.

**OPINION**

COLLINS, Circuit Judge:

Defendants-Appellants Duane Ehmer, Darryl Thorn, Jake Ryan, and Jason Patrick (collectively, "Appellants") appeal their convictions for various offenses arising from their participation in the January 2016 occupation of the Malheur National Wildlife Refuge ("Malheur NWR") in eastern Oregon.  That occupation was undertaken in protest against what Appellants and others saw as significant abuses of power by the federal Government.  Patrick and Thorn also appeal the sentences imposed on them by the district court. In addition, Appellants challenge the district court's denial of access to certain materials that were filed *ex parte* and under seal.  Although we agree with Appellants that several of the rulings they challenge were erroneous, we ultimately conclude that none of them warrants reversal of their convictions or sentences.  As to Appellants' requests for access to sealed materials, we grant relief as to one document, remand for reconsideration as to certain others, and deny relief as to the remainder.

**I**

We begin by describing the factual context leading up to the occupation before describing the occupation itself and the prosecutions that arose from it.

**A**

In April 2014, the federal Bureau of Land Management ("BLM") sought to carry out federal court orders authorizing the BLM to impound cattle that Nevada rancher Cliven Bundy was allowing to graze on federal land without a permit.  Shortly after the BLM began its impoundment

efforts near Bunkerville, Nevada, hundreds of protestors, "including many openly carrying firearms, converged on the impoundment site demanding that the BLM personnel leave the site immediately and release the impounded cattle."[1] Concerned about the safety of its personnel, the BLM suspended its efforts and released the cattle. Cliven Bundy and his sons Ammon and Ryan, together with a fourth person, were criminally indicted for their part in the confrontation, but the charges were dismissed with prejudice after the district court concluded that the Government had committed multiple egregious violations of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), to provide the defense with evidence in its possession "that is potentially exculpatory." *United States v. Bundy*, 406 F. Supp. 3d 932, 940 (D. Nev. 2018). After the Government appealed, we affirmed that decision. *See United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020).

Ammon Bundy thereafter became a prominent activist and speaker on subjects such as land rights, and by 2015 his email list reached about 28,000 people. In particular, he promoted the view that the federal Government's sole source of power to control lands within a State is the Constitution's Enclave Clause, which authorizes Congress "[t]o exercise exclusive Legislation in all Cases whatsoever, . . . over all Places purchased *by the Consent of the Legislature of the State* in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." *See* U.S. CONST. art. I, § 8, cl. 17 (emphasis added). The Supreme Court, however, has expressly

---

[1] Our quotations in this section are from the parties' stipulation at trial concerning certain of the events that preceded the occupation of the Malheur NWR.

rejected the view that, "in the absence of such consent" from a State under the Enclave Clause, "Congress lacks the power to act contrary to state law" in its management of federal lands. *Kleppe v. New Mexico*, 426 U.S. 529, 541 (1976). Instead, the Court has held that, even when the Enclave Clause has not been invoked and a State "retains jurisdiction over federal lands within its territory," *id*. at 543, the Constitution's *Property* Clause—which grants Congress "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States," *see* U.S. CONST. art. IV, § 3, cl. 2—gives Congress authority "to enact legislation respecting those lands" that "necessarily overrides conflicting state laws under the Supremacy Clause." *Kleppe*, 426 U.S. at 543.

In late 2015, Ammon Bundy learned about the prosecution of Dwight and Steven Hammond, two ranchers living in Harney County, Oregon. The Hammonds had been convicted of violating 18 U.S.C. § 844(f)(1), which prohibits maliciously damaging or destroying federal property by fire, based on their unauthorized conduct of rangeland burns. *See United States v. Hammond*, 742 F.3d 880, 881 (9th Cir. 2014). One of the two counts on which Steven Hammond was convicted involved land within the Malheur NWR. Dwight and Steven Hammond were sentenced to within-Guidelines sentences of, respectively, three months and 12 months plus one day. *Id*. at 882. However, the Government appealed the sentences, asserting that the district court was obligated to impose the statutory minimum sentence of five years and that, contrary to what the district court had concluded, this mandatory minimum sentence did not violate the Eighth Amendment. We agreed and remanded the case for resentencing. *Id*. at 884–85.

Ammon Bundy viewed the Hammonds' case as "being prosecuted for burning grass," and he thought that the Government overreach involved in "what was happening to them was very similar" to "what happened to [his] family." He sought to rally support for the Hammonds, including meeting them in person; publicizing their case by email, on the internet, in print, and on radio; and meeting with the Harney County Sheriff to "stand for the Hammonds." In mid-December 2015, he drafted a "Redress of Grievance" that he sent to the Governor and other elected representatives, asking them to create a panel to "investigate these issues with the Hammonds."

After receiving "zero" response from elected representatives about the Hammonds' situation—"not even an e-mail back from them" or "even an answer of no"— Ammon Bundy decided to take a "harder stand." He concluded that "we should go into the [Malheur] refuge and occupy the refuge, and that would wake them up." At a December 29, 2015 meeting at a house in Burns, Oregon, which Defendant Patrick also attended, Bundy laid out to a group of supporters his idea of occupying the Malheur NWR. According to Blaine Cooper, a participant at the meeting who later testified for the Government at trial, the plan was to take over the refuge "while armed with weapons," and in the event that the occupiers "encountered employees as we went in there, we were told to ask them to leave politely." Ammon Bundy denied at trial that any such discussion concerning employees had occurred at this meeting.

A rally had already been scheduled in Burns for Saturday, January 2, 2016, which was two days before the Hammonds were set to report to prison on their new longer sentences. After one supporter expressed concern to

Ammon Bundy on December 31 that the upcoming rally was being portrayed by some as a "Bundy Ranch style call to action," he responded in a private Facebook message that "It is much more than a protest."

**B**

About an hour before the January 2 protest in Burns began, Ammon Bundy met with about 30 people at a restaurant in town and explained his intention, after the rally, to continue the protest at the nearby Malheur refuge. The protest in Burns was peaceful.

As the protest was concluding, a convoy of three vehicles headed towards the Malheur NWR. Upon arriving, Cooper and the other occupants of the vehicles, together with others already at the refuge, began going through the buildings to make sure no one was there. Most of those who went through the buildings were armed, including Defendant Patrick, who had an AR-15. Given that it was a Saturday and the day after New Year's Day, no federal employees were present, although the refuge was open to the public. A neighboring rancher observed a group of about 12 armed men who appeared to be "securing a perimeter" at the refuge. Cooper stated that, after checking the buildings, he and another man "set up a watch" at the "fire watchtower" near the refuge's front gate "in case the federal government would come in on [them]."

Ammon Bundy arrived after the first convoy, accompanied by several protesters who had attended the rally in Burns. More protesters followed over the coming days. Ehmer arrived on January 3, Thorn arrived some time that week, and Ryan arrived two weeks after the occupation started.

Many of the occupiers were armed, and the entrances to the refuge were generally guarded by armed persons. A neighboring ranger stated that the watchtower was continuously staffed by armed individuals, who appeared to follow eight-hour shifts "like clockwork." Indeed, the ranger remarked that the guards "looked like a sniper team." In addition, Ehmer, Thorn, and Ryan were all listed, in a handwritten document later found in the refuge, as members of various armed security teams organized by the occupiers. During the occupation, Thorn occasionally posted about his guard duty on Facebook. Cooper testified that the "consensus" position among the protesters was that any employees who tried to return to the refuge, or any law enforcement officers who tried to dislodge the protesters, would be stopped—the goal was "to make sure nobody came in."

The occupiers used Malheur NWR buildings as living quarters and also used vehicles and equipment found on site. Some of the occupiers posted notices on various buildings stating "CLOSED PERMANENTLY." At some point during the occupation, Patrick was filmed cutting through one of the refuge's wire fences, while it was announced that the land was being restored for "beneficial use." At trial, Ammon Bundy testified that the occupation was in part an attempt to challenge federal ownership of the Malheur NWR by "perfecting title through adverse possession." In interviews, Ammon and Ryan Bundy emphasized that they were protesting not only the Hammonds' arson convictions, but also federal landownership and land-management policies in general.

The Sheriff for Harney County, in which the Malheur NWR refuge was located, repeatedly urged the occupiers, over the phone and in person, to leave the refuge, but to no

avail. In late January, the FBI learned that some of the occupation's leadership, including the Bundy sons, were planning to travel outside the refuge on January 26 to attend a rally or meeting in the town of John Day, Oregon. The FBI intercepted the group once they were outside the refuge, and in the ensuing confrontation, one member of the group, LaVoy Finicum, was fatally shot. The remaining members of the group, which included Ammon Bundy and his sons, were arrested. The FBI communicated news of the arrests "to all the individuals whose telephone numbers [it] had on the refuge to try and persuade them to leave the refuge immediately." The FBI also relayed that it intended to set up roadblocks around the refuge and that "if they wanted to leave the refuge, now was the time to go."

At a meeting later that evening, Thorn encouraged others to stay and "defend the Constitution." Patrick also urged those present to stay, announcing that he would "defend Article I, Section 8, Clause 17 of the United States Constitution." However, Thorn left the refuge later that day or early the next day (January 27), and Patrick also left on January 27. Concerned that the FBI might undertake an armed assault on the refuge, Ehmer and Ryan on January 27 used an excavator to begin digging two large defensive trenches. However, Ehmer left later that day and was arrested. Ryan departed on January 28. Four holdouts—none of whom are Appellants in this case—remained until February 11.

## C

A grand jury in the District of Oregon ultimately returned a superseding indictment against 26 of the occupiers, including the four Appellants, in March 2016. All 26 defendants were charged in count one, which alleged a

conspiracy, in violation of 18 U.S.C. § 372, to impede officers of the United States, by "force, intimidation, and threats," from discharging their duties. Twenty defendants—including Appellants Patrick, Thorn, and Ryan—were charged in count two with possession of firearms in a federal facility, with intent to commit another crime (namely, the conspiracy charged in count one), in violation of 18 U.S.C. § 930(b). In count three, Patrick and eight other defendants were charged with using and carrying a firearm during and in relation to a crime of violence (namely, the conspiracy alleged in count one), in violation of 18 U.S.C. § 924(c)(1)(A). Lastly, Ryan was charged in count six with depredation of Government property in violation of 18 U.S.C. § 1361. Appellants were not charged in the remaining counts in the indictment.

On June 10, 2016, the district court dismissed the § 924(c) charge against Patrick and eight other defendants, concluding that a conspiracy in violation of § 372 did not qualify as a crime of violence for purposes of § 924(c). The Government has not appealed that dismissal.

Eleven defendants pleaded guilty to one or more counts of the indictment, and all charges against one defendant were dismissed. The remaining 14 defendants were scheduled to be tried in two separate trials. The first trial involved the charges against seven defendants—namely, Ammon Bundy, Ryan Bundy, Shawna Cox, David Fry, Jeff Banta, Kenneth Medenbach, and Neil Wampler. On October 27, 2016, the jury returned not guilty verdicts on all charges against all seven of these defendants, except that the jury was unable to reach a verdict as to one charge against Ryan Bundy. The Government subsequently moved to dismiss that remaining charge against Ryan Bundy, and the district court granted that motion.

The second trial involved the charges against the remaining seven defendants, including the four Appellants, and that trial was scheduled to begin on February 14, 2017. However, after the first trial resulted in acquittals, the Government filed additional charges against these remaining defendants. Specifically, on December 19, 2016, the Government filed a seven-count misdemeanor information charging violations of various regulations governing conduct at national wildlife refuges. All seven defendants were charged with trespassing in violation of 50 C.F.R. § 26.21(a) (count one); Appellants were each charged with one or more counts of tampering with vehicles and equipment in violation of 50 C.F.R. § 27.65 (counts two through five); Patrick was charged with one count of destruction of public property in violation of 50 C.F.R. § 27.61 (count six); and Ehmer was charged with one count of unlawful removal of property in violation of 50 C.F.R. § 27.61 (count seven). In addition, on December 20, 2016, the Government obtained a separate indictment against Ehmer for depredation of government property in violation of 18 U.S.C. § 1361. Over Ehmer's opposition, the district court joined this additional indictment for trial on February 14, 2017, together with the main superseding indictment.

Shortly before trial, the three remaining defendants who are not Appellants here—namely, Dylan Anderson, Sean Anderson, and Sandra Anderson—each pleaded guilty to the single misdemeanor count of trespassing alleged against them in the information, and all remaining charges against them were dismissed.

After a 12-day trial, the case was submitted to the jury on the felony counts against Appellants. While the jury was deliberating, the district court conducted a brief bench trial at which it received additional evidence as to the

misdemeanor counts. On the fourth day of deliberations, the jury returned its verdicts, convicting each Appellant of at least one felony. Just over a week later, the district court returned its verdict on the misdemeanor charges, convicting each Appellant of at least one misdemeanor. The resulting verdicts were as follows:

| Main Indictment | | | Jury Verdict as to | | | |
|---|---|---|---|---|---|---|
| Count | Charge | Basis | Patrick | Thorn | Ryan | Ehmer |
| 1 | Conspiracy to Impede U.S. Officers | 18 U.S.C. § 372 | **Guilty** | **Guilty** | Not Guilty | Not Guilty |
| 2 | Possession of Firearm in U.S. Facility | 18 U.S.C. § 930(b) | Not Guilty | **Guilty** | Not Guilty | |
| 6 | Depredation of U.S. Property | 18 U.S.C. § 1361 | | | **Guilty** | |
| Second Indictment | | | Jury Verdict as to | | | |
| Count | Charge | Basis | | | | Ehmer |
| 1 | Depredation of U.S. Property | 18 U.S.C. § 1361 | | | | **Guilty** |
| Information | | | Court Verdict as to | | | |
| Count | Charge | Basis | Patrick | Thorn | Ryan | Ehmer |
| 1 | Trespassing | 50 C.F.R. § 26.21(a) | **Guilty** | **Guilty** | **Guilty** | **Guilty** |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2 | Tampering with Vehicles | 50 C.F.R. § 27.65 | **Guilty** | | | |
| 3 | Tampering with Vehicles | 50 C.F.R. § 27.65 | | | **Guilty** | **Guilty** |
| 4 | Tampering with Vehicles | 50 C.F.R. § 27.65 | | Not Guilty | | |
| 5 | Tampering with Vehicles | 50 C.F.R. § 27.65 | | **Guilty** | | |
| 6 | Destruction of U.S. Property | 50 C.F.R. § 27.61 | **Guilty** | | | |
| 7 | Removal of Property | 50 C.F.R. § 27.61 | | | | Not Guilty |

Patrick was sentenced to 21 months in prison, and Thorn to 18 months. Ehmer and Ryan were both sentenced to 12 months and one day, and neither contests his sentence on appeal.

All four defendants timely appealed. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II

Appellants challenge certain aspects of the jury selection procedures that the district court employed in this case. Although we conclude that the district court should have used different procedures, we hold that, on this record, reversal is not warranted.

## A

To set the issues concerning jury selection in context, it is helpful to begin with a detailed overview of the jury selection process in this case. But before doing that, we must first resolve the parties' threshold dispute over the scope of the record that we may consider.

## 1

The Government included in its supplemental excerpts of record certain email exchanges between the district judge and all counsel concerning jury selection procedures. Appellants moved to strike those documents from the Government's excerpts on the ground that they are not properly part of the record on appeal. In response to that motion, the Government filed a motion in the district court seeking to have these documents formally added to the record under Federal Rule Appellate Procedure 10(e)(2)(B), and the district court granted that motion. We then denied Appellants' motion to strike those documents from the Government's excerpts. Appellants then moved for reconsideration, directly challenging the district court's order adding these items to the record under Rule 10(e). We deferred consideration of that issue so that it could be considered together with the other issues raised on appeal. We conclude that the district court properly added these documents to the formal record under Rule 10(e).

Rule 10(e) authorizes the district court, even after the record has been forwarded to this court on appeal, to add to the record "anything material to either party" that was "omitted from . . . the record by error or accident." *See* FED. R. APP. P. 10(e)(2); *see also United States v. Mageno*, 786 F.3d 768, 773 n.5 (9th Cir. 2015). The official communications between the district court and the parties

concerning the issues to be resolved concerning the jury selection process, and the district court's rulings and instructions on that score, should not have been sent by private emails but should have been set forth in filings or orders that were made part of the official record of the proceedings, under seal if necessary. Given that the district court committed legal error by not making these official communications part of the record at the outset, they were "omitted from the record by error" within the plain meaning of Rule 10(e). *Cf. Kemp v. United States*, 596 U.S. 528, 536–38 (2022) (holding that a "mistake" that would authorize relief from a judgment under Rule 60(b)(1) includes "both legal and factual errors"). Moreover, adding these materials "conform[s] the record to what happened" in the district court concerning the jury selection process, and it does not add anything that was not before that court or not considered by it. *United States v. Smith*, 493 F.2d 906, 907 (5th Cir. 1974). Accordingly, Rule 10(e) authorized the district court to later formally add those materials to the record and to forward them to this court. *See Parker v. Della Rocco*, 252 F.3d 663, 665 n.2 (2d Cir. 2001) (invoking Rule 10(e) to add to the record correspondence between the parties and the district judge). We therefore deny Appellants' motion to reconsider our previous order declining to strike these materials from the record.

## 2

With that clarification, we set forth what the record reveals about the jury selection process in this case.

On December 29, 2016, the district court sent an email to each party's counsel explaining how the court would proceed with certain aspects of the jury selection process. The court's email included the final version of the following

forms that would be sent as a package to approximately 1,000 prospective jurors: (1) the juror summons letter; (2) a standard "Jury Duty Excuse Form"; (3) the juror questionnaire that had been developed specifically for this case in order to explore several areas for possible disqualification of jurors; and (4) a juror's oath form. The decision to mail these forms together was a departure from the procedure at the first trial, in which the case-specific juror questionnaire was not provided to prospective jurors until *after* they had first been screened by the district court for general qualifications and hardship excuses.

The court's December 29 email explained that the juror questionnaire was "similar, but not identical, to the one used for the first trial," and that the court had declined to adopt "Defendants' proposals for an entirely different questionnaire." The court also stated that it would not entertain further comments or objections from the parties about "the substance of the questionnaire."[2] The court explained its refusal to consider further comments as follows:

> I am satisfied this version will get us started with all of the necessary information and, of course, each juror's information will be supplemented by the in-court process. As in the first trial, you will have the opportunity to give me juror-specific questions to raise with individual, prospective jurors as may be

---

[2] To preserve an adequate record for appeal, the court invited the parties to lodge, as part of the record, the "form of questionnaire that [Defendants] wanted the Court to use but that [the court] chose not to."

necessary to complete in [*sic*] the in-court
process.

The court's email then described what the process would
be after the juror questionnaires and any "excuse requests"
had been received by the court.  The court explained that,
given the deadline that was set for the jurors' responses, the
court expected to "have a critical mass of Juror
Questionnaires prepared for [counsel] to review by
sometime during the week of January 30, 2017."  The court
instructed counsel to plan to set aside time during that week
to review the questionnaires "so that we can determine
shortly after January 30, 2017, which jurors you agree
should be excused for cause[,] at which point those
prospective jurors will be notified that they need not report
for in-court *voir dire*."  Once this process of excusing jurors
"for cause or hardship" was completed, then "the remaining
jury pool [would] be sequenced randomly in the order in
which they will be called for voir-dire."

At a subsequent status conference on January 6, 2017,
the court reiterated that, as juror questionnaires "come in, I'll
be communicating with you.  To the extent we get a group
of questionnaires, a number sufficient that I think warrants
your—the beginning of your consideration of for-cause
challenges and the like, I'll be in touch with you."  The court
stated, though, that it was "not going to set a deadline today
for the need to get the parties' responses to juror
questionnaires for the for-cause piece."  The court described
as follows the process for conducting a preliminary review

of the juror questionnaires for hardship and for-cause challenges (emphasis added):

> I'll be making decisions *on deferral or hardship* in the ordinary course, and simply informing you.
>
> *With respect to issues of the cause challenges*, you'll need to confer. Let me know the extent to which you agree a juror's questionnaire shows a basis to excuse for cause.
>
> If the last process is predictive of this one, in most cases I accepted the parties' stipulation. To the extent the parties had a dispute, then we reserved it to actual in-court voir dire, developing the record with a real live person—the juror—there, and then going forward.
>
> Once we go through the for-cause process ahead of schedule, ahead of February 14, then the remaining jurors in the pool will be ordered randomly. And then that's the order in which they'll be showing up in the jury box for jury selection.

After then addressing the subject of how many alternate jurors should be seated, the court returned to the subject of reviewing the juror questionnaires (emphasis added):

> I'll be setting a timeline, as soon as I have a better idea of how the jurors are responding[,] with respect to deadlines for these for-cause challenges, and the like.

> *The goal will be, no later than when we do the pretrial conference, to be engaging on the record on disputed cause challenges.* Because we need to give enough [prospective jurors] enough notices as to whether they're coming or not, whether they need to be here or not.

No party objected to any aspect of the process that the court described for resolving any issues arising from the preliminary review of the juror questionnaires. The only voir-dire-related issue raised at the status conference was a concern about the logistics by which counsel could propose follow-up questions to the court during the actual live voir dire of jurors in the courtroom.

After receiving additional input from the parties on other juror-related issues (such as sequestration and the number of alternates), the district court issued a written order concerning jury selection. That order included a section that specifically addressed the parties' review of the juror questionnaires and that was modelled on the comparable order issued at the first trial. The relevant portion of the order again assured the parties that "[a]s soon as possible after the Court receives a critical mass of the completed Juror Questionnaires, the Court will make such Questionnaires available to the parties for the parties' advance review and conferral regarding whether any potential jurors should be excused 'for cause.'" The court ordered the parties to prepare a joint status report by February 3, 2017 in which they would identify potential jurors who, from the face of the questionnaires, should be excused for cause without resort to in-person voir dire. The court stated that, at the pretrial conference, it would review "the parties' recommendations

and challenges regarding the prospective jurors to excuse for cause based only on their Questionnaire responses," and would "rule[] on the parties' requests to excuse certain prospective jurors for cause and pursuant to the parties' agreement." After the completion of that process, the order explained, "the Jury Administrator will order the remaining jurors randomly in the sequence they will be called to participate in live, in-court *voir dire*." Again, no party raised any objection to this portion of the court's order.

Taken together, the court's email, oral comments, and written order confirmed that (1) the court would make decisions on "*deferral or hardship*" without the parties' input; (2) the parties would be given an opportunity to review the juror questionnaires with respect to *for-cause challenges* and to submit written recommendations and challenges concerning particular jurors; and (3) those "disputed cause challenges" based on the questionnaires would be resolved "on the record" at the pretrial conference.

Despite the clarity of the process outlined by the court, the district court informed the parties on January 27, 2017 that, without their input, it had *sua sponte* excused some jurors for cause based solely on the questionnaires. Specifically, in an email sent to counsel, the court stated (emphasis added):

> To date, the Court has excused, deferred or disqualified 430 of the 1000 summonsed jurors. The reasons range from hardships arising from the expected length of trial or winter driving conditions, *familiarity with the case producing strong opinions in favor* [*of*] *or against one party or another*, financial hardship (including loss of wages during

extended jury service), inability to be absent from work for an extended period, medical/age/caregiver hardships, preplanned and purchased travel, and language issues.

At the pretrial conference on February 7, 2017, the district court addressed the parties' written submission setting forth their respective contentions that, based solely on the written questionnaires that had been sent to all counsel, there was sufficient information to excuse certain potential jurors for cause. Noting that the Government and Appellants had agreed that several specific persons should be excused for cause, the court stated that it nonetheless wanted to verify the correctness of these challenges by having the parties "state the agreed basis for challenge for cause on the record." The court ultimately agreed with each of these joint challenges for cause and excused 27 prospective jurors on that basis. The persons excused included, for example, prospective jurors who had expressed strong views as to the Appellants' guilt and an employee of the U.S. Fish and Wildlife Service who had been "kept informed of matters at the refuge as they were ongoing." There were 13 other prospective jurors who the parties agreed should be excused for cause, but the court stated that it had already *sua sponte* excused each of these jurors for "hardship" reasons, thereby rendering "the for-cause issue . . . moot."

The court next reviewed the set of 26 prospective jurors as to whom, in their written submission, only one side contended that a for-cause challenge was warranted based solely on the juror questionnaires. For 12 of these prospective jurors, the parties ultimately agreed on the record that the person should be excused for cause or the

court instead excused the person based solely on hardship grounds. For the remaining 14, the court granted five opposed for-cause challenges made by the Government and five made by Appellants. The court, however, denied four opposed challenges made by Appellants, concluding that the issues raised warranted further exploration on voir dire before making a final decision.

The court next addressed, in the same way, the parties' challenges concerning a second batch of prospective jurors. The court agreed with the parties' joint motion to excuse one juror for obvious lack of facility in the English language and to excuse two other jurors for cause. The court excused another juror challenged by Appellants based solely on hardship grounds, and it granted Appellants' opposed for-cause challenge to an additional juror.

At another status conference the next day, February 8, 2017, Defendant Ehmer's counsel, on behalf of all Appellants, requested "on the record clarification" concerning the Court's earlier *sua sponte* excusal of prospective jurors without any input from the parties. Defense counsel stated that, with respect to the jurors whom the court had excused for cause, there needed to "be a record as to the reasons for cause," just as the court required the parties "to go through and articulate yesterday each of our grounds for cause, even when there were stipulations." The district court responded that "what exists is a handwritten note by me . . . on every questionnaire where a juror was excused." After explaining some of the factors the district court considered, the court stated "I will tell the jury supervisor to save all of the notes I made, in the event there's an issue. So those will be preserved." After further assurance that the court's notes would be preserved, defense counsel answered: "Thank you. That's fine." Shortly

thereafter, Defendant Patrick, who was representing himself, followed up by asking the court whether the court's *sua sponte* hardship dismissals had been "based on weather." In the ensuing colloquy with the court, Patrick expressed a concern that weather-based excusals would disproportionally rule out jurors from the eastern part of the State, thereby skewing the jury pool. After the court indicated that at least some jurors were willing to come from that region and had been summoned, Patrick replied: "Okay."

After the preliminary review of questionnaires was completed, prospective jurors were summoned and then subjected to voir dire in the ordinary course.

## B

Appellants' challenges to the jury selection process rest on two analytically distinct propositions. First, Appellants contend that the court should not have excused individual jurors without first receiving input from the parties and their counsel as to those particular exclusions. Second, Appellants assert that the *manner* in which that input should have been received was a court hearing at which Appellants, their counsel, and the public would have had a right to attend.[3] We partly agree with the first contention but, on the facts of this case, we reject the second.

---

[3] Appellants have not raised any contention that the district court's sealing decisions erroneously denied public access to papers filed or lodged with the court concerning jury selection, such as individual jurors' questionnaires or the parties' filings concerning them. The sole public access claim that Appellants raise concerning the jury selection process relates to access to in-court hearings.

**1**

Before turning to those two specific questions, we provide a brief overview of the relevant constitutional and rules-based rights invoked by Appellants in making these contentions.

**a**

First, as Appellants recognize, the Sixth Amendment's guarantee that a criminal defendant "shall enjoy the right . . . to have the Assistance of Counsel for his defence," U.S. CONST. amend. VI, is one of the primary means for ensuring that a defendant will be able to present a defense throughout the court proceedings. Although the "core purpose of the counsel guarantee was to assure 'Assistance' *at trial*, when the accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor," the Supreme Court has held that the right to assistance of counsel also extends to "pretrial proceedings" that constitute a "critical stage of the proceedings." *United States v. Ash*, 413 U.S. 300, 309–11 (1973) (emphasis added) (citation and internal quotation marks omitted). Appellants contend that the district court's pretrial exclusion of individual prospective jurors qualified as a "critical stage" to which the constitutional right to assistance of counsel attaches, *see id.* at 311, and that the court therefore violated this Sixth Amendment right by dismissing hundreds of jurors "for hardship and cause outside the presence of counsel."

Although neither side has called the point to our attention, we note that Appellant Patrick lacks standing to assert on appeal any claim that the court's jury selection procedures interfered with his Sixth Amendment right to assistance of counsel. Long before the district court made the now-challenged exclusions, Patrick had successfully

asserted his constitutional right to represent himself, *see Faretta v. California*, 422 U.S. 806, 835 (1975), which required that he first "knowingly and intelligently forgo[] his right to counsel," *McKaskle v. Wiggins*, 465 U.S. 168, 173 (1984). Although the district court appointed standby counsel for Patrick—over his objection—that standby appointment did not diminish Patrick's *Faretta* right to control his own defense. And Patrick did represent himself throughout all relevant proceedings. Patrick therefore cannot assert any claim that his Sixth Amendment right to counsel was infringed during jury selection.

Nonetheless, we construe the arguments of Appellants, including Patrick, as also resting on a defendant's broader and more fundamental right—rooted in the constitutional guarantee "that no one shall be deprived of liberty without due process of law"—to have "an opportunity to be heard in his defense," which "include[s], as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel." *Rock v. Arkansas*, 483 U.S. 44, 51 (1987) (citation omitted); *see also LaChance v. Erickson*, 522 U.S. 262, 266 (1998) ("The core of due process is the right to notice and a meaningful opportunity to be heard."); *United States v. Bordallo*, 857 F.2d 519, 522 (9th Cir. 1988). This due process right of Patrick, as a *pro se* defendant, to be heard in his criminal prosecution necessarily affords him, at a minimum, the right to be heard in any stage of the proceedings as to which, had he been represented, his right to counsel would have attached. *Cf. United States v. Rice*, 776 F.3d 1021, 1024 (9th Cir. 2015) ("[W]e assume that the right to self-representation applies to all proceedings to which the right to counsel applies.").

**b**

Appellants also rely on a criminal defendant's "right to presence" as an additional source of their right to participate in the court's decisions concerning the excusal of jurors. *United States v. Gagnon*, 470 U.S. 522, 526 (1985). A criminal defendant's "constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment," but the Supreme Court has "recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him." *Id.* (citation omitted); *see also Campbell v. Wood*, 18 F.3d 662, 671 (9th Cir. 1994) (en banc). As the Court has explained, "[t]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Gagnon*, 470 U.S. at 526 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934)) (simplified). Among the proceedings at which a defendant has such a due process right to be present are "the voir dire and empanelling of the jury." *Campbell*, 18 F.3d at 671.

In addition, Federal Rule of Criminal Procedure 43 provides that "the defendant must be present at," *inter alia*, "every trial stage, including jury impanelment and the return of the verdict." *See* FED. R. CRIM. P. 43(a)(2). We have held that this right under Rule 43 "is broader than the scope of the constitutional right to be present." *United States v. Reyes*, 764 F.3d 1184, 1189 (9th Cir. 2014). Unlike the constitutional standard, which "only grants to the criminal defendant the right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings," *United States v. Sherman*, 821 F.2d 1337, 1339 (9th Cir. 1987) (citations and internal quotation marks omitted), Rule 43 grants a categorical right to be present at

"*at every stage of the trial*," *id*. (quoting FED. R. CRIM P. 43(a)).

Appellants' right-to-presence claim is somewhat unusual, because it does not rest on the assertion that the district court conducted a hearing or proceeding from which they were physically excluded. *Cf. Bordallo*, 857 F.2d at 522–23 (holding that defendant Bordallo's right to presence was violated by district court's actions in excusing "some of the prospective jurors" while the judge and "veniremembers were in the courtroom" but "[n]either Bordallo nor his counsel were present"). On the contrary, their complaint is that (1) the district court should have held a hearing before concluding that certain jurors should be excused based on their questionnaires alone; and (2) *had* the requisite hearing been held, they would then have had a right to be present at that hearing. To succeed on such a claim, they must establish both of those two propositions.

**c**

Finally, Appellants also contend that the district court's *sua sponte* and *ex parte* excusals of jurors implicate their Sixth Amendment right to a "public trial." U.S. CONST. amend. VI. This explicit constitutional right was "created for the benefit of the defendant," *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979), and ensures that the proceedings against the defendant will be subjected "to contemporaneous review in the forum of public opinion," *id*. (quoting *In re Oliver*, 333 U.S. 257, 270 (1948)). The Supreme Court has held that this Sixth Amendment right to a public trial includes the "right to insist that the *voir dire* of the jurors be public." *Presley v. Georgia*, 558 U.S. 209, 213 (2010).

As with Appellants' right-to-presence claim, their public-trial claim rests on two assertions: (1) that the district court should have held an in-court *hearing* on this subject; and (2) had it done so, that hearing would have had to be open to the public. *See United States v. Ramirez-Ramirez*, 45 F.4th 1103, 1110–11 (9th Cir. 2022) (holding that the public-trial right requires an in-court hearing to announce the verdict in a bench trial, which hearing the public can then attend). As noted earlier, Appellants have not raised any contention that the district court violated their public-trial rights by sealing from public view various *documents* that were lodged or filed with the court concerning jury selection. *See supra* note 3.

## 2

Against this backdrop, we turn to the question whether the district court erred in excusing individual jurors without soliciting or receiving *any* input from the parties or counsel concerning those individual decisions. In arguing that no such input was required, and that none of the rights Appellants invoke are implicated here, the Government relies on the premise that the district court's actions stayed entirely within the parameters of the sort of preliminary "administrative screening process" for jurors that courts may properly conduct on an *ex parte* basis. We conclude that the Government's premise is only partly correct.

We agree with the Government that pre-screening and excusing potential jurors "for hardship" is an administrative task that "cannot reasonably be considered a part of the criminal trial" and that therefore may be conducted by the court or its staff—even in person—without the participation of the parties or their lawyers. *United States v. Calaway*, 524 F.2d 609, 615–16 (9th Cir. 1975) (rejecting claim that, under

Rule 43, defendant and his counsel had to be present when judge excused jurors for hardship in open court without telling them what the case was about), *abrogated on other grounds by Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  The Jury Selection and Service Act expressly allows the court, or the "*clerk* under supervision of the court," to excuse prospective jurors "upon a showing of undue hardship or extreme inconvenience," 28 U.S.C. § 1866(c)(1) (emphasis added), and we expressly held in *Calaway* that judges and court clerks may exercise this administrative power to grant hardship applications under § 1866(c)(1) on an *ex parte* basis.  As we explained, "[o]rdinarily it falls to the jury clerks or commissioners to excuse jurors for hardship, a practice that has been approved by the courts," and "[s]urely the fact that this time the excusing was done by a judge sitting in his courtroom does not alter the essential nature of what was done." *Calaway*, 524 F.2d at 616; *see also United States v. Greer*, 285 F.3d 158, 168 (2d Cir. 2002) ("[H]ardship questioning is not a part of *voir dire*—and thus not a critical stage of the trial during which the parties and counsel must be present."); *United States v. Woodner*, 317 F.2d 649, 651 (2d Cir. 1963) ("Ordinarily, the jury clerks hear such [hardship] excuses, and defendants have the benefit of neither notes nor physical presence."); *cf. also Fay v. New York*, 332 U.S. 261, 271 (1947) ("[W]e cannot find it constitutionally forbidden to set up administrative procedures in advance of trial to eliminate from the panel those who, in a large proportion of cases, would be rejected by the court after its time had been taken in examination to ascertain the disqualifications."), *abrogated on other grounds by Taylor v. Louisiana*, 419 U.S. 522, 536–38 & n.19 (1975).  Accordingly, to the extent that Appellants

challenge the district court's *sua sponte* and *ex parte* excusal of jurors on *hardship* grounds, we reject that contention.

The district court, however, also *sua sponte* excluded other jurors *for cause* based in whole or in part on their perceived ability to be impartial in this particular case. The Government argues that these excusals likewise fall within the permissible scope of routine administrative pre-screening that can be undertaken by the court acting *sua sponte* and *ex parte* and without hearing at all from the parties or their counsel. We reject this contention.

The Government's argument is foreclosed by our decision in *Bordallo*, 857 F.2d 519. In that case, the district court excused a number of prospective jurors for cause after questioning them in the courtroom in the absence of the parties and their counsel. *See id*. at 522. We held that this manner of proceeding was a violation of the Due Process Clause and that, at the very least, "either the defendant or his counsel should have been present." *Id*. at 523. Although we did not cite *Calaway*, we rejected the view that the court's *ex parte* examination of the jurors could be characterized as a permissible form of "ministerial" screening. *Id*. at 522–23. Noting that the district court's actions fell "somewhere between" a purely administrative action and "the formal pretrial narrowing of the pool through voir dire for a particular trial," we concluded that the court's *ex parte* oral examination of the jurors was "more appropriately analogized to voir dire, because the prospective jurors knew which specific case they would hear, and some were excused due to factors related to Bordallo's particular cause." *Id*. at 523; *see also Greer*, 285 F.3d at 168 (citing *Bordallo* and similarly distinguishing between "mere administrative" screening and case-specific inquiries into bias).

Although this case differs from *Bordallo* in that the district court did not undertake an in-person inquiry of the prospective jurors, each of the jurors here had completed a lengthy questionnaire that specifically addressed a number of case-specific concerns about bias for or against one of the parties. As a result, the jurors all "knew which specific case they would hear," and "some were excused due to factors related to [Appellants'] particular cause." *Bordallo*, 857 F.2d at 523. As in *Bordallo*, the court's failure here to obtain the input of the defendants and counsel before excluding jurors for cause based on case-specific concerns about bias creates a risk that the "judge, either consciously or inadvertently," could "adversely affect[] the neutrality of the juror pool." *Id*. By making case-specific determinations of potential bias based on prospective jurors' written comments about this specific case, the district court went well beyond the sort of administrative screening that may be conducted on an *ex parte* basis under *Calaway*. Although *Bordallo* involved *in-person* "court contacts with jurors," *id*. at 522, *Bordallo*'s broader reasoning confirms that the district court's case-specific elimination of jurors for potential bias in this matter went beyond administrative screening and crossed into the actual juror-selection process for this particular case. As part of that process, the district court's case-specific excusal of particular jurors for cause constituted a "critical stage" of the proceedings with respect to which, at the very least, Appellants had the right to counsel and the right to be heard.[4]

---

[4] We address below Appellants' further argument that, in light of the specific rights that they invoke, the *manner* in which the parties and counsel provide their input must be an in-court hearing at which the defendants and the public attend. *See infra* section II(B)(3).

The Government nonetheless asserts that the Jury Selection and Service Act ("the Act") and the District of Oregon's Juror Management Plan ("the Plan") specifically authorized the district court's actions, thereby confirming their purely administrative nature.  That is wrong, because nothing in the Act or in the Plan authorized the district court's actions here, much less confirms that they may be deemed to be purely administrative for constitutional purposes.[5]

The relevant portions of the Act are codified in Chapter 121 of Title 28 of the United States Code.  Section 1866(c) of that title enumerates five grounds for excusing otherwise qualified jurors from service.  Specifically, prospective jurors may be excused (1) "upon a showing of undue hardship or extreme inconvenience"; (2) "on the ground that such person may be unable to render impartial jury service or that his service as a juror would be likely to disrupt the proceedings"; (3) "upon peremptory challenge as provided by law"; (4) "upon a challenge by any party for good cause shown"; and (5) "upon determination by the court that his service as a juror would be likely to threaten the secrecy of the proceedings, or otherwise adversely affect the integrity of jury deliberations."  28 U.S.C. § 1866(c)(1)–(5).  The Government notes that § 1866 explicitly requires that any "exclu[sion] *under clause (5)* of this subsection" must be made "in open court," *see id*. § 1866(c)(5) (emphasis added), and that no such express requirement applies to exclusions

---

[5] We emphasize that we are construing the Act and the Plan only because the Government has invoked them as persuasive authority in defining the scope of a court's permissible administrative pre-screening of jurors.  As the Government correctly notes, Appellants have not pressed in this court any contention that their convictions should be set aside due to violations of the Act or the Plan themselves.

for inability "to render impartial jury service" under clause (2). It therefore argues that, under the Act, exclusions for bias may be made *sua sponte* by the court based on its review of case-specific questionnaires. *See United States v. Contreras*, 108 F.3d 1255, 1269 n.9 (10th Cir. 1997) (stating that, in light of the Act's specific in-court requirement for excusals under only one clause of § 1866(c), "we can logically infer that it may be permissible for a court to exclude a juror for hardship *or bias* prior to *voir dire*") (emphasis added). This argument fails.

The fact that § 1866(c) does not *itself* expressly require in-court hearings for each of the other four categories of exclusions does not mean that those exclusions are all administrative in nature and may therefore be conducted by the court *ex parte* and *sua sponte*. Nothing in the language of § 1866(c) purports to foreclose the possibility that *other* sources of law—such as the Constitution or the Federal Rules of Criminal Procedure—may preclude *ex parte* action by the court with respect to the enumerated categories of exclusions. Thus, although the list of remaining exclusions in § 1866(c) includes "hardship" exclusions that may be made by the court clerk *ex parte* in an administrative capacity, *see id*. § 1866(c)(1), it *also* includes other categories of exclusions that plainly qualify as a trial stage to which the rights to presence and counsel would ordinarily attach. For example, § 1866(c)(3) refers to the exclusion of jurors pursuant to peremptory challenges, and there can be no doubt that the constitutional rights to presence and to counsel attach to the exclusion of jurors on that basis. *See United States v. Thomas*, 724 F.3d 632, 642–43 (5th Cir. 2013) (holding that defendant's constitutional rights to counsel and to presence apply to the exercise of peremptory challenges); *cf. Bordallo*, 857 F.2d at 522 ("Clearly counsel

must be present for the examination of the prospective jurors *and exercise of peremptory challenges*") (emphasis added); Moreover, another subsection of § 1866(c) addresses exclusions "by any *party* for good cause shown," 28 U.S.C. § 1866(c)(4) (emphasis added), and such exclusions obviously cannot be made without the participation of the parties and counsel.   Accordingly, the Government's suggestion that all of the other types of exclusions listed in § 1866(c) are administrative and ministerial in nature, and therefore may be conducted by the court an *ex parte* basis, is patently incorrect.

The Government's argument is further undermined by the relevant language of the District of Oregon's Plan.  That Plan *separately* discusses the first ground for exclusion listed in § 1866(c)—*i.e.*, exclusions for "undue hardship," *see id*. § 1866(c)(1)—in a section of the Plan that addresses excusals and exemptions from jury service that may be made by the *clerk* under the supervision of the court.  *See* District of Oregon, Juror Management Plan § 3.04(c)(2) (February 2, 2015).  The other four grounds for exclusion listed in § 1866(c) are addressed in a later section of the Plan that merely tracks the statutory language without elaboration. *See id*. § 5.01(a)–(d).  If anything, the Plan arguably reflects the view that, among the five grounds listed in § 1866(c), only exclusions for "hardship" qualify as the sort of administrative pre-screening that may be conducted *ex parte* by the court or the clerk.

More broadly, the Government's argument that the district court's for-cause exclusions constitute permissible administrative screening overlooks the fact that exclusions for cause "may encompass both the generic *and the case-specific*."  *United States v. Spriggs*, 102 F.3d 1245, 1253 (D.C. Cir. 1996) (emphasis added).  Thus, even assuming

that there might conceivably be some instances in which, acting on an *ex parte* basis and in an administrative capacity, a court might make a *generic* exclusion from jury service due to an inability to be impartial—*e.g.*, a categorical exclusion, from criminal jury service, of the spouse or adult children of the local U.S. Attorney—that does not mean that determinations of bias *based on individual juror comments that are specific to a particular criminal case* stand on the same footing and may also be made administratively on an *ex parte* basis. As we have explained, that was the critical line we drew in *Bordallo*, and the for-cause exclusions that occurred here were therefore not administrative or ministerial in nature.

**3**

Having concluded that the excusal of jurors for cause based on case-specific determinations of bias constitutes a critical stage of the proceedings with respect to which the parties and their counsel must be given an opportunity to be heard, we next consider the parties' contentions as to whether the respective rights that Appellants invoke were violated in a manner that requires reversal.

**a**

Appellants contend that the district court was required to receive that input at an *in-person hearing* at which the parties, their counsel, and the public would be present. In making this argument, Appellants rely heavily on *Bordallo*, in which we held that the defendant's right to presence under both the Due Process Clause and Rule 43 was violated when neither the defendant nor his counsel was present during the court's in-court questioning and excusal of jurors based on case-specific issues of potential bias. 857 F.2d at 522–23.

We reject this contention, because this case differs from *Bordallo* in a crucial respect.

As we explained earlier, Appellants here agreed to a procedure whereby the jurors would initially be screened based *solely* on their answers to a paper questionnaire. *See supra* section II(A)(2). Accordingly, the only question the court was asked to decide was whether a particular juror's written questionnaire responses were sufficiently disqualifying *on their face* that there was *no need for* live voir dire at which the juror would be interrogated. If the court could not make that conclusion based solely on the paper record, then—and only then—would the juror in question be summoned for individual voir dire in open court.

In *Bordallo*, by contrast, the defendant and his counsel were absent from the court's *in-person* "question[ing]" of individual jurors "about their knowledge of a specific case." 857 F.2d at 522. Such "in-the-moment *voir dire*" allows for "a more intimate and immediate basis for assessing a venire member's fitness for jury service," because those present to observe that questioning can directly assess "the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." *Skilling v. United States*, 561 U.S. 358, 386–87 (2010). It is not surprising, therefore, that we concluded in *Bordallo* that the absence of the defendant and counsel from such in-person questioning violated the defendant's due process rights and Rule 43. 857 F.2d at 522–23. But in Appellants' case, the district court's for-cause excusal decisions did not involve any such in-person interaction with prospective jurors; instead, they involved only determinations as to whether the paper record, by itself, warranted for-cause challenges. As a result, Appellants' rights to be present did not require that the district court afford them an in-person hearing to resolve

those issues.  Indeed, Rule 43 expressly states that it does not provide a right for a defendant to be present at a "proceeding involv[ing] only a conference or hearing on a question of law," *see* FED. R. CRIM. P. 43(b)(3), and we held in *Reyes* that a "side bar exchange where the court decides whether to excuse a juror for cause is . . . 'a conference or hearing on a question of law' at which the defendant need not be present under Rule 43(b)(3)," 764 F.3d at 1191.  And we further held in *Reyes* that, so long as the defendant has had adequate opportunities to confer with his or her counsel before the conference, the defendant does not have a constitutional right to be present at a side-bar conference at which counsel for both sides address the question whether to excuse a particular juror for cause.  *See id.* at 1196–97 (describing such side-bars as "prototypical examples of instances 'when presence would be useless, or the benefit but a shadow'" (quoting *Snyder*, 291 U.S. at 106–07)).

We have recognized that an "evidentiary hearing" may be required on a motion in a criminal case, such as a motion to suppress, if the motion makes a sufficient showing of a need to resolve "contested issues of fact" that must be decided by the court.  *United States v. Cook*, 808 F.3d 1195, 1201 (9th Cir. 2015) (citation omitted).  But we are aware of no authority that would require the district court to hold an in-court hearing to resolve issues that can be adequately addressed and resolved on the papers.  *See* 1A CHARLES ALAN WRIGHT & ANDREW D. LEIPOLD, FEDERAL PRACTICE AND PROCEDURE § 195 (5th ed. 2020) (noting that, absent a "showing that there are material facts in dispute that require a hearing to resolve," a "party is not entitled to a hearing on a motion" in a criminal case).  Accordingly, nothing in the Due Process Clause or the Federal Rules of Criminal Procedure would have precluded the district court, for

example, from requiring the parties to submit briefs detailing their respective arguments concerning whether particular jurors should be excused based on their questionnaire responses alone and then issuing a written ruling based solely on those briefs.  To be sure, Appellants expected, based on the district court's juror management order, that their recommendations regarding whether jurors would be excused for cause would be considered during an in-court hearing where Appellants and their counsel would have been present.  But given that the matter to be resolved raises only the question of whether the questionnaire responses alone were disqualifying, Appellants' rights to be present, whether under the Constitution or the federal rules, did not give them the right to insist on an in-person hearing to resolve those matters.[6]

Moreover, because the sole public access claim raised here relates to public access to in-court hearings, *see supra* note 3, there was likewise no violation of Appellants' right to a public trial.  That is, even assuming that Appellants' public-trial rights would have extended to a hearing on these for-cause exclusions had one been held, *cf. Waller v. Georgia*, 467 U.S. 39, 46–47 (1984) (holding that a defendant's public-trial right extends to a pretrial hearing on a motion to suppress); *United States v. Allen*, 34 F.4th 789,

---

[6] The concurrence construes Appellants' right-to-presence arguments as not really being about *presence*, but about the opportunity for the defendant to have input in the jury selection process. *See* Concur. at 154. We agree that, as we have explained, *see supra* at 32, a defendant has a due process right to be heard even as to matters that do not involve or require an in-person hearing—a right that is typically satisfied if the defendant's counsel has had sufficient opportunity for input into those matters.  But it seems anomalous to analyze such right-to-be-heard issues under the rubric of a right to "presence."

800–01 (9th Cir. 2022), the Sixth Amendment right to a public trial does not create a right to *have* an in-court oral argument on such a question, so that the public can then attend it. Although there are some instances in which the Sixth Amendment right to a public trial affirmatively requires an in-court proceeding that the public can then attend, *see Ramirez-Ramirez*, 45 F.4th at 1110–11 (holding that the Sixth Amendment right to a public trial requires that the verdict in a bench trial be announced "in a public proceeding" in court), the resolution of a matter suitable for decision on a strictly paper record is not one of those instances.

Furthermore, there is no sense in which the Sixth Amendment right to counsel or the due process right to be heard requires an in-person hearing on the question of whether a juror's written questionnaire sufficiently disclosed grounds for excusal for cause. *See Dredge Corp. v. Penny*, 338 F.2d 456, 462 n.14 (9th Cir. 1964) ("The opportunity to be heard orally on questions of law is not an inherent element of procedural due process, even where substantial questions of law are involved."); *cf. United States v. Birtle*, 792 F.2d 846, 848 (9th Cir. 1986) (rejecting the view that failure of counsel to appear at oral argument amounts to a per se Sixth Amendment violation, noting that "[o]ral argument on appeal is not required by the Constitution in all cases; nor is it necessarily essential to a fair hearing"). So long as there is a sufficient opportunity to be heard with respect to such a matter, an in-person hearing is not constitutionally compelled.

Accordingly, an in-person hearing was not required to resolve these paper-based juror-excusal decisions. And, as a result, Appellants' right-to-presence and public-trial claims necessarily fail.

**b**

Appellants also contend, however, that even if an in-person hearing was not required, the district court's *sua sponte* and *ex parte* for-cause excusals (1) amounted to a complete denial of the assistance of counsel at a critical stage of the trial proceedings, requiring automatic reversal without any harmless error inquiry, under *United States v. Cronic*, 466 U.S. 648, 658–59 (1984); and (2) deprived them of a sufficient opportunity to be heard in violation of their due process rights. Under the specific circumstances of this case, we reject these arguments.

As we have explained, the particular question addressed by the district court involved a strictly paper review of the jurors' already-completed questionnaires for the presence of disqualifying bias. As such, it did not entail any live interaction with those prospective jurors or any other development of the factual record. *Cf. Gomez v. United States*, 490 U.S. 858, 874–75 (1989) (holding that voir dire erroneously conducted by a magistrate judge without the parties' consent could not "meaningfully" be reviewed, because such voir dire turned on "not only spoken words but also gestures and attitudes of all participants to ensure the jury's impartiality"). And because the only issue was whether the paper record already made clear that particular jurors should be excused for cause without conducting in-person voir dire, the task did not involve spotting and raising any other legal issues. Given the resulting very limited nature of the inquiry, any errors in excusing particular jurors *sua sponte* based on the questionnaires alone can be readily and fully identified by undertaking a retrospective review of those questionnaires. Indeed, such a retrospective review of the *substance* of the district court's *sua sponte* rulings is not materially different from the review that we would have

conducted had Appellants chosen to challenge on appeal the correctness of any of the many juror-excusal rulings that the district court made after receiving the parties' input at the February 7, 2017 status conference.

Moreover, at Appellants' request, all of the questionnaires at issue here—which contained the district court's handwritten rulings concerning the particular prospective jurors—were preserved and were made available to counsel after the fact. In response to a defense inquiry at the February 8, 2017 pretrial status conference, the court stated that all of the questionnaires, together with the court's handwritten comments, would be preserved. No defendant requested the opportunity to review those questionnaires in advance of the trial. After the convictions had been appealed, Appellants' counsel filed an unopposed motion to be granted access to the relevant juror materials and to have them added formally to the record. In February 2019, the district court granted this motion in part, allowing defense counsel the right "to inspect and to copy unredacted versions of the case-specific Juror Questionnaires and Jury Service Excuse Forms." However, given the volume of paper records involved, the court declined to "scan and/or file these voluminous records on the docket." Instead, the court invited defense counsel, after inspection of the questionnaires, to identify whatever subset they wished to add to the formal record and to file a further motion to accomplish that. After a review of the juror questionnaires was completed, Appellants' counsel filed such a motion in the district court to formally add to the record the particular subset of juror materials that counsel had identified, which involved a total of nine prospective jurors. The court granted that motion, and those materials have been provided to this court. Having thus had the benefit of defense counsel's

after-the-fact review of the questionnaires, we are fully able to review whether the nine *ex parte* excusals identified by Appellants' counsel were improper.

Against this backdrop, we reject Appellants' argument that the proceedings below entailed a complete deprivation of the right to counsel with respect to a critical stage, so as to warrant automatic reversal under *Cronic*. Appellants correctly note that the Supreme Court has held (1) that the Sixth Amendment right to counsel attaches to "pretrial proceedings" that constitute a "*critical stage*[] of the proceedings," *Ash*, 413 U.S. at 310–11 (emphasis added) (citation and internal quotation marks omitted); and (2) that structural error occurs, without the need to make any "showing of prejudice," if a defendant is completely deprived of the assistance of counsel "at a *critical stage* of his trial," *Cronic*, 466 U.S. at 659 & n.25 (emphasis added). But despite this similarity in terminology, we have repeatedly rejected the view that every "critical stage" to which the right of counsel *attaches* is "necessarily the sort of 'critical stage' at which the deprivation of that right *constitute[s] structural error*" under *Cronic*. *Ayala v. Wong*, 756 F.3d 656, 673 (9th Cir. 2014) (emphasis added), *rev'd on other grounds sub nom. Davis v. Ayala*, 576 U.S. 257, 267 (2015); *see also United States v. Martinez*, 850 F.3d 1097, 1103 n.4 (9th Cir. 2017); *United States v. Mohsen*, 587 F.3d 1028, 1031–32 (9th Cir. 2009); *United States v. Owen*, 407 F.3d 222, 227–28 (4th Cir. 2005). Instead, a denial of counsel at a critical stage to which the right to counsel attaches will require automatic reversal only if the relevant actions taken at that stage "hold[] such 'significant consequences' for the overall proceeding that *a prejudice inquiry is impractical*." *Martinez*, 850 F.3d at 1103 n.4 (citations omitted) (emphasis added); *see also Woods v.*

*Donald*, 575 U.S. 312, 318 (2015) (stating that automatic reversal for complete denial of counsel at a critical stage "applies in 'circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified'" (citation omitted)). Under that standard, automatic reversal is not warranted here.

We conclude that three unique features of this case combine to make per se reversal inappropriate. First, as we have repeatedly emphasized, the challenged decisions involved the resolution of a carefully focused question based solely on a discrete paper record. Second, Appellants' attorneys were subsequently able to review all of the juror materials in question and to identify whichever ones they wished to submit to the court as reflecting potentially erroneous for-cause excusals. As a result, we are fully able to assess Appellants' contentions—made with the assistance of their counsel—as to whether the identified *ex parte* excusals by the court were unwarranted. Third, as we shall explain, our review of those questionnaires here leads us to conclude that none of the challenged excusals were improper. Under these circumstances, we cannot say that a "prejudice inquiry is impractical," *Martinez*, 850 F.3d at 1103 n.4, or that the "circumstances . . . are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," *Woods*, 575 U.S. at 318 (citation omitted).

In considering whether any of the *ex parte* excusals identified by Appellants with the assistance of counsel were improper, we are presented with an initial threshold question as to what standard of review we should apply in examining the correctness of the district court's for-cause excusals. We do not appear to have specifically addressed what standard of review applies when the district court excuses a juror for

cause based solely on a written questionnaire, and other circuits appear to have taken differing views, at least in the death penalty context. *Compare United States v. Chanthadara*, 230 F.3d 1237, 1270 (10th Cir. 2000) (applying de novo review where for-cause excusals were based on questionnaires), *with United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005) (expressly rejecting *Chanthadara* on this point). Moreover, the fact that we are confronting this question in the context of a retrospective review of excusals that were made without advance input from counsel raises the question whether we should apply the standard of review applicable to claims of constitutional error—namely, whether the error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 21–22 (1967); *cf. Mohsen*, 587 F.3d at 1031–32 (applying *Chapman* standard to failure to consult with counsel before responding to jury note). Applying the *Chapman* standard in this context would require us to consider whether we can say, beyond a reasonable doubt, that the challenged excusals were proper. *See Bordallo*, 857 F.2d at 523 (applying that standard in the context of evaluating excusals made during an in-court voir dire from which the defendant and counsel were excluded). We need not resolve this question as to the proper standard of review for evaluating the correctness of the district court's excusals in this specific context. Even assuming that the most demanding standard applies—*i.e.*, the *Chapman* standard—we conclude that the excusals were proper.

Having examined the juror materials identified by Appellants' counsel, we note at the outset that the record makes clear that at least one of the nine prospective jurors whom counsel has identified was excused or deferred due to *hardship* reasons, not bias. As we have explained, the

district court did not err in making such exclusion decisions
*ex parte*.  Turning to the remaining eight jurors identified,
we conclude that there is no reasonable doubt that these eight
jurors were properly excluded.

For starters, one of the excused prospective jurors stated
that her husband was a member of a SWAT team that had
responded to the occupation of the Malheur NWR.  Four
others expressed strong opinions about the case on their
questionnaires and declared that they could not be impartial.
*See United States v. Paradies*, 98 F.3d 1266, 1279 (11th Cir.
1996) (upholding exclusion of jurors for cause, based solely
on paper questionnaires, when the potential jurors
"professed that they were badly prejudiced against one
side").    Another prospective juror admitted that, after
receiving the jury questionnaire but before reviewing its
instructions closely, he had (improperly) researched the case
on the internet for nearly 90 minutes.  *See United States v.
North*, 910 F.2d 843, 910 (D.C. Cir. 1990) (upholding
exclusion of jurors based solely on written questionnaire
indicating "significant" familiarity with highly publicized
inadmissible evidence), *withdrawn in part on other grounds
on rehearing*, 920 F.2d 940 (D.C. Cir. 1990).  As to the
remaining two jurors, they were deferred from jury service
after expressing both significant hardship concerns as well
as issues concerning an inability to follow court instructions
or to be impartial.  The record thus does not make entirely
clear whether these two deferrals were solely for hardship
reasons, but viewing the respective juror materials as a
whole, we conclude that these exclusions were also proper.
We are thus satisfied beyond a reasonable doubt that, as in
*Bordallo*, "[t]he record is clear that those particular

prospective jurors who were released would and should have been released in any event." 857 F.2d at 523.[7]

To sum up, this is a case in which (1) the district court made *ex parte* for-cause excusals based solely on a discrete paper record; and (2) defense counsel subsequently had the opportunity to review that complete paper record and to identify any jurors whose excusal was questionable. We therefore conclude that this is not a situation in which there was a "complete denial of counsel" with respect to a critical stage in the sense in which *Cronic* uses that phrase, and that automatic reversal is not warranted. 466 U.S. at 659. We have further concluded, beyond a reasonable doubt, that the nine jurors identified by counsel were properly excused. For the reasons we explained earlier, it follows from these premises that the district court's failure to consult with counsel or the parties in advance did not make any difference. And, given that conclusion, there was no prejudicial impingement on the right to counsel or on the due process right to be heard with respect to these strikes. *See Bordallo*, 857 F.2d at 523.

---

[7] The concurrence contends that, in the absence of implied bias, a district court ordinarily cannot excuse a prospective juror based on perceived impartiality or familiarity with the case unless it first "conduct[s] inquiry before excusing the juror for cause." *See* Concur. at 143. That position, which would effectively outlaw the use of questionnaires to conduct an initial level of for-cause screening, is not one that Appellants have raised in this case. On the contrary, Appellants clearly consented to a process in which such screenings *could* occur based on the questionnaires alone, and large numbers of jurors were excluded, with counsel's input, based only on the written questionnaires. *See supra* at 28–30. Because Appellants have clearly forfeited the concurrence's argument that no such paper-based excusals are permissible except in implied-bias cases, we need not consider whether the result would be different had Appellants preserved such an objection.

Accordingly, there is no reversible error on this score. It should nonetheless be clear from our discussion that we cannot and do not endorse what the district court did here. To make case-specific excusals of prospective jurors for cause without having first obtained the input of the parties and counsel is improper and unnecessarily risks injecting reversible error into the proceedings. We do not expect to be confronted with such a practice ever again.

## III

Appellants argue that the district court violated their Sixth Amendment right to trial by jury when, over their objections, the court refused to submit to the jury the various misdemeanor charges that had also been brought against them. Reviewing de novo, *see United States v. Charette*, 893 F.3d 1169, 1172 (9th Cir. 2018), we conclude that the district court did not err.

## A

Appellants contend, as a threshold matter, that the Sixth Amendment requires a jury trial in all criminal cases, including misdemeanors. They note that the literal words of the Sixth Amendment state, without exception, that "[i]n *all* criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. CONST. amend. VI (emphasis added). The jury trial provision set forth in the original Constitution likewise states that "[t]he Trial of *all* Crimes, except in Cases of Impeachment, shall be by Jury." U.S. CONST. art. III, § 2 (emphasis added). Appellants concede, however, that the Supreme Court has long held "that the Sixth Amendment, like the common law, reserves this jury trial right for prosecutions of serious offenses, and that 'there is a category of *petty crimes or offenses* which is not subject to the Sixth Amendment jury

trial provision.'" *Lewis v. United States*, 518 U.S. 322, 325 (1996) (emphasis added) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 159 (1968)). That binding precedent requires us to reject Appellants' argument that they were entitled to a jury trial even if the charged misdemeanor offenses were properly classified as "petty" offenses.

Appellants nonetheless assert that the continued validity of the petty-offense exception to the jury-trial right has been called into question by the line of Supreme Court cases beginning with *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Under the *Apprendi* line of cases, any fact that would increase the maximum sentence, or that would trigger or increase a mandatory minimum sentence, constitutes an element of the offense and must be found by the jury. *See Alleyne v. United States*, 570 U.S. 99, 111–17 (2013); *Apprendi*, 530 U.S. at 490. But the *Apprendi* line of cases merely defines the scope of what must be submitted to the jury in the trial of an offense to which the jury-trial right applies; it does not purport to alter the settled understanding of *which* offenses trigger that right in the first place. This conclusion is confirmed by the Supreme Court's decision in *Southern Union Co. v. United States*, 567 U.S. 343 (2012), which held that any fact that would alter the range of criminal fines that may be imposed is an element of the offense that is subject to *Apprendi*'s rule. *See id.* at 360. In the course of reaching that conclusion, the Court stated:

> Where a fine is so insubstantial that the underlying offense is considered "petty," the Sixth Amendment right of jury trial is not triggered, and no *Apprendi* issue arises. The same, of course, is true of offenses punishable by relatively brief terms of

imprisonment—these, too, do not entitle a defendant to a jury trial.

*Id*. at 350–51 (citations omitted). *Southern Union* makes clear that the *Apprendi* line of cases leaves undisturbed the long-recognized petty-offense exception to the jury-trial right.

**B**

"In determining whether a particular offense should be categorized as 'petty,'" the Supreme Court has emphasized reliance on "objective indications of the seriousness with which society regards the offense." *Blanton v. City of North Las Vegas*, 489 U.S. 538, 541 (1989) (citations omitted). The "most relevant [of] such criteria" is "the maximum authorized penalty," which often best reflects the legislative judgment as to the seriousness of an offense. *Id*. (citations omitted). In some cases, "the length of the authorized prison term or the seriousness of other punishment is enough in itself to require a jury trial," and the Court has found that to be true "whenever the offense for which [the defendant] is charged carries a maximum authorized prison term of greater than six months." *Id*. at 542 (citations and emphasis omitted). By contrast, where the maximum sentence is six months or less, the offense is presumed to be a petty offense, and a "defendant is entitled to a jury trial in such circumstances only if he can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." *Id*. at 543; *see also United States v. Clavette*, 135 F.3d 1308, 1310 (9th Cir. 1998) (holding that "the addition of a $25,000 fine to a

prison term of not more than six months" was insufficient to rebut the presumption that the offense was petty).

Given the central role that the statutory maximum penalty plays in this analysis, the first question we must decide is *which* statutory provision Appellants have been charged with violating. That would ordinarily be a simple question of examining what statutory violation is alleged in the charging document. But where the charged offenses involve violations of *regulations* that Congress has made it a crime to disobey, the matter can be more complicated. In the case before us, the parties disagree as to which criminal statutes underlie the relevant regulations, and the competing alternative statutes do not have the same maximum penalty. We conclude that *both* of the respective statutes cited by Appellants and by the Government apply to the relevant regulations and that, as a result, the Government had the prosecutorial discretion to invoke either statute in charging a violation of the regulations. And because the charging information here makes clear that the Government invoked a statute that defines only a petty offense, Appellants had no right to a jury trial for these regulatory violations.

**1**

We begin with the language of the charging information. Each of the five relevant counts in that information[8] alleges that one or more Appellants committed certain conduct in violation of specified regulations "and Title 16, United States Code, Section 460k-3, a Class B misdemeanor." Each of those five counts charges a violation of one of the following three regulations: (1) 50 C.F.R. § 26.21(a), which

---

[8] The respective Appellants were acquitted on two of the seven individual charges.

prohibits "trespass[ing]" in "any national wildlife refuge"; (2) 50 C.F.R. § 27.65, which prohibits "[t]ampering with . . . any motor vehicle, boat, equipment or machinery on any national wildlife refuge without proper authorization"; and (3) 50 C.F.R. § 27.61, which prohibits "[t]he destruction . . . or the unauthorized removal of any public property . . . on or from any national wildlife refuge."[9]

The statutory section referenced in the information is § 4 of the Refuge Recreation Act ("RRA"), Pub. L. No. 87-714, 76 Stat. 653, 654 (Sept. 28, 1962), which has been classified, as amended, to 16 U.S.C. § 460k-3.[10] Section 4 of the RRA is one of the cited sources of authority under which the three relevant regulations were issued in their current form in 1976. *See* 41 Fed. Reg. 9166, 9168, 9170 (Mar. 3, 1976). Section 4 authorizes the Secretary of the Interior "to issue regulations to carry out the purposes" of that Act, *see* 16 U.S.C. § 460k-3, and those purposes include ensuring that any "public recreation" allowed "on areas within the National Wildlife Refuge System" is "compatible with, and will not prevent accomplishment of, the primary purposes for which the said conservation areas were acquired or established," *id*. § 460k. The cited regulatory prohibitions against trespassing, destruction or unauthorized removal of

---

[9] Each of the counts also cites the regulatory provision that describes the penalties associated with these regulations, but that provision merely states that a violation of one of the regulations contained in the relevant subchapter of the Code of Federal Regulations "may render such person liable" to the "penalties as prescribed by law." *See* 50 C.F.R. § 28.31. That provision thus does not purport to identify which *statutory* penalty provision is associated with which regulatory prohibition; instead, it merely string-cites all of the potentially applicable statutory provisions.

[10] Unlike certain other titles of the U.S. Code, Title 16 has not been enacted as positive law. *See* 1 U.S.C. § 204(a); 2 U.S.C. § 285b(4).

property, and unauthorized tampering with vehicles or machinery are all reasonably related to these statutory objectives of ensuring that members of the public will not interfere with the primary purposes of a national wildlife refuge. *See Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 369 (1973) ("Where the empowering provision of a statute states simply that the agency may make such rules and regulations as may be necessary to carry out the provisions of this Act, we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is reasonably related to the purposes of the enabling legislation." (simplified)).

That remains true even when those regulations are applied to persons (such as Appellants) whose presence in a refuge would perhaps not be thought of as "recreation" in the ordinary sense of that term. The authority to admit members of the public to a refuge (or parts within it) for specified purposes necessarily includes the authority to prohibit unauthorized entry (*i.e.*, trespassing). And that authority, as well as the authority to regulate the behavior of members of the public admitted to a refuge for recreation purposes, is reasonably furthered by across-the-board regulations against misbehavior by any members of the public who happen to be within a refuge. The issuance and enforcement of the three relevant regulations at issue here thus are amply supported, in their current form, based just on the regulatory authority conferred by § 4 of the RRA.

To the extent that § 4 of the RRA provides the relevant statutory authority underlying the three regulations that Appellants are charged with violating, § 4 specifies that a "violation of such regulations shall be a misdemeanor with maximum penalties of imprisonment for not more than six months, or a fine of not more than $500, or both." 16 U.S.C.

§ 460k-3.  However, under the alternative maximum fines provisions of Title 18 of the U.S. Code, the maximum fine that would be available for a violation of a regulation issued under § 4 of the RRA is actually $5,000 rather than $500. *See* 18 U.S.C. §§ 3559(a)(7), 3571(b)(6), (e).  Because the maximum term of imprisonment is six months or less, a violation of a regulation issued under § 4 of the RRA is presumptively a petty offense.  *See Blanton*, 489 U.S. at 543. And under *Clavette*, the addition of a maximum fine of $25,000 or less (such as the $5,000 maximum fine here) is insufficient to rebut that presumption.  135 F.3d at 1310. Accordingly, to the extent that § 4 of the RRA provides the relevant statutory offense here, the violations charged here were petty offenses and Appellants were not entitled to a jury trial.

However, as Appellants note, the 1976 notice issuing these regulations cited, as an *additional* source of authority, § 4 of the National Wildlife Refuge System Administration Act of 1966 ("NWRSAA"), Pub. L. No. 89-669, 80 Stat. 926, 927 (Oct. 15, 1966), which has been classified, as amended, to 16 U.S.C. § 668dd.  Section 4(b)(5) of the NWRSAA authorizes the Secretary of the Interior to "[i]ssue regulations to carry out" that Act.  *See* 16 U.S.C. § 668dd(b)(5).  The broadly defined purposes of the NWRSAA include the protection of the "biological integrity, diversity, and environmental health" of areas within the "National Wildlife Refuge System"; the "conservation of fish, wildlife, and plants, and their habitats within the System"; and the regulation of "public uses of the System," including "priority general public uses" such as "compatible wildlife-dependent recreational uses," through the imposition of such "restrictions" on public use "as may be necessary, reasonable, and appropriate."     *Id*.

§ 668dd(a)(1), (a)(3)(D), (a)(4)(A), (a)(4)(B), (a)(4)(H)–(J). This regulatory authority conferred by the NWRSAA is likewise sufficient, on its own, to support the three relevant regulatory prohibitions against trespassing, the destruction or removal of property, or tampering with vehicles or equipment in national wildlife refuges. *See Mourning*, 411 U.S. at 369.

But in contrast to the penalty provision in § 4 of the RRA, the criminal provision of the NWRSAA, which is contained in § 4(f), draws a distinction between a "person who *knowingly* violates or fails to comply with . . . any regulations issued" under the NWRSAA and a "person who *otherwise* violates or fails to comply with" such a regulation. 16 U.S.C. § 668dd(f)(1)–(2) (emphasis added). The former is subject to "imprison[ment] for not more than 1 year" and/or a fine of up to $100,000, while the latter is subject only to imprisonment for "not more than 180 days" and/or a fine of up to $5,000. *See id.*; 18 U.S.C. §§ 3559(a)(6)–(7), 3571(b)(5)–(6). As Appellants note, the information here affirmatively alleged that each of the charged regulatory violations was committed "knowingly." Accordingly, if § 4(f) of the NWRSAA is the relevant criminal provision here, then the maximum sentence of imprisonment was one year and Appellants were entitled to a jury trial. *Blanton*, 489 U.S. at 542.

**2**

Appellants make a series of arguments as to why the only criminal provision that can properly be applied here is § 4(f) of the NWRSAA, to the *exclusion* of § 4 of the RRA. None are persuasive.

First, Appellants contend that, by its terms, § 4 of the NWRSAA must be understood as superseding § 4 of the

RRA.  In making this argument, Appellants point to § 4(a)(1) of the NWRSAA, which provides, as pertinent here:

> *For the purpose of consolidating the authorities* relating to the various categories of areas that are administered by the Secretary for the conservation of fish and wildlife, including species that are threatened with extinction, *all lands, waters, and interests therein administered by the Secretary as wildlife refuges*, areas for the protection and conservation of fish and wildlife that are threatened with extinction, wildlife ranges, game ranges, wildlife management areas, or waterfowl production areas *are hereby designated as the "National Wildlife Refuge System"* (referred to herein as the "System"), *which shall be subject to the provisions of this section*, and shall be administered by the Secretary through the United States Fish and Wildlife Service.

16 U.S.C. § 668dd(a)(1) (emphasis added).  Appellants assert that, by providing for the "consolidat[ion]" of authorities concerning areas within the National Wildlife Refuge System and by stating that all such areas "shall be subject to the provisions of this section," § 4(a)(1) of the NWRSAA "supersedes any other provision" on the same subject, such as § 4 of the RRA.  This contention fails.

Appellants' claim that § 4 of the NWRSAA supersedes § 4 of the RRA is refuted by the text of the NWRSAA itself. Section 4(i) of the NWRSAA expressly states that "[n]othing in this section shall be construed to amend, repeal, or

otherwise modify the provision of the Act of September 28, 1962 (76 Stat. 653; 16 U.S.C. 460k–460k-4) which authorizes the Secretary to administer the areas within the System for public recreation." 16 U.S.C. § 668dd(i). The cross-referenced statute that is thereby expressly preserved is none other than the RRA, including specifically § 4 (16 U.S.C. § 460k-3). Moreover, § 4(i) of the NWRSAA further states that the provisions of § 4 of the NWRSAA "relating to recreation shall be administered in accordance with the provisions of said Act," *viz*., the RRA. *See* 16 U.S.C. § 668dd(i). Thus, far from superseding the RRA, the NWRSAA both (1) expressly preserves the authority provided in § 4 of that statute and (2) directs that, to the extent that both statutes confer authority to regulate "recreation" in the National Wildlife Refuge System, both statutes must be complied with. And, as we have explained, the three particular core regulatory provisions at issue here— which prohibit trespassing, property destruction and removal, and tampering with equipment or vehicles—all fall within that area of overlap, because they are reasonably related to ensuring that members of the public will physically enter a refuge only if authorized to do so, and that, while they are in the refuge, they do not engage in behavior that could impede the purposes of the refuge.

Appellants nonetheless assert that, in its current form, § 4 of the RRA applies only to "National Conservation Areas" administered by the BLM under § 2002(b)(1)(B) of the Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, 123 Stat. 991, 1095 (2009), which is classified to 16 U.S.C. § 7202(b)(1)(B). Nothing in the relevant statutes supports this view. As amended, the RRA applies to all "*areas within the National Wildlife Refuge System*, national fish hatcheries, *and other conservation areas*

*administered by the Secretary of the Interior for fish and wildlife purposes*." 16 U.S.C. § 460k (emphasis added). Even assuming that Appellants are correct in suggesting that National Conservation Areas managed by the BLM constitute "other conservation areas administered by the Secretary of the Interior for fish and wildlife purposes" (a point we do not decide), the text of the RRA still unambiguously applies to all "areas within the National Wildlife Refuge System," and that System indisputably includes the Malheur NWR. Moreover, under the NWRSAA, that System (including the Malheur NWR) is "administered by the Secretary through the United States Fish and Wildlife Service." *Id*. § 668dd(a)(1).

Appellants also argue that the RRA cannot be invoked here because it applies only to *certain* areas within the National Wildlife Refuge System and not to the entire System. This argument fails. By definition, the "National Wildlife Refuge System" designated in § 4(a)(1) of the NWRSAA consists of all of the "various *categories of areas* that are administered by the Secretary for the conservation of fish and wildlife," including "[1] *all lands*, waters, and interests therein *administered by the Secretary as wildlife refuges*, [2] areas for the protection and conservation of fish and wildlife that are threatened with extinction, [3] wildlife ranges, [4] game ranges, [5] wildlife management areas, or [6] waterfowl production areas." 16 U.S.C. § 668dd(a)(1) (emphasis added). Accordingly, when § 1 of the RRA refers to "areas within the National Wildlife Refuge System," *id*. § 460k, it is referring to any of these six enumerated "categories of areas," *id*. § 668dd(a)(1), and it grants the Secretary authority "to administer *such areas or parts thereof* for public recreation," *id*. § 460k (emphasis added). Contrary to what Appellants contend, the RRA thus applies

to the entirety of any such "area"—including a "wildlife refuge[]"—*and* any "parts thereof."

Appellants argue that, notwithstanding the breadth of the statutory text of the RRA, that statute's more limited scope is confirmed by the fact that (1) it is "found in Subchapter LXVIII" of Title 16 of the United States Code and (2) that subchapter "is entitled 'National Conservation Recreational Areas,' not National Wildlife Refuges." But as noted earlier, Title 16 has never been enacted as positive law, *see supra* note 10, and the enacted text of the RRA, as amended, contains no headings at all.[11] The decision to place the RRA into a "Subchapter LXVIII" and to add the heading "National Conservation Recreational Areas" was thus not made by Congress, but only by the "Office of the Law Revision Counsel" of the House of Representatives, which by statute has the task of assembling the United States Code, "including those titles which are not yet enacted into positive law." 2 U.S.C. § 285b(3). Because the features on which Appellants rely are merely editorial additions made by a congressional office, and not any part of a statute enacted by Congress, they are entitled to no weight and provide no grounds for disregarding the clear statutory text.

Finally, Appellants point to the Code of Federal Regulation's ("CFR") "Parallel Table of Authorities and Rules," which is an "aid[] to users" of the CFR that is prepared under the supervision of the Administrative Committee of the Federal Register and is included as an appendix to the CFR. *See* 44 U.S.C. § 1510(b). As

---

[11] The current text of the RRA, as amended, is available at the website of the Government Publishing Office. *See* https://www.govinfo.gov/content/pkg/COMPS-1621/pdf/COMPS-1621.pdf.

Appellants note, that Table lists the various statutes on which the regulations in the CFR are based, and the *only* entry for 16 U.S.C. § 460k-3 (§ 4 of the RRA) is "50 Part 404," which is a section of the CFR addressing the Papahānaumokuākea Marine National Monument. By contrast, the Table's entry for 16 U.S.C. § 668dd (§ 4 of the NWRSAA) includes "50 Part[] 26" and "50 Parts . . . 27, 28"—which are the parts that contain the regulations at issue here. This argument is unavailing. Just as we see no basis for giving weight to editorial additions to statutes made by a congressional office, we perceive no basis for giving any interpretive weight to user aids prepared under the supervision of the Administrative Committee of the Federal Register. That three-person committee, which consists of the Archivist of the United States, the Director of the Government Publishing Office, and a representative of the Department of Justice, *see* 44 U.S.C. § 1506(a), is not the issuer of any of the pertinent regulations and therefore has no relevant interpretive authority to which we arguably might give deference. *Cf. United States v. Kuzma*, 967 F.3d 959, 971 (9th Cir. 2020) (leaving open the question of whether deference would be given to an agency's interpretation of an "underlying *regulatory* prohibition[], which [is] then enforced by a criminal statute").

In any event, Appellants' argument fails because it ultimately seeks to give weight to what is plainly a set of underlying typographical errors. The Table on which Appellants rely does not appear to reflect any substantive judgment about which statutes support which regulations (which is a further reason not to give it any weight). Rather, it appears merely to be a mechanical compilation of whatever statutes were cited in the underlying Federal Register notices by which the respective regulations were

issued.  The three regulations at issue here are contained in Parts 26 and 27 of Title 50 of the CFR.  The relevant 1976 Federal Register notice lists, among the authorities for Part 26, "Sec. 4, 76 Stat. 654 (16 U.S.C. 460k)," *see* 41 Fed. Reg. at 9168, and among the authorities for Part 27, "Sec. 4, 76 Stat. [*sic*] (16 U.S.C. 460k)," *see id*. at 9169.  The first citation unambiguously refers to § 4 of the RRA, and the second citation, despite omitting the intended page number from the Statutes at Large, also appears to refer to that section.  However, in giving the parallel citation in the unenacted Title 16 of the U.S. Code for the cited "Sec. 4", both citations mistakenly identify it as "(16 U.S.C. § 460k)." *Id*.  Section 460k is *§ 1* of the RRA, not § 4.  The parallel U.S. Code citations provided in the underlying Federal Register notice are thus wrong and should have been listed as "16 U.S.C. 460k-3."   The CFR reproduces that typographical error by dutifully citing, as one of the authorities for Parts 26 and 27, "16 U.S.C. § 460k." *See* 50 C.F.R. Parts 26, 27.  And, of course, the Table on which Appellants rely likewise mechanically lists, under the entries for "16 U.S.C. § 460k," "50 Parts . . . 26, 27."  The absence of "16 U.S.C. § 460k-3" from the CFR's Table is thus merely due to an undetected typographical error in the underlying Federal Register notice.  Undoubtedly, had the correct parallel citation for § 4 of the RRA been supplied, the Table would reflect it.  Appellants' reliance on this table thus amounts to a flawed effort to give controlling weight to a typographical error.

For all of these reasons, we reject Appellants' contention that § 4 of the NWRSAA is the exclusive authority on which the three relevant regulations are based.  On the contrary, each of these two provisions (and potentially others as well)

*independently* provides ample statutory authority for the issuance of the relevant regulations.

**3**

Because the regulations at issue here are independently supported by either statute, the result is the not uncommon situation in which a prosecutor has the option to elect to charge the same underlying violative conduct under different criminal statutes.  The only remaining question then, is which of those options was actually charged in the information here.

The information that constitutes the charging document in this case cites one and only one statute as the basis for the regulatory violations charged here, and that is "16 U.S.C. § 460k-3," which is § 4 of the RRA.  The title of the charging document is "Misdemeanor Information," and directly under that title is the citation "16 U.S.C. § 460k-3."  Each separate count then lists, under the title of the count, the relevant CFR regulation, followed by the citation "16 U.S.C. § 460k-3."  Moreover, the body of each of the charges describes the underlying violation and then concludes with a sentence that uses the following format (with the relevant section numbers for each respective violated regulation added in the blank): "All in violation of Title 50, Code of Federal Regulations, Sections ___, and Title 16, United States Code, Section 460k-3, a Class B Misdemeanor."   A "Class B Misdemeanor" is one in which "the maximum term of imprisonment authorized" is "six months or less but more than thirty days."   18 U.S.C. § 3559(a)(7).   Given this language, it is unmistakable that the Government elected to charge these regulatory violations *only* under § 4 of the RRA, *i.e.*, 16 U.S.C. § 460k-3, which is a Class B misdemeanor.  There is no reference whatsoever to § 4(f)(1)

of the NWRSAA, *i.e.*, 16 U.S.C. § 668dd(f)(1), which carries a maximum sentence of one year in prison and is a Class A misdemeanor. *See* 18 U.S.C. § 3559(a)(6).

Appellants nevertheless argue that because the information expressly charges them with "knowingly" violating 50 C.F.R. §§ 26.21, 27.61, and 27.65, the information *must* be understood as actually relying on § 4(f)(1) of the NWRSAA, 16 U.S.C. § 668dd(f)(1), and as charging a Class A misdemeanor. The necessary premise of this argument is that a scienter of "knowingly" is required *only* for a violation of § 4(f)(1) of the NWRSAA and is *not* an element of a violation of § 4 of the RRA, such that the inclusion of this element describes the offense defined by the former statute rather than the latter. Under this view, the information's references to "16 U.S.C. § 460k-3" and to a "Class B Misdemeanor" would be disregarded as typographical errors. *See* FED. R. CRIM. P. 7(c)(2) ("Unless the defendant [is] misled and thereby prejudiced, neither an error in a citation nor a citation's omission is a ground to dismiss the indictment or information or to reverse a conviction."). This contention is unavailing.

Even assuming that Appellants are correct in contending that a scienter of "knowingly" is not an element of a violation of § 4 of the RRA—a point we do not decide—their argument still fails. There is no assertion here that the information is *missing* any essential element of a violation of § 4 of the RRA, but rather only that an additional superfluous element has been included. *Cf. United States v. Bonallo*, 858 F.2d 1427, 1430–31 (9th Cir. 1988) (holding that a superficially ambiguous indictment cannot be construed as charging an offense whose elements it omits). The inclusion of an unnecessary additional allegation is insufficient to outweigh the overwhelming textual evidence

that the information here, on its face, reflects an election to charge a violation of § 4 of the RRA. It is not uncommon for charging documents, in an abundance of caution, to include additional averments that may or may not be strictly necessary to define the charged offense. In such cases the additional language "may normally be treated as 'a useless averment' that 'may be ignored.'" *United States v. Miller*, 471 U.S. 130, 136 (1985) (quoting *Ford v. United States*, 273 U.S. 593, 602 (1927)). Regardless of whether a scienter of "knowingly" is a required element of an offense under § 4 of the RRA, the inclusion of that allegation in the information does not detract from the clear intendment of the document to charge only a violation of that statute and not a violation of § 4(f)(1) of the NWRSAA. *See United States v. Thompson*, 990 F.3d 680, 683–84 (9th Cir. 2021) (holding that an indictment's inclusion of unnecessary allegations of "overt acts" in charging a wire-fraud conspiracy offense under 18 U.S.C. § 1349 did not mean that the indictment should be construed as instead relying on the general conspiracy statute, 18 U.S.C. § 371, which (unlike § 1349) requires an overt act).

We therefore hold that Appellants were properly charged only under § 4 of the RRA, which is a petty offense. Accordingly, the district court correctly held that Appellants were not entitled to a jury trial.

**IV**

Patrick, Ryan, and Ehmer challenge the sufficiency of the evidence to convict them of some of the misdemeanor charges. In reviewing this contention, we examine the evidence in the light most favorable to the Government and ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*United States v. Temkin*, 797 F.3d 682, 688 (9th Cir. 2015) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), in the context of a bench trial). We conclude that the challenged convictions were adequately supported.

As a threshold matter, these Appellants contend that the Government should be bound by its position in the charging information and during the bench trial that a scienter of "knowingly" was required to convict, even under § 4 of the RRA. They argue that they might have defended the case differently had they known that, after the trial, the Government might argue that (1) knowledge was not an element of a violation of § 4 of the RRA and (2) their violative conduct should instead be judged by an objective standard of what a reasonable person would have known. *Cf. Musacchio v. United States*, 577 U.S. 237, 244 & n.2 (2016) (holding that sufficiency challenges are generally governed by the correct elements of an offense, even if the Government did not object to jury instructions that wrongly added an element, but expressly reserving the question whether a different result applies when the *charging document* adds an unnecessary element). We need not resolve this issue because, even assuming that a scienter of "knowingly" was applicable here, Appellants' challenges still fail. The district court explicitly found, in the alternative, that the higher scienter requirements were met as to each of the challenged convictions, and the evidence was sufficient to support those findings.

First, Ryan argues that the Government failed to prove that he knowingly trespassed in violation of 50 C.F.R. § 26.21 on the Malheur NWR (which was referred to by the district court as the "MNWR"). We disagree. The trial evidence supports the district court's finding that there were "numerous signs around the MNWR headquarters

compound that gave notice of the hours during which the MNWR was open to the public," including "[m]ultiple signs clearly stat[ing] the MNWR was only open to the public from sunrise to sunset." The district court further found that Ryan "arrived at the MNWR on January 16, 2016," and "stayed at the MNWR until January 28, 2016," and that finding is supported by testimony from an FBI agent at the jury trial. Ryan argues that the Government failed to present evidence excluding the possibility that he left the refuge before sunset each day, as he suggests "members of the media or curious visitors" did. But as the district court noted, a video of a meeting at the refuge on January 26, 2016 indicates that Ryan did remain past sunset that day. Moreover, there was evidence that Ryan was formally assigned to one of the armed security teams at the refuge, and that fact further supports a reasonable inference that he remained at the refuge with the others rather than departed before sunset each day.

Second, Ryan and Ehmer argue that the Government failed to present sufficient evidence to prove the information's allegation that they knowingly used, without authorization, "an excavator that was the property of the United States Government," in violation of 50 C.F.R. § 27.65's prohibition on unauthorized tampering with equipment. In making this argument, they do not contest that the evidence was sufficient to show that they operated the excavator, but only that there was no evidence to support a finding that the excavator was the *property of the Government* and that they subjectively knew that to be the case. The Government suggests that, despite the information's allegations, it was not actually required to prove either that the Government owned the excavator or that Ryan and Ehmer knew that. Once again, we find it

unnecessary to resolve this issue. Even if we assume that the Government was required to prove these additional elements, the district court explicitly made alternative findings with respect to them, and the evidence was sufficient to support those findings.

As the district court noted, the presence of this large piece of machinery at the Government-owned and administrated refuge supported a reasonable inference that the excavator belonged to the Government and that, like other equipment present on the refuge grounds, it was used by the Government in the operations of the refuge. That conclusion was supported by testimony from the director of the Malheur NWR, who explained that the refuge owned "lots of heavy equipment," including "excavators." Moreover, it is reasonable to infer that, by using this item of equipment while at the Government-owned refuge, Ryan and Ehmer were subjectively aware that the excavator belonged to the Government.

Ryan and Ehmer claim that the district court improperly shifted the burden of proof to them by observing that there was "not any evidence that any individual associated with the occupation of the MNWR brought any privately-owned heavy construction equipment to the MNWR." We disagree. The district court's comment must be read in the context of the entirety of its ruling and the record as a whole. *United States v. Coutchavlis*, 260 F.3d 1149, 1156–57 (9th Cir. 2001); *see also United States v. Lozoya*, 19 F.4th 1217, 1218 (9th Cir. 2021) (en banc) (per curiam). The court's ruling made clear that the district court accurately comprehended that the burden of proof rested solely on the Government to prove the required elements beyond a reasonable doubt. Its observation as to the absence of evidence that the occupiers brought equipment to the refuge, in context, simply reflects

the court's attentiveness to the fact that nothing in the evidentiary record as a whole about how the occupation unfolded gave rise to a reasonable doubt as to whether the excavator belonged to the Government. *Id*.

Third, Patrick argues that the evidence was insufficient to sustain the information's allegation that he had knowingly entered and started, without authorization, an "all-terrain vehicle that was the property of the United States Government," in violation 50 C.F.R. § 27.65. Once again, we will assume *arguendo* that the Government was required to prove that the vehicle in question—a Dodge Durango— was owned by the Government and that Patrick knew that it was owned by the Government, because we conclude that the evidence was sufficient to support the district court's findings as to those elements. At trial, an FBI agent testified that the Dodge Durango was a "refuge vehicle" and that an aerial surveillance video depicted Patrick driving it on January 27, 2016. By that point, Patrick had been at the Malheur NWR for 25 days. Based on the record evidence, the district court could reasonably infer that, over the course of his time at the Malheur NWR, Patrick became "familiar with the government-owned vehicles and other government-owned property that were present at the MNWR" and that he knew this vehicle, despite its lack of markings, was one of many Government vehicles on the refuge.

## V

We turn next to several challenges raised by Patrick and Thorn to their felony convictions, namely, (1) Patrick's and Thorn's convictions for conspiracy to impede an officer of the United States in violation of 18 U.S.C. § 372; and (2) Thorn's conviction for possession of a firearm in a

federal facility with intent that it be used in the commission of a crime, in violation of 18 U.S.C. § 930(b).

## A

Although it consists of a single long sentence, § 372 contains multiple clauses that describe several different categories of proscribed conspiracies:

> If two or more persons in any State, Territory, Possession, or District conspire [1] to prevent, by force, intimidation, or threat, any person [i] from accepting or holding any office, trust, or place of confidence under the United States, or [ii] from discharging any duties thereof, or [2] to induce by like means any officer of the United States to leave the place, where his duties as an officer are required to be performed, or [3] to injure him in his person or property [i] on account of his lawful discharge of the duties of his office, or [ii] while engaged in the lawful discharge thereof, or [4] to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties, each of such persons shall be fined under this title or imprisoned not more than six years, or both.

18 U.S.C. § 372. Patrick and Thorn were indicted under what we have designated as clause [1][ii], which imposes criminal punishment on any person who conspires with another "to prevent, by force, intimidation, or threat, any person . . . holding any office, trust, or place of confidence under the United States, . . . from discharging any duties thereof." 18 U.S.C. § 372. Patrick and Thorne contend that

the district court erred in declining to instruct the jury that the phrase "person . . . holding any office, trust, or place of confidence under the United States" refers only to those "Officers of the United States" whose appointments are governed by the Constitution's Appointments Clause, U.S. CONST. art. II, § 2, cl. 2.[12]  The error was prejudicial, they contend, because the trial evidence "indicated that all sixteen of the impacted federal workers" were merely "employees" of the U.S. Fish and Wildlife Service ("USFWS") and not "Officers" within the meaning of the Appointments Clause.[13]  Reviewing de novo, *see United States v. Perdomo-Espana*, 522 F.3d 983, 986 (9th Cir. 2008), we hold that the district court did not err in declining the requested jury instruction.

Patrick and Thorn rely on longstanding authority holding that "the words 'officer of the United States,' when employed in the statutes of the United States, is [*sic*] to be taken usually to have the limited constitutional meaning" specified by the Appointments Clause.  *Steele v. United States*, 267 U.S. 505, 507 (1925); *see also United States v. Germaine*, 99 U.S. 508, 510 (1879).  However, *Steele* also noted that the Court, "in consideration of the context, has sometimes given [the phrase] an enlarged meaning, and has found it to include others than those appointed by the President, heads of departments, and courts."  267 U.S. at

---

[12] The Appointments Clause specifies that "Officers of the United States" shall be appointed by the President, "by and with the Advice and Consent of the Senate," except that Congress "may by Law" provide that "inferior Officers" may be appointed by "the President alone," "the Courts of Law," or "Heads of Departments."  U.S. CONST., art. II, § 2, cl. 2.

[13] The Government does not contest that the USFWS employees whose duties were impeded here were not "Officers" appointed in conformity with the Appointments Clause.

507.    Considering the relevant language from § 372 in context, we conclude that it extends beyond those officers who must be appointed in conformity with the Appointments Clause.

As an initial matter, the relevant clause of § 372 under which Patrick and Thorn were charged does not use the phrase "officers of the United States." Instead, it refers to "any person . . . holding any office, *trust, or place of confidence* under the United States." 18 U.S.C. § 372 (emphasis added).[14] Thus, even assuming that Patrick and Thorn are correct in contending that "person . . . holding any *office* . . . under the United States" should be construed as being essentially equivalent to the phrase "officer of the United States"—a point we do not decide—the language of this clause of § 372 contains additional terms that go beyond the holders of an "office." In this respect, the relevant clause differs notably from the other three clauses of § 372, all of which are limited to actions directed at an "officer of the United States." *See id*. (referring, in the second clause, to "any officer of the United States" and then, in the third and fourth clauses, referring back to that phrase by using "him" and "his"). As a result, the predicate for applying *Steele*'s presumption—*i.e*, that the statute's reach is defined by "the words 'officer of the United States,'" *see* 267 U.S. at 507

---

[14] As noted earlier, the relevant clause proscribes a conspiracy "to prevent, by force, intimidation, or threat, any person [i] from accepting or holding any office, trust, or place of confidence under the United States, or [ii] from discharging any duties thereof." 18 U.S.C. § 372. The phrase "any duties thereof" refers back to the duties of "any office, trust, or place of confidence under the United States." Under the relevant subclause, therefore, the person being prevented from discharging his or her duties is a "person . . . holding any office, trust, or place of confidence under the United States."

(citation omitted)—is absent in the relevant clause of § 372. And Congress's conspicuous choice *not* to use the simple phrase "officer of the United States" (or a substantially equivalent phrase) in all four clauses of § 372 presumptively signifies an intention to give the first clause a different scope. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).

The particular words used in the first clause of § 372 reinforce the conclusion that the clause is not limited to "officers of the United States" within the meaning of the Appointments Clause. The distinctive phrase "holding any office, trust, or place of confidence" in clause [1][i] of § 372 (using the bracketing we have supplied earlier) traces back nearly verbatim to an 1861 statute passed shortly after the Civil War began. *See* Chap. 33, 12 Stat. 284 (July 31, 1861) (proscribing, *inter alia*, any conspiracy "by force, or intimidation, or threat to prevent any person from accepting or holding any office, or trust, or place of confidence, under the United States").[15] Extending back well before 1861, and even continuing to this day, leading dictionaries have included, among the definitions of the word "place," an

---

[15] Section 2 of the Civil Rights Act of 1871 added clauses [1][ii], [2], [3], and [4], *see* Chap. 22, 17 Stat. 13, § 2 (Apr. 20, 1871), and the relevant portion of § 2 of that Act, as carried forward in subsequent statutes, was ultimately codified, with only minor changes, in § 372 when title 18 of the U.S. Code was enacted into positive law in 1948. Section 2 of that Civil Rights Act also contained language creating a remedy of a civil suit, and that language (now contained in § 1980 of the Revised Statutes) is classified to 42 U.S.C. § 1985(1).

"[o]ffice; publick character or employment." *Place*,
SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE
(1843 ed.); *see also Place*, 2 NOAH WEBSTER, AMERICAN
DICTIONARY OF THE ENGLISH LANGUAGE (1828 ed.) ("NOAH
WEBSTER") ("Office; employment; official station"); *Place*,
WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY
(1939) ("WEBSTER'S SECOND") ("Official status or position;
an office or employment, specif. in public service"); *Place*,
AMERICAN HERITAGE DICTIONARY (5th ed. 2018) ("A job,
post, or position"). Likewise, the word "trust" is not limited
to formal legal devices for holding property interests but has
also long been used to refer more generally to "[t]hat which
is committed to one's care," *see Trust*, NOAH WEBSTER,
*supra*, or a "responsible charge or office," *see Trust*,
WEBSTER'S SECOND, *supra*. The use of these additional
terms, which refer more generally to public employment,
confirms that this clause of § 372 is not strictly limited to
those "Officers of the United States" whose appointments
are governed by the Appointments Clause.

Accordingly, the district court did not err in instructing
the jury on this point.

**B**

As noted earlier, one of the elements of the § 372 charge
against Patrick and Thorn is that they conspired to prevent
USFWS employees from discharging their duties "by force,
intimidation, or threat." 18 U.S.C. § 372. In addressing this
element, the district court gave the following instruction to
the jury:

> In order for speech or expressive conduct to
> qualify as "intimidation" or a "threat" in this
> context, [1] the speaker or actor must intend

his or her words or conduct to intimidate or to be a threat, and [2] those words or conduct must also be such that a reasonable person hearing or observing them would foresee that they would be interpreted as a serious expression of intent to harm or assault.

Although they concededly did not preserve an objection to this instruction below, Patrick and Thorn contend on appeal that the instruction constitutes plain error. *See* FED. R. CRIM. P. 30(d), 52(b). Specifically, Patrick and Thorn argue that, by including language that defines "threats" and "intimidation" under an "objective 'reasonable person' standard," the district court's instruction contravenes the Supreme Court's decision in *Elonis v. United States*, 575 U.S. 723 (2015). This contention is meritless.

In *Elonis*, the defendant posted a variety of violently themed posts on Facebook, several of which referenced violence against his ex-wife and law enforcement agents. 575 U.S. at 726–31. He was indicted for violating 18 U.S.C. § 875(c), which proscribes transmitting, in interstate commerce, "any communication containing any threat . . . to injure the person of another." *Id.* at 726. At his trial, Elonis asked the court to instruct the jury that "the government must prove that he intended to communicate a true threat," but the district court denied that request. *Elonis*, 575 U.S. at 731. The jury was instead instructed that "[a] statement is a true threat when a defendant intentionally makes a statement in a context or under such circumstances wherein a *reasonable person* would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual." *Id.* (emphasis added). The

Supreme Court held that it was "error" to instruct the jury that "the Government need prove *only* that a reasonable person would regard Elonis's communications as threats." *Id*. at 740 (emphasis added). Because the "threatening nature of the communication" is "'the crucial element separating legal innocence from wrongful conduct,'" a culpable scienter must presumptively be shown with respect to that element. *Id*. at 737 (citation omitted); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (stating that, in construing a criminal statute, the Court "start[s] from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct'" (citation omitted)). Accordingly, the Court held that, in a prosecution under § 875, the "defendant's mental state" must also be considered, and the requisite *mens rea* would be satisfied "if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat."[16] *Elonis*, 575 U.S. at 740. Because the instructions at Elonis's trial eliminated this scienter requirement, the Court reversed his conviction. *Id*.

We agree that, under § 372, "the crucial element separating legal innocence from wrongful conduct," *Elonis*, 575 U.S. at 737 (citation omitted), is that the defendant conspires to prevent an employee from discharging his or her duties "by force, intimidation, or threat," *see* 18 U.S.C.

---

[16] Because the issue had not been briefed in Elonis's case, the Court declined to consider whether a lesser mental state of "recklessness" would also be sufficient. 575 U.S. at 740. The Court subsequently answered that question in the affirmative in *Counterman v. Colorado*, 600 U.S. 66 (2023).

§ 372.  It follows that, absent some textual indication to the contrary, a "culpable mental state" must presumptively be shown with respect to that element.  *Rehaif*, 139 S. Ct. at 2195 (citation omitted).  There is no such language in § 372 that would rebut this presumption of scienter, and Patrick and Thorn are therefore correct insofar as they contend that the Government was required to establish scienter with respect to the use of "intimidation" or "threat[s]."  But they overlook that the district court's instruction *did* include such a scienter requirement, because it expressly stated that, "[i]n order for speech or expressive conduct to qualify as 'intimidation' or a 'threat' in this context, the speaker or actor *must intend his or her words or conduct to intimidate or to be a threat*" (emphasis added).  That instruction thus fully complied with the relevant holding of *Elonis*.

As Patrick and Thorn note, the district court's instruction further provided that "speech or expressive conduct" would not qualify as a "threat" or "intimidation" unless the jury *also* found that "those words or conduct [were] such that a reasonable person hearing or observing them would foresee that they would be interpreted as a serious expression of intent to harm or assault."  *See also United States v. Keyser*, 704 F.3d 631, 638 (9th Cir. 2012).  But contrary to what Patrick and Thorn contend, this reliance on an objective standard in describing an *additional* element that must be met with respect to the defendant's "speech or expressive conduct" does not in any way detract from the district court's inclusion of a fully sufficient subjective scienter requirement.  On the contrary, the caselaw confirms that the district court correctly included *both* elements.  We have construed a similar criminal prohibition proscribing, *inter alia*, "threat[s]" to assault certain federal officials "with intent to impede, intimidate, or interfere with such official

. . . while engaged in the performance of official duties," in 18 U.S.C. § 115(a)(1)(B), as extending only to an objectively defined "true threat," *i.e.*, one that "a reasonable person would foresee . . . would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990); *see also Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1080 (9th Cir. 2002) (en banc) (reaffirming that this language from *Orozco-Santillan* "is an accurate statement of our law, and is faithful to the objective standard we use for determining whether a statement is a true threat"). By requiring both the sort of true threat required under *Orozco-Santillan* and a subjective scienter that is constitutionally sufficient under *Elonis* and *Counterman*, the district court's instructions here correctly defined the scope of "threats" and "intimidation" required by § 372.

## C

Patrick and Thorn further challenge their § 372 convictions on the grounds that the district court committed a variety of evidentiary errors at trial. None of the asserted errors warrants reversal.

## 1

The district court did not abuse its discretion in admitting, over Patrick's and Thorn's objections, an excerpt of an interview with Ryan Bundy conducted by a reporter from Oregon Public Broadcasting ("OPB").

On January 9, 2016, towards the beginning of the occupation, OPB posted on its website a nearly seven-minute audio report that included excerpts of a telephonic

interview of Ryan Bundy that had been conducted by an
OPB reporter (John Sepulvado).  The Government sought to
admit at trial a two-minute, 34-second portion of the
interview ("Exhibit 23"), which was drawn from that report.
During the interview, Bundy told Sepulvado that he believed
that the Malheur NWR is "where the charges came from to
destroy the Hammonds"; that the Malheur NWR is
"destroying the lives and libert[y] and . . . property rights" of
local ranchers; and that "by being here, it puts a stop to that."
After Sepulvado noted that the Malheur NWR's federal
employees were still able to work from home, Bundy
replied, "Well, perhaps.  You know, this whole system isn't
perfected yet."  Bundy emphasized that the occupiers "are
not here to hurt people, not even the people that work here,"
and that "no threats of any kind have gone out to anybody,
any individual."  But when Sepulvado asked him why he
could not just "do all this but without the guns," Bundy
replied, "because the lack of seriousness."  At trial, the
Government used Bundy's interview to argue that Patrick
and Thorn thought that "without the guns there would be a
lack of seriousness."  The Government also argued that, by
responding to a question about USFWS employees working
from home with the statement "that the system hasn't been
perfected yet," Bundy confirmed that "one of the objects of
the conspiracy" was to "keep[] these employees from doing
their jobs."

Prior to trial, the Government attempted to subpoena
Sepulvado in order to lay a foundation for the admission of
the interview excerpts, but OPB successfully moved to
quash the subpoena on First Amendment grounds.  Notably,
during the course of the proceedings concerning the motion
to quash, OPB's attorney stated that neither OPB nor
Sepulvado had retained a copy of the complete, unedited

telephonic interview with Ryan Bundy and that, as a result, all that remained was the portion contained in the January 9, 2016 report posted on OPB's website. The district court further ruled that, because Ryan Bundy was still facing criminal charges in Nevada at the time, his Fifth Amendment privilege rendered him unavailable to lay a foundation for the interview excerpts. The court nonetheless admitted the excerpts at trial. As to the issue of authentication, the court concluded that the testimony of the FBI agent who had downloaded the interview from OPB's website (Ron Walker) was sufficient. The court also rejected the defense's additional evidentiary objections to the admission of Exhibit 23. On appeal, Patrick and Thorn challenge the district court's rejection of several of their objections, but their arguments are unavailing.

First, the district court did not abuse its discretion in concluding that there was a sufficient foundation for the admission of the excerpts of Sepulvado's telephonic interview with Ryan Bundy. As the court explained, Walker had personally downloaded the OPB report containing the interview directly from the OPB website, which was sufficient to authenticate it as an OPB news report. *Cf.* FED. R. EVID. 902(6) (stating that "[p]rinted material purporting to be a newspaper or periodical" is self-authenticating). The court did not clearly err in finding that, as a result of the investigation, Walker had sufficient familiarity with Ryan Bundy's voice that Walker could identify him as the person being interviewed. Although Walker concededly lacked any personal knowledge as to the identity of the interviewer, the portion of the interview played to the jury did not identify the interviewer's name, and the transcript supplied to the jury merely identified him as "OPB Interviewer." The district court reasonably concluded that the other speaker's

role as "an OPB interviewer" could be circumstantially inferred from the fact that the interview excerpt was derived from an OPB report. Although there was no testimony from OPB as to the editing process used to select the interview excerpts that were contained in the report, there is no obvious disjointedness in either the substance of what was recounted or the sound of the audio recording, and it was reasonable to infer, in the absence of any evidence to the contrary, that the pairing of question and answers was genuine. The district court's predicate findings on this score are not clearly erroneous, and there was no abuse of discretion in the court's conclusion that a sufficient foundation had been laid for the admission of Exhibit 23.[17]

Second, the district court correctly rejected Patrick's and Thorn's argument that admission of Exhibit 23 without any authenticating testimony from Sepulvado deprived them of their rights under the Confrontation Clause. The Confrontation Clause prohibits the introduction, in a criminal trial, of testimonial statements by non-testifying witnesses. *See*, *e.g.*, *Lucero v. Holland*, 902 F.3d 979, 987 (9th Cir. 2018). In invoking the clause here, Patrick and

---

[17] We reject Patrick's and Thorn's contention that, under *United States v. King*, 587 F.2d 956 (9th Cir. 1978), the Government was required "to produce *clear and convincing evidence* of authenticity and accuracy as a foundation for the admission of recordings." *Id*. at 961 (simplified) (emphasis added). To the extent that *King* was addressing the requirements for foundation under the then-recently adopted Federal Rules of Evidence (which *King* never mentions), its adoption of a clear and convincing standard is irreconcilable with the Supreme Court's subsequent decision in *Bourjaily v. United States*, 483 U.S. 171 (1987), which confirmed that the preliminary determinations of admissibility made by a court under Rule 104(a) are to be made under a "preponderance of the evidence" standard." *Id*. at 175–76. The district court therefore properly applied that standard here.

Thorn do *not* contend that the statements of Sepulvado that were contained in the interview of Bundy were "testimonial," so as to trigger the applicability of the clause. Nor do they contend that the statements of Bundy that are contained in Exhibit 23 were testimonial. Rather, their argument is that, by admitting Exhibit 23 without an adequate foundation, the district court's ruling was the "functional equivalent" of allowing Sepulvado's "foundational statements or testimony" to be received unchallenged. This argument fails because its premise is wrong: as we have explained, there was an adequate foundation for the admission of Exhibit 23 even in the absence of Sepulvado's testimony. Moreover, to the extent that the receipt of Exhibit 23 into evidence might arguably be thought to communicate Sepulvado's editorial judgments as to what was noteworthy in the larger interview he had with Bundy, any such implicit communication would not qualify as "testimonial." We apply a "primary purpose" test in evaluating whether a statement is testimonial for purposes of the Confrontation Clause, *see Lucero*, 902 F.3d at 989. There is simply no basis in the record to conclude that *OPB's primary purpose* in excerpting the Bundy interview was "for use as evidence at a future criminal trial," *United States v. Fryberg*, 854 F.3d 1126, 1136 (9th Cir. 2017) (citation omitted).

Third, the district court did not abuse its discretion in concluding that Ryan Bundy's statements during the interview were admissible as co-conspirator statements under Rule 801(d)(2)(E). *See United States v. Saelee*, 51 F.4th 327, 339 n.4 (9th Cir. 2022) ("[W]e review for an abuse of discretion the district court's decision to admit coconspirators' statements, and review for clear error the district court's underlying factual determinations that a

conspiracy existed and that the statements were made in furtherance of that conspiracy." (citations omitted)). Under that Rule, "a statement is not hearsay if it is 'offered against an opposing party' and was '[1] made by the party's coconspirator [2] during and in furtherance of the conspiracy.'" *Id*. at 342 (quoting FED. R. EVID. 801(d)(2)(E)). Patrick and Thorn challenge the district court's finding only as to the second requirement—*viz*., that Bundy's statements were made in furtherance of the alleged § 372 conspiracy—but we conclude that this finding was not clearly erroneous. The district court reasonably concluded that Bundy sought to "further the goals of the occupation" by describing to Sepulvado—a member of the news media— both the group's objectives (*i.e.*, to "put[] a stop" to the activities of "this facility," which were "destroying the lives and liberties" of those nearby) and the group's reason for using firearms (*i.e.*, a failure to carry firearms would show a "lack of seriousness"). By publicly communicating the group's determination to stop the Malheur NWR's activities and the group's belief that carrying firearms demonstrated their "seriousness" on that score, Bundy's public statements could reasonably be viewed as furthering the conspiracy by: (1) shoring up the morale and determination of the group and (2) communicating a warning to USFWS employees that they would face armed resistance if they tried to return. To be sure, as Patrick and Ryan note, Bundy's comments could also be given a different construction, but the district court's view of the matter was reasonable and we therefore cannot set it aside. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (citation omitted)).

Fourth, the district court properly rejected Patrick's and Thorn's argument that admission of Exhibit 23 was inconsistent with the best evidence rule, *see* FED. R. EVID. 1002. As we have explained, there was an adequate foundation to conclude that Exhibit 23 was an authentic "duplicate" of the excerpted portions of the OPB report that was posted on the OPB website, and it was therefore admissible under Rule 1003's exception to Rule 1002's best evidence rule. *See* FED. R. EVID. 1003 ("A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate."). Patrick and Thorn contend, however, that the relevant "original" is the entire OPB interview with Bundy, and that the absence of the remainder of the interview makes it "unfair to admit the duplicate." *See id.*, advis. comm. note (1972 proposed rule) ("Other reasons for acquiring the original may be present when only a part of the original is reproduced and the remainder is needed for cross-examination or may disclose matters qualifying the part offered or otherwise useful to the opposing party."). But to the extent that the full OPB interview with Bundy were deemed to be the relevant "original," the admission of Exhibit 23 would then be covered by the *different* exception to the best evidence rule contained in Rule 1004(a), which provides that "[a]n original is not required and other evidence of the content of a writing, recording, or photograph is admissible if: (a) all the originals are lost or destroyed, and not by the proponent acting in bad faith." *See* FED. R. EVID. 1004(a). Given OPB's explicit representation, at the hearing on the motion to quash, that the original complete interview no longer existed, the district court had ample ground to conclude that the original had been lost or

destroyed and that its absence was "[n]ot through any fault of the Government" or of Patrick or Thorn.  *See* FED. R. EVID. 104(a) (noting that, in making preliminary determinations relevant to admissibility, "the court is not bound by evidence rules, except those on privilege"); *see also United States v. Workinger*, 90 F.3d 1409, 1415 (9th Cir. 1996) (holding that the "best evidence rule was not violated" when the original recording of a deposition had been erased by the counsel who took the deposition "in the ordinary course of his business and not at the behest of the government").

Fifth, for similar reasons, the district court did not abuse its discretion in concluding that the so-called rule of completeness in Rule 106 did not bar admission of Exhibit 23.  That rule provides that, where (as here) a portion of a recording is introduced, the opponent may insist on the contemporaneous introduction of "any other part" of that "recorded statement" (or any other recorded statement) that ought in fairness "to be considered at the same time."  *See* FED. R. EVID. 106.  But Patrick and Thorn did *not* ask for any additional part of the OPB report, or the interview of Bundy contained within it, to be introduced together with Exhibit 23.  Their objection, rather, is that, because the remainder of the original underlying interview with Bundy "had not been preserved," it "was impossible for either the parties or the trial court to determine whether Bundy's statement, as proffered by the government, had been unfairly excerpted from the original recording."  This argument misconceives the role of Rule 106.  The rule, by its terms, does not exclude any evidence, but merely provides that, if all or part of a "recorded statement" is offered, then an opponent may require that certain *additional* parts or recorded statements must *also* be introduced

contemporaneously if fairness requires. The fact that the additional recorded statements that the opponent would like to offer *no longer exist* simply means that the opponent lacks any additional statement to which the right of contemporaneous introduction conferred by Rule 106 might attach. Nothing in the language of Rule 106 says that, when the remainder of the recorded statement does not exist, the portion offered into evidence must be excluded. *See* 21A CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5078 (2d ed. 2005) ("Rule 106 does not give the opponent the power to prevent the proponent from introducing an incomplete statement; it only gives him the power to require that the statement be completed or to complete it himself.").

The question whether a recorded statement should be admitted, despite its unavoidable incompleteness, instead raises a question of undue prejudice under Rule 403. *See id.* On that score, the district court did not abuse its discretion in concluding that the probative value of Exhibit 23 was not "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." *See* FED. R. EVID. 403. As the district court explained—and as Patrick and Thorn have themselves noted in connection with their arguments about the co-conspirator exception to the hearsay rule—Bundy's statements could also be read in a manner that was *favorable* to the defendants.

## 2

Patrick and Thorn also assert that the district court abused its discretion in admitting testimony from various federal employees and private citizens as to their subjective feelings of fear and intimidation. This argument is meritless.

In an order partially granting a defense *in limine* motion, the district court held that evidence of Malheur NWR employees' "subjective impressions" would be admitted only to the extent that it addressed "the closure of the MNWR and the reasons for that closure." Such evidence was relevant, the court held, because it bore on the issues of (1) "Defendants' intent to impede by force, intimidation, or threat" and (2) whether Defendants' actions "were such that a reasonable person observing them would interpret them as serious expressions of intent to harm." At trial, the district court agreed with the Government that, by presenting evidence concerning the peaceful nature of the protest, the defense had opened the door to the admission of additional evidence, on rebuttal, concerning the subjective fears engendered by the occupation.

Renewing their argument that *Elonis* precluded any use of a "reasonable person" standard in assessing whether their actions constituted threats or intimidation, Patrick and Thorn contend that the district court erred in declining to exclude all such evidence. But as we have explained, *see supra* section V(B), Patrick's and Thorn's reading of *Elonis* is wrong, and this argument therefore fails.

Patrick and Thorn further argue that the district court erred in failing to enforce the limitations of the *in limine* ruling and in concluding that the defense had opened the door to additional evidence concerning the reactions to the Defendants' actions at the Malheur NWR. But even assuming that the district court did not adhere to its *in limine* ruling, we find no abuse of discretion in the admission of the challenged testimony. The testimony of Malheur NWR employees concerning the subjective fear engendered by the armed occupation of the refuge and the resulting perceived inability to enter the refuge were clearly relevant to assessing

(1) whether the conspirators *intended* to produce that response; and (2) whether a reasonable person would foresee that the conspirators' actions "would be interpreted as a serious expression of intent to harm or assault." *See*, *e.g.*, *United States v. Walker*, 665 F.3d 212, 230 (1st Cir. 2011) (holding that, while "not controlling," a "'victim's reactions and actions taken in response to an alleged threat'" are "assuredly relevant" (citation omitted)). Patrick and Thorn note that the Government also offered testimony about *non-employees*' fears—*viz.*, (1) a neighboring rancher's fear when, after Ammon Bundy was arrested on January 26, some of the occupiers leaving the Malheur NWR trespassed near his house; and (2) an "avid birder['s]" fear upon encountering armed occupiers who initially blocked the passage of her vehicle. But this further evidence of the reactions generated by the occupiers' behavior was likewise relevant both to the occupiers' intent in acting as they did and to a reasonable person's understanding of how that conduct would be interpreted. There was no abuse of discretion in allowing this testimony.

### 3

Patrick and Thorn also challenge the admission of certain statements made by Thorn, as well as an oral statement made by another participant in the occupation, Sandra Anderson. We conclude that there was no prejudicial error.

At trial, the Government introduced a variety of Facebook messages sent by Thorn between January 3, 2016 and February 11, 2016. The messages in the earlier time frame consist largely of photos of Thorn and others that were taken during the occupation and occasional very brief comments about "standing guard," being on "watch" and participating in "the federal building occupation." But

beginning on February 4, after Thorn had left the Malheur NWR, he sent a number of messages concerning his intention to return. For example, on February 4, he posted a message stating, "I'm also planning on going back to [B]urns . . . . I may be planning on getting back on the refuge by alternate means such as sneaking back on[.] I have a good layout of the land and I'm pretty sure I can pull it off." This statement was promptly followed by another message declaring, "I won't let my brothers and sisters die by themselves[.] I intended on m[a]king sure they have direction and added support." When someone else in the chat responded, "Just remember winning is more bad ass than dying be smart be safe," Thorn replied, "I will [be] leading a handful of boots to the refuge for support. I'm not afraid of death, Liberty and Freedom replaces fear." The Government also introduced statements made by Thorn after he was arrested by the FBI on February 11, 2016. Specifically, Thorn told the arresting agents, *inter alia*, that "there were thousands of members of the movement that were educated and ready to rise up and replace him." He also stated that the FBI "only had jurisdiction within ten square miles of Washington, D.C.," and that the FBI would be repaid "an eye for an eye" and "would have [its] hands full."

Patrick contends that any statements made by Thorn after January 27 were inadmissible hearsay as to Patrick, because on that afternoon, Patrick had walked off the refuge and voluntarily turned himself in to the FBI. Because he had thereby withdrawn from the conspiracy, Patrick argues, any statements made by Thorn could not be deemed to be co-conspirator statements as to Patrick.

We agree that "once a party withdraws from a conspiracy subsequent statements by a coconspirator do not fall within

th[e] [hearsay] exemption" in Rule 801(d)(2)(E). *See United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988). The Government is quite wrong in suggesting that the hearsay exception continues to apply, even as to persons who have withdrawn from the conspiracy, so long as the *declarant* remains in the conspiracy. Contrary to what the Government contends, our decision in *United States v. Williams*, 668 F.2d 1064 (9th Cir. 1981), does not endorse any such view. There, the district court concluded that Williams "had *not* withdrawn from the conspiracy," but we nonetheless faulted the court's application of the co-conspirator exception to a statement of one of Williams's codefendants, because the court had failed to make the *further* "determination whether the statement was made during and in furtherance of the conspiracy." *Id*. at 1070 (emphasis added).

When Patrick raised his objection on this score and requested a limiting instruction, the district court rejected his request, concluding that it was for the jury to decide, under its instructions, whether these statements were made at a time the conspiracy was still on-going. The court was apparently referring to its instruction explaining to the jury the limitations on the use of co-conspirator statements, which instructions explained that the jury would need to make certain findings that tracked the requirements of Rule 801(d)(2)(E). While there is no error in advising the jury that it must follow the applicable limitations on the use of co-conspirator statements, the threshold question whether the requisites for admissibility under Rule 801(d)(2)(E) have been met is a preliminary determination to be made by the court by a preponderance of the evidence under Rule 104(a). *See Bourjaily*, 483 U.S. at 175–76; *United States v. Martinez de Ortiz*, 907 F.2d 629, 631–32 (7th Cir. 1990). There is no indication in the record here that, before rejecting Patrick's

request for a limiting instruction, the district court made such a determination as to whether Patrick had withdrawn from the conspiracy on January 27, before Thorn made the statements at issue. On the contrary, the court appears to have erroneously treated that as a question for the jury to decide.

However, even if the district court erred in this regard, we conclude that the error was harmless. Patrick's participation in the § 372 conspiracy before January 27 was amply established by other, independent evidence, and it is unlikely that, in convicting Patrick, the jury relied on statements made by Thorn in February. Moreover, because those statements remained admissible as against Thorn,[18] the only issue here was the failure to give a specific limiting instruction expressly telling the jury that it could not use the statements against Patrick. But, as we have noted, the district court did give a generalized instruction about the limitations of Rule 801(d)(2)(E), and Patrick's counsel invoked that instruction in explicitly arguing to the jury, in his closing, that the statements made by others after Patrick turned himself in on January 27 "should not be considered against him." On this record, we cannot say that it is more likely than not that the jury's verdict with respect to Patrick was affected by the absence of the requested specific limiting instruction. *See United States v. Santini*, 656 F.3d

---

[18] Contrary to what Patrick and Thorn contend, the district court did not commit plain error in admitting these statements against Thorn. Although they were made after Thorn had left the refuge, the statements were probative of Thorn's earlier intent to impede the official duties of USFWS personnel during the occupation. Although the statements used strong language, the court had ample discretion to conclude that their probative value was not "substantially outweighed" by the risk of unfair prejudice. *See* FED. R. EVID. 403.

1075, 1079 (9th Cir. 2011) ("An error is harmless if it is more probable than not that the error did not materially affect the verdict." (citation omitted)).

Patrick and Thorn also challenge the admission of Exhibit 411, which was a recording of a January 28, 2016 phone call between an FBI agent and two persons participating in the occupation, *viz.*, Sandra Anderson and her husband Sean. During the conversation, in which the Andersons discussed the mechanics of surrendering, the FBI agent told Sandra that Sean would be arrested for "[i]nterfering with a federal employee reporting to work." Sandra interrupted and said, "Wait a minute. We *all* have done that. Why is only *he* getting charged for that?" Although the statement was probative of the understanding of the co-conspirators as to the objective of the occupation,[19] the district court's conclusion that this statement was made in furtherance of the conspiracy was clearly erroneous. Sandra Anderson's discussion of the logistics and terms of her and her husband's *surrendering* to the FBI cannot plausibly be viewed as having been made in furtherance of *then* accomplishing the conspiracy's objective to impede the work of USFWS personnel. Once again, however, we conclude that any error was harmless. The independent evidence concerning Patrick's and Thorn's participation in the § 372 conspiracy was very strong, and it is more probable than not that the admission of Sandra Anderson's statement did not affect the verdict. *See Santini*, 656 F.3d at 1079. And as to Patrick, we reach the same conclusion as to

---

[19] Because the statement was based on Sandra Anderson's own participation in the occupation and her understanding of the shared objective that underlay the actions of the occupiers, we reject Patrick's and Thorn's contention that it amounted to expert opinion testimony. *See* Fed. R. Evid. 602, 701.

harmlessness, even considering this error together with the failure to give a limiting instruction.  *See United Sates v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (court must consider the "cumulative effect of multiple errors").

**4**

Patrick and Thorn assert that the district court erred in admitting, under Rule 801(d)(2)(E)'s co-conspirator statement exception to the hearsay rule, various statements made by co-defendants who had been acquitted at the first jury trial.  The contention fails.

In *United States v. Peralta*, 941 F.2d 1003 (9th Cir. 1991), we held that a determination that there was a reasonable doubt as to a person's participation in a conspiracy (thus warranting an acquittal) did not logically preclude a finding that it was more likely than not that the person was a co-conspirator (thus supporting a finding under Rule 104(a) that the person was a member of the conspiracy and made a statement in furtherance of it).  In light of this critical difference in the relevant standard of proof, we squarely held that "if a district court is persuaded by a preponderance of the evidence that the declarant and the accused were members of a conspiracy, the declarant's statement is admissible notwithstanding the fact that the court concludes that the evidence is insufficient under the reasonable doubt standard to support a *conviction* of the declarant of the crime of conspiracy."  *Id*. at 1007.  Under *Peralta*, the district court did not err.

Patrick and Thorn do not dispute this understanding of *Peralta*, but they nonetheless argue that *Peralta* is contrary to our earlier decision in *United States v. Ratcliffe*, 550 F.2d 431, 433 (9th Cir. 1976), and that we should call for en banc rehearing to resolve the internal conflict.  We conclude that

there is no live conflict within our caselaw and that *Peralta* remains binding.

In *Ratcliffe*, we noted that the district court, after acquitting one co-defendant (Wisdom) under Federal Rule of Criminal Procedure 29, "instructed the jury not to consider Wisdom's extra-judicial statements in determining the [remaining] defendants' guilt." *Id*. at 433. In describing that procedural history, we remarked, without elaboration, that "[w]hen Wisdom was acquitted on the conspiracy count these statements became inadmissible against the other defendants." *Id*. Ultimately, however, we concluded that we did not need to resolve whether "this inadmissible evidence tainted their convictions" on the conspiracy charges, and we declined to do so.[20] *Id*. Even assuming that these brief comments may be considered a holding on the *Peralta* issue, they are clearly irreconcilable with subsequent Supreme Court caselaw. In *Bourjaily*, the Court clarified that the standard of proof for the predicate facts concerning co-conspirator statements is "preponderance of the evidence," 483 U.S. at 175–76, and in *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 362 (1984), the

---

[20] We grounded our refusal to decide that issue on the so-called "concurrent sentence rule," *Ratcliffe*, 550 F.2d at 433, under which "a federal appellate court, as a matter of discretion, may decide that it is unnecessary to consider arguments advanced by an appellant with regard to his conviction under one or more counts of an indictment, if he was at the same time validly convicted of other offenses under other counts and concurrent sentences were imposed," *United States v. Moore*, 452 F.2d 576, 577 (9th Cir. 1971). We abrogated that rule in *United States v. DeBright*, 730 F.2d 1255, 1259–60 (9th Cir. 1984) (en banc); *see also Ray v. United States*, 481 U.S. 736, 737 (1987) (holding that the "concurrent sentence doctrine" has no applicability under current sentencing law, which requires the imposition of separate financial assessments on each count (citing 18 U.S.C. § 3013)).

Court confirmed that an acquittal under the beyond-a-reasonable-doubt standard does "not negate the possibility that a preponderance of the evidence could show" the defendant's guilt for other purposes (such as, in that case, civil forfeiture). These two subsequent Supreme Court holdings refute any assertion that a defendant's acquittal of conspiracy precludes a finding that his or her statements qualify, by a preponderance of the evidence, as co-conspirator statements. Thus, to the extent that *Ratcliffe* is contrary to *Peralta*, it is irreconcilable with subsequent Supreme Court authority. *See Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc). *Peralta* thus is and remains binding authority on this point.

## VI

As noted earlier, Ryan and Ehmer were each convicted of a single count of depredation of government property in violation of 18 U.S.C. § 1361. These counts were based on the allegation that, on January 27, 2016, Ryan and Ehmer had used an excavator to dig two large trenches at the Malheur NWR. Ryan and Ehmer envisioned the trenches as a "fox hole of sorts" that would allow them "to defend themselves" from an attack by the Government. The day before the excavation, one of the occupiers, LaVoy Finicum, had been shot by law enforcement personnel who intercepted the vehicle that was carrying Finicum and others to a meeting outside the refuge. News of Finicum's death quickly reached those inside the refuge, and it frightened Ryan, who called his mother that evening to express his anxiety as to what would happen next. As a result of their concerns, Ryan and Ehmer began digging the trenches the next day.

Ryan and Ehmer raise several challenges to their convictions under § 1361, but we conclude that there was no reversible error.

## A

Before trial, Ryan and Ehmer requested that the jury be instructed concerning their defense that "the depredation was done in self-defense" due to a reasonable fear of "immediate use of unlawful force" by the Government. The district court declined to give the requested instruction, concluding that, because the trenches took "hours to complete," there was no factual basis to support the view that Ryan and Ehmer were acting in response to an "imminent threat." The district court did not err.

"A defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence." *United States v. Fejes*, 232 F.3d 696, 702 (9th Cir. 2000) (simplified). We have recognized that a "trial court's determination that the evidence was insufficient to justify the giving of an instruction on a theory of defense is a question of law" that is subject to "de novo" review, *see United States v. Ibarra-Alcarez*, 830 F.2d 968, 973 (9th Cir. 1987), but we have also said that we review for "abuse of discretion" whether "there is evidence upon which the jury could rationally sustain the defense," *United States v. Ocampo-Estrada*, 873 F.3d 661, 665 (9th Cir. 2017) (citation omitted). Although panels of this court have occasionally attempted to clarify the law in this area in favor of abuse-of-discretion review, *see, e.g., United States v. Gomez-Osorio*, 957 F.2d 636, 642 (9th Cir. 1992) (stating that there really is no conflict and that, on the specific question of the sufficiency of the evidence to support a theory of defense, "the court should apply an abuse

of discretion standard of review"); *see also United States v. Arnt*, 474 F.3d 1159, 1163 (9th Cir. 2007) (making a similar point in the context of instructions on lesser-included offenses), we have continued to note such a conflict, *see, e.g.*, *United States v. Job*, 871 F.3d 852, 867 (9th Cir. 2017) (noting the conflict in the context of whether to give a "multiple conspiracies instruction"), and we have continued on occasion to review de novo whether a duress defense should be precluded on the grounds that there is an insufficient factual basis to allow it, *see United States v. Shryock*, 342 F.3d 948, 987–88 (9th Cir. 2003). Any uncertainty on this score makes no difference here because, even applying de novo review, we conclude that the district court properly declined to instruct the jury as to self-defense.[21]

---

[21] Most of our sister circuits apply de novo review to the threshold question whether the evidence is sufficient to support an instruction concerning a defense. *See*, *e.g.*, *United States v. Farah*, 899 F.3d 608, 615 (8th Cir. 2018); *United States v. Berroa*, 856 F.3d 141, 160 (1st Cir. 2017); *United States v. Lomax*, 816 F.3d 468, 475–76 (7th Cir. 2016); *United States v. Rampton*, 762 F.3d 1152, 1156 (10th Cir. 2014); *United States v. Richardson*, 532 F.3d 1279, 1290 (11th Cir. 2008); *United States v. Fedroff*, 874 F.2d 178, 181–82 (3d Cir. 1989). The subset of our cases that have applied abuse-of-discretion review have done so based on the dubious premise that the question whether the evidence would support a defense involves a "factual determination" to be made by the district court and reviewed deferentially by us. *See Arnt*, 474 F.3d at 1163; *Gomez-Osorio*, 957 F.2d at 642 (presuming that, "[l]ogically," we should apply deferential review in assessing "whether the required factual foundation exists"). But as we have elsewhere explained, the question whether "the evidence was insufficient to justify the giving of an instruction on a theory of defense is a question of law" and not a factual determination. *United States v. Weitzenhoff*, 35 F.3d 1275, 1290 (9th Cir. 1993); *see also United States v. Baird*, 712 F.3d 623, 627 (1st

In order for a defendant to raise a defense of self-defense, he must make a "prima facie" showing as to "two elements: (1) a reasonable belief that the use of force was necessary to defend himself or another against the immediate use of unlawful force and (2) the use of no more force than was reasonably necessary in the circumstances." *See United States v. Biggs*, 441 F.3d 1069, 1071 (9th Cir. 2006). If the defendant makes this threshold showing, "the burden shifts to the government to disprove [the defense] beyond a reasonable doubt." *United States v. Keiser*, 57 F.3d 847, 851 n.4 (9th Cir. 1995). Construing the evidence in the light most favorable to Ryan and Ehmer, we agree with the district court's conclusion that they failed to make a prima facie showing that it was "reasonable" to believe that they faced an "immediate use of unlawful force." *Biggs*, 441 F.3d at 1071. Even assuming that Ryan and Ehmer reasonably believed that the Government might soon attempt to retake the refuge by force, there is no basis for reasonably concluding that, at the time that the trenches were dug, Ryan and Ehmer *then* faced an "immediate use of unlawful force." *Id*. At the time they began digging, Ryan and Ehmer may have thought that the Government might soon decide to attack the refuge, but any such potential in-the-future action did not confront them with an *immediate* use of force, much less one that could reasonably be deemed to be unlawful.[22]

---

Cir. 2013) (holding that, because the relevant "determination entails not differential fact-finding, but merely an inquiry into the legal sufficiency of the evidence, the standard of appellate review should be plenary" (simplified)).

[22] We therefore have no occasion to decide whether property damage of this kind and under these circumstances could sustain a self-defense defense if the defendants *did* harbor a reasonable belief that they faced an imminent use of unlawful force.

*See United States v. Urena*, 659 F.3d 903, 907 (9th Cir. 2011) (citing *United States v. Haynes*, 143 F.3d 1089, 1090 (7th Cir. 1998), for the proposition that a threat to take action "later that afternoon was not imminent").

**B**

Ryan argues that his conviction for violating § 1361 should be reversed because the district court abused its discretion in excluding as cumulative four of Ryan's six proffered character witnesses. *See* FED. R. EVID. 403. We disagree.

At trial, the Sheriff of Sanders County, Montana, where Ryan resided, testified as to Ryan's "character for being law-abiding," stating that Ryan "is the least of my worries in Sanders County." Another resident of Sanders County, who had known Ryan for 12–15 years, testified that Ryan was a "[t]otally, absolutely peaceful" person and that Ryan had helped him in conducting a large event for local veterans. Ryan sought to call four other character witnesses, and he made a proffer on the record as to what they would say. Two persons who worked with Ryan on theater productions would have testified as to his character for "peacefulness"; a police officer from another town in Sanders County, who had also served as a deputy sheriff for Sanders County, would have testified to Ryan's character as "a law-abiding person"; and a state legislator would have attested to Ryan's character "for being law abiding" and "for being helpful." The district court declined to allow these additional witnesses to testify, concluding that their testimony would be cumulative.

Ryan argues that these four witnesses should have been permitted to testify, because their testimony would have taken only a few minutes and it was important to his good

faith defense. These points have some force, but we cannot say that a contrary conclusion was outside the district court's wide discretion under Rule 403. Whether to limit the number of character witnesses on grounds of cumulativeness "is 'left to the sound discretion of the [district] judge,'" and we generally will not reverse such a ruling absent "exceptional and compelling circumstances." *United States v. Scholl*, 166 F.3d 964, 972 (9th Cir. 1999) (citation omitted). Given that Ryan was able to present testimony as to his law-abiding nature from the top law enforcement officer of his home county and testimony as to his peaceful and helpful nature from a long-term acquaintance, we cannot say that the district court was out of bounds in concluding that additional testimony on these points would be unnecessarily cumulative. *See id.* (finding no abuse of discretion in limiting defendant to three character witnesses); *United States v. Henry*, 560 F.2d 963, 965 (9th Cir. 1977) (reaching same conclusion where district court limited character evidence to two witnesses).

## C

Ehmer argues that the district court violated the Speedy Trial Act by setting his separate indictment on a single count of depredation of Government property to be tried together with the other charges contained in the main indictment. We conclude that there was no reversible error.

## 1

In the March 8, 2016 superseding indictment that served as the basis for the trial in this case, Ehmer was charged only in one count, namely the § 372 conspiracy charge. However, on December 20, 2016, a grand jury returned a freestanding separate indictment charging Ehmer with a single count of depredation of property in violation of 18 U.S.C. § 1361.

The wording of this charge tracked nearly verbatim the pre-existing § 1361 charge alleged against Ryan and Sean Anderson in count six of the main superseding indictment. Ehmer was formally arraigned on the new indictment on January 20, 2017.

On January 19, 2017, the Government moved to join the trial of the indictment in this second, Ehmer-only case (which was docketed as No. 16-cr-493) with the upcoming trial on the superseding indictment in the main case (No. 16-cr-51), which was set for trial on February 14, 2017. Ehmer objected that a February 14 trial date on the new indictment would violate the Speedy Trial Act's requirement that, absent the defendant's written consent, "trial shall not commence less than thirty days from the date on which the defendant first appears through counsel." 18 U.S.C. § 3161(c)(2). On January 30, 2017, the district court granted the Government's motion, citing three main reasons. First, the court held that the new indictment was functionally equivalent to a superseding indictment, and that, under the caselaw governing superseding indictments, it therefore did not trigger a new 30-day minimum period. Second, the court held that, because the new indictment had been discussed in a status conference with all parties in case No. 16-cr-51 on January 6, 2017, that earlier date should count as the day on which Ehmer "first appear[ed] through counsel" for purposes of § 3161(c)(2)'s 30-day clock. Third, the court concluded that Ehmer suffered no prejudice, because the Government had given ample advance warning that it intended to seek a further indictment against Ehmer asserting a depredation charge under § 1361. Accordingly, the court ordered the indictment in case No. 16-cr-493 to be joined with the indictment in case No. 16-cr-51 "for all purposes, including trial."

**2**

Section 3161 of the Speedy Trial Act establishes the time parameters within which a trial must be conducted on an information or indictment. Specifically, § 3161(c)(1) provides that, "[i]n any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment" shall generally commence within a *maximum* of 70 days from either the filing of the charging document or "the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). Section 3161(h) specifies a number of discrete time periods, such as a period of delay resulting from a pretrial motion, that are to be excluded from the 70-day clock, thereby extending it. *See id*. § 3161(h). Section 3161(c)(2) then sets forth a corresponding *minimum* period of preparation that must be afforded to the defendant: "Unless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se." *Id*. § 3161(c)(2).

Section 3161(c)(2)'s reference to "the trial" in describing the minimum-timing rule is obviously a cross-reference to "the trial" mentioned in § 3161(c)(1)'s maximum-time rule. The latter provision describes that "trial" as "the trial of a defendant charged in an information or indictment" in "*any case* in which a plea of not guilty is entered." *Id*. § 3161(c)(1) (emphasis added). Thus, in referencing "the date on which the defendant first appears through counsel," § 3161(c)(2) must be understood as referring to the date on which the defendant first appeared with counsel in the "*case in which* [the] plea of not guilty [was] entered." *Id*. (emphasis added). Accordingly, the resulting minimum-

timing rule is that the "trial of a defendant charged in [the] information or indictment" in *that* "case" must not begin sooner than 30 days after that "first appear[ance] through counsel" in *that* case. *Id*. § 3161(c)(2). That is why, when a superseding indictment is filed in a case in which the defendant has *already* made his first appearance through counsel, the defendant does not get a fresh 30-day minimum clock. *See United States v. Rojas-Contreras*, 474 U.S. 231, 234 (1985) (holding that, because "[t]he statute clearly fixes the beginning point for the trial preparation period as the first appearance through counsel," and not the "date of the indictment," "Congress did not intend that the 30-day trial preparation period begin to run from the date of filing of a superseding indictment").

It follows from this analysis that the district court erred in concluding that the collateral discussion of the second case at the January 6, 2017 status conference in the *first* case qualified as the date Ehmer "first appeared through counsel" in the *second* case. The relevant date that Ehmer first appeared in the second case was at his arraignment on the second indictment, with counsel present, on January 20, 2017. That is therefore "the date on which the defendant first appear[ed] through counsel" in case No. 16-cr-493. To be sure, once the Government elected to file a separate indictment in a separate case, the district court had authority to order that the two cases be tried together. *See* FED. R. CRIM. P. 13 ("The court may order that separate cases be tried together as though brought in a single indictment or information if all offenses and all defendants could have been joined in a single indictment or information."). But unless and until the two cases were formally consolidated for trial under Rule 13—which did not occur here until the district court's January 30, 2017 order—the two cases

remained *separate* for purposes of the applicable statutes and rules. And while the cases remained separate, a status conference in the main case (No. 16-cr-51) cannot be deemed to be the "first appear[ance] through counsel" in the *other* case (No. 16-cr-493). The district court erred in holding otherwise.

For similar reasons, the district court erred in concluding that, for purposes of determining the start date for § 3161(c)(2)'s 30-day minimum clock, the indictment in the second case should be treated as equivalent to a superseding indictment that added an additional count to the indictment in the first case. There is no doubt that the Government could have chosen to file a second superseding indictment in the first case that added the additional depredation charge against Ehmer. *See* FED. R. CRIM. P. 8(a) (stating that separate counts against a defendant may be joined in a single indictment or information if, *inter alia*, they "are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan"). Had the Government done so, then, under *Rojas-Contreras*, there would be no new 30-day minimum clock, because Ehmer would already have appeared with counsel in the "case" in which his not-guilty plea was entered. 18 U.S.C. §3161(c)(1)–(2). But for whatever reason, the Government chose not to go that route, and it instead obtained a separate indictment against Ehmer in a separate "case." Moreover, the Government did not obtain the consolidation of those two cases until January 30, 2017, which was ten days *after* Ehmer first appeared with counsel in the second case. That subsequent consolidation could not and did not retroactively change the date of Ehmer's initial appearance with counsel in the second case, which was January 20, 2017.

Because Ehmer first appeared with counsel in the second case on Friday, January 20, 2017, the trial on the indictment in that case could not begin less than 30 days after that date, *i.e.*, not before Tuesday, February 21, 2017.  *See* 18 U.S.C. § 3161(c)(2); *see also* FED. R. CRIM P. 45 (extending any period that ends on a Saturday, Sunday, or holiday to the next day that is not one of those).  The district court therefore violated § 3161(c)(2) by setting Ehmer's trial on the depredation charge for February 14, 2017.

**3**

Ehmer argues that, under *United States v. Daly*, 716 F.2d 1499, 1506 (9th Cir. 1983), *abrogated on other grounds by Rojas-Contreras*, 474 U.S. at 234, 236, the district court's error requires automatic reversal, without regard to whether he suffered case-specific prejudice.  We reject this argument.

The Speedy Trial Act contains a provision specifying that, "on motion of the defendant," the indictment or information "shall be dismissed" if the defendant "is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h)."  18 U.S.C. § 3162(a)(2).  As we recognized in *Daly*, this language's reference to the "time *limit* required by section 3161(c) *as extended*," 18 U.S.C. § 3162(a)(2) (emphasis added), "does not appear logically to apply to a situation in which the defendant is brought to trial too quickly," *Daly*, 716 F.2d at 1506.  But we concluded that we did not need to decide this issue because, given that the defendants had failed to "move for dismissal of the indictment," they had "failed to comply with an essential requirement" for triggering the automatic sanction provided in § 3162(a)(2).  *Id*.; *see also United States v. Mancias*, 350 F.3d 800, 810 (8th Cir. 2003) (holding expressly that § 3162(a)(2)'s automatic dismissal

remedy does not apply to violations of § 3161(c)(2)'s 30-day minimum clock).

Although Ehmer concededly never requested that the second indictment be *dismissed*, he argues that he nonetheless sufficiently satisfied § 3162(a)(2)'s motion requirement by explicitly objecting that the consolidated trial date would violate § 3161(c)(2). This argument is foreclosed by *Daly*. Although a formal written motion to dismiss is not required and an oral motion will suffice, *see United States v. Alvarez-Perez*, 629 F.3d 1053, 1060–61 (9th Cir. 2010), § 3162(a)(2)'s requirement of a "motion of the defendant" to "dismiss[]" the indictment due to a violation of the Speedy Trial Act clearly requires *some* request for that specific remedy. We therefore held in *Daly* that an explicit request for a "continuance of the trial on the basis of section 3161(c)(2)" was *not* sufficient to satisfy § 3162(a)(2)'s motion requirement. 716 F.2d at 1506. Under *Daly*, a defendant's objection that a contemplated course of action would produce a Speedy Trial Act *violation* is not equivalent to making a request that, if such a violation occurs, the *remedy* should be dismissal of the indictment. Because "at no time did [Ehmer] move for dismissal" of the second indictment under § 3161(a)(2), "that remedy is not available" to him. *Id*.

We are consequently left with a situation where, as in *Daly*, the "Act provides no specific guidance as to the appropriate remedy in this case." 716 F.2d at 1506. We held in *Daly* that, in such circumstances, the violation of § 3161(c)(2) "should be treated like an erroneously denied motion for a continuance," and the Act should be understood as "essentially establish[ing] that any pretrial preparation period shorter than 30 days is inadequate *per se*." *Id*. Applying that framework, we reversed the judgments against

the two defendants whose trials had been set in violation of § 3161(c)(2)'s 30-day minimum clock. *Id*. The analogy to a denial of a continuance would suggest that the defendant must "demonstrate 'actual prejudice'" to obtain a reversal, *see United States v. Lehman*, 756 F.2d 725, 728 (9th Cir. 1985) (citation omitted), but *Daly* effectively establishes that such prejudice will be presumed if "any pretrial preparation period" is "shorter than 30 days," 716 F.2d at 1506. Ehmer argues that the same presumption of prejudice should be applied here and that, under *Daly*, he should be granted a new trial. We disagree.

In announcing its presumption of prejudice, *Daly* addressed a situation in which the two defendants in question lacked *any* opportunity to conduct pretrial preparation with their counsel for a full 30 days, because the defendants in question simply did not have any trial counsel at all until their respective trial lawyers were appointed at the appearances that triggered their 30-day clocks. *Id*. at 1504–05. Similarly, in *United States v. Harris*, 724 F.2d 1452 (9th Cir. 1984), *abrogated on other grounds by Rojas-Contreras*, 474 U.S. at 234, 236, we applied *Daly*'s presumption in the context of additional new charges that were returned by a grand jury only four days before the trial began. *Id*. at 1453, 1455. In both cases, the defendants lacked a full 30 days to prepare with their counsel to defend against the charges. The same is not true on the unique facts of this case. Although Ehmer's appointed counsel in the first case was not formally appointed as counsel for the second case until January 20, 2017, the record makes clear that all parties understood that Ehmer would have the same counsel in both matters. Indeed, the scheduling of Ehmer's first appearance in the second case was delayed precisely because Ehmer's defense counsel in the first case requested that as a scheduling

accommodation to Ehmer. Thus, although the district court violated § 3161(c)(2) by scheduling Ehmer's trial on the second indictment for February 14, 2017, this is *not* a situation in which, as a result, Ehmer effectively lacked a "pretrial preparation period shorter than 30 days." *Daly*, 716 F.2d at 1506. Because that essential predicate for *Daly*'s presumption is inapplicable here, we decline to apply it in Ehmer's case.

Ehmer alternatively contends that he can demonstrate prejudice from the violation of § 3161(c)(2), but this argument fails. Ehmer admits that his counsel in the first case had a copy of the second indictment as of December 27, 2016 and that his counsel had already discussed with the Government the scheduling of Ehmer's formal appearance on that indictment. Ehmer and his counsel also knew, from a discussion of the impending indictment at a December 14, 2016 status conference, that the district court contemplated that all charges would be tried together, and the district court reiterated that expectation at a January 6, 2017 status conference. Ehmer's argument ultimately rests on the implausible contention that, unless and until his counsel in the first case was *formally* appointed in the second case, no meaningful pretrial preparation could occur. The facts we have recounted concerning the procedural history, and Ehmer's existing counsel's awareness of the new charges, belie this contention as a factual matter. The district court properly concluded that, even if there was a technical violation of § 3161(c)(2), Ehmer was not prejudiced. Accordingly, we conclude that reversal is not warranted.

## VII

Appellants Thorn and Patrick raise four challenges to the sentences imposed on them by the district court. We briefly

summarize their sentences and the bases for them before addressing the specific objections they have raised. In considering those objections, we review the district court's interpretation of the Guidelines de novo, its factual findings for clear error, and its application of the facts to the law for abuse of discretion. *See United States v. Gasca-Ruiz*, 852 F.3d 1167, 1170 (9th Cir. 2017) (en banc).

## A

Thorn was convicted of two felonies—conspiracy to impede federal officers, *see* 18 U.S.C. § 372, and possession of a firearm in a federal facility with the intent that it be used in the commission of a crime (here, the § 372 conspiracy charge), *see* 18 U.S.C. § 930(b). These two counts form a single group under the guidelines, *see* U.S.S.G. § 3D1.2, and the base offense level for that group is determined under § 2A2.4, which governs offenses involving "obstructing or impeding officers." *See* U.S.S.G. § 2A2.4 (capitalization omitted); *see also id*. § 2X1.1 (stating that the applicable guideline for conspiracy offenses is generally "the guideline for the substantive offense" that was the object of the conspiracy); *id*. § 2K2.5(c)(1) (stating that, where a firearm is used in another offense with a higher resulting offense level, the guideline for that other offense should generally be used). Accordingly, under § 2A2.4(a), Thorn's applicable base offense level was 10. Because Thorn's criminal history category was III, that base offense level would yield a sentencing range of 10–16 months. In sentencing Thorn, the district court applied a three-level enhancement for threatened use of a firearm under § 2A2.4(b)(1)(B) and a two-level enhancement as an upward departure under application note 4 of § 3A1.4 (relating to "terrorism" offenses). The resulting offense level of 15 produced a final guidelines range of 24–30 months. After considering the

factors in 18 U.S.C. § 3553(a), the district court varied downward from the guidelines range and sentenced Thorn to 18 months in prison. As to the two misdemeanors for which Thorn was convicted, the court imposed a sentence of 30 days, concurrent with the 18-month felony sentences.

Patrick was convicted of a single felony, namely, conspiracy to impede federal officers in violation of § 372. As explained above, the resulting base offense level for that offense was 10. At sentencing, the district court applied a two-level upward adjustment under § 3B1.1(c) based on Patrick's more culpable role in the offense and a four-level enhancement under application note 4 of § 3A1.4. Because Patrick's criminal history category was I, the resulting guidelines range associated with his final offense level of 16 was 21–27 months. The district court sentenced Patrick to a low-end sentence of 21 months. With respect to Patrick's three misdemeanor convictions, the court sentenced him to 30 days, concurrent with his felony sentence.

**B**

We first address a threshold issue raised by Thorn as to the standard of proof that the district court used in determining whether to apply various enhancements in calculating Thorn's sentencing range under the sentencing guidelines. "[D]ue process is generally satisfied by using a preponderance of the evidence standard to prove sentencing factors that are set forth" in the sentencing guidelines. *United States v. Jordan*, 256 F.3d 922, 927 (9th Cir. 2001). However, when an aggravating sentencing factor would have an "extremely disproportionate effect" on the defendant's sentence, the Government must prove that factor by clear and convincing evidence. *Id.* at 929. Thorn contends that, under the governing multi-factor test for

determining whether a sentencing factor would have such an extremely disproportionate impact, *see United States v. Valensia*, 222 F.3d 1173, 1182 (9th Cir. 2000), *vacated and remanded on other grounds*, 532 U.S. 901 (2001), the district court erred by applying a preponderance-of-the-evidence standard at his sentencing.[23]   The standard of review makes a difference here, because the district court expressly stated that it would decline to apply the three-level firearm enhancement to Thorn under a clear-and-convincing-evidence standard.  We conclude that the district court properly applied the preponderance standard.

In assessing whether guideline sentencing adjustments would have a sufficiently "disproportionate effect" to warrant application of a clear-and-convincing-evidence standard, we have identified six non-exclusive factors that should be considered:

> (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment; (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment;   (4) whether the increase in sentence is based on the extent of a conspiracy; (5) whether the increase in the number of offense levels is less than or equal

---

[23] By contrast, at Patrick's separate sentencing, the district court applied a clear-and-convincing standard in assessing the adjustments to his sentence.

> to four; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.

*Jordan*, 256 F.3d at 928 (simplified) (quoting *Valensia*, 222 F.3d at 1182). As we have recognized, "the real action is in *Valensia* factors five and six." *United States v. Lonich*, 23 F.4th 881, 911 (9th Cir. 2022).

The first two factors "are to some extent eclipsed by subsequent developments in Sixth Amendment case law, including that the Sentencing Guidelines are now merely advisory in nature" and that, under *Apprendi*, "'other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Id*. at 911 (citations omitted). Accordingly, under current law, the first two factors will typically "do little independent work in driving the analysis," *id*., and there is nothing here to suggest that this is the unusual case in which these factors might have some residual applicability.

The third and fourth factors "are effectively a threshold inquiry that asks whether the enhancement is based on the conduct of conviction." *Id*. at 916. These factors rest on the premise that "due process concerns are satisfied by a preponderance of the evidence standard" where "the enhancements are based on criminal activity for which the defendant has already been convicted." *Id*. at 915 (simplified). Invoking such reasoning, the Government contends that, under the fourth factor, the preponderance

standard applies automatically here merely because "each of Thorn's sentencing enhancements arose directly from the conspiracy for which he was charged and convicted." We need not resolve this issue because, even assuming *arguendo* that the fourth factor did not itself require application of a preponderance standard, we conclude that consideration of the fifth and sixth factors ultimately point to a preponderance standard.

In assessing whether, under the fifth *Valensia* factor, "the increase in the number of offense levels [is] less than or equal to four," *Valensia*, 222 F.3d at 1182, the district court held—over Thorn's objection—that it should consider each enhancement separately and that, since neither of the two enhancements at issue here exceeded four levels, this factor favored the preponderance standard. As the Government now acknowledges on appeal, the district court's analysis of this fifth factor was erroneous: we have repeatedly held that, in applying this factor, "the *cumulative* effect of 'disputed enhancements'" must be considered. *Lonich*, 23 F.4th at 911 (emphasis added) (citation omitted); *see also United States v. Parlor*, 2 F.4th 807, 817 (9th Cir. 2021); *Jordan*, 256 F.3d at 928–29. Because the total number of levels at issue was five, this factor favored the clear-and-convincing standard.

In determining whether there has been a doubling of the guidelines range (the sixth *Valensia* factor), we must "compare[] both the respective high and low points of the relevant Guidelines ranges." *United States v. Pike*, 473 F.3d 1053, 1058 (9th Cir. 2007). Here, the doubling of the relevant sentence range is only partial—the low end is more than doubled (it goes from 10 months to 24 months), but the high end is not doubled (it goes from 16 months to 30 months). In previous cases in which this Court has invoked the sixth factor in applying the clear and convincing

evidence standard, *both* the high end and low end have doubled. *See, e.g.*, *United States v. Valle*, 940 F.3d 473, 480 (9th Cir. 2019) (from 1–7 months to 37–46 months); *United States v. Pineda-Doval*, 614 F.3d 1019, 1041 (9th Cir. 2010) (from 168–210 months to life imprisonment); *United States v. Bonilla-Montenegro*, 331 F.3d 1047, 1050 (9th Cir. 2003) (from 6–12 months to 63–78 months); *Jordan*, 256 F.3d at 929 (from 70–87 months to 151–188 months); *United States v. Munoz*, 233 F.3d 1117, 1127 (9th Cir. 2000) (from 12–18 months to 41–51 months); *United States v. Mezas de Jesus*, 217 F.3d 638, 643 (9th Cir. 2000) (from 21–27 months to 57–71 months); *United States v. Hopper*, 177 F.3d 824, 833 (9th Cir. 1999) (from 24–30 months to 63–78 months). Because there is no such full doubling of the range here, the sixth *Valensia* factor does not favor applying the clear-and-convincing-evidence standard.

We are thus left with a situation in which "the fifth *Valensia* factor is met, but the sixth is not." *Lonich*, 23 F.4th at 912. Because "the clear and convincing standard" is reserved for "exceptional circumstances," *United States v. Felix*, 561 F.3d 1036, 1047 (9th Cir. 2009) (emphasis omitted), "we have recognized" that the district courts in such split-factor cases "may apply a preponderance of the evidence standard, notwithstanding an increase in the offense level of four or more, when the sentence did *not* otherwise double." *Lonich*, 23 F.4th at 912; *see also Pike*, 473 F.3d at 1058 (noting that "we have never in any opinion required a heightened standard of proof solely upon the basis of an enhancement of more than four levels"). Considering the totality of the circumstances, we do not perceive anything exceptional about this case that would warrant a different conclusion here. The district court therefore

properly applied a preponderance standard in assessing the enhancements to Thorn's base offense level.

### C

We reject Thorn's contention that the district court erred in applying a three-level enhancement under U.S.S.G. § 2A2.4(b)(1)(B).

Under that guideline, if a "dangerous weapon (including a firearm) was possessed *and its use was threatened*," then the offense level is to be increased by three levels. *Id*. (emphasis added). By its terms, this guideline adjustment applies only if the defendant goes beyond mere possession of the weapon and "threaten[s]" to "use" it. Thorn argues that, because § 2A2.4(b)(1)(B)—unlike some other guidelines—does not use the term "brandishing," a threat to use a firearm must mean more than "brandishing" it. And because, in his view, the latter term includes "display[ing] a gun for purposes of intimidation," a "threat" to "use" a firearm must mean more than that. Accordingly, Thorn argues, the adjustment under § 2A2.4(b)(1)(B) only applies where the defendant has "affirmatively expresse[d] an intention to use the gun to inflict harm" and this threat has been specifically directed at the "impeded federal officers." This argument is unavailing.

As an initial matter, we doubt that it makes much, if any, difference that § 2A.4(b)(1)(B) does not use the term "brandish." The concepts of "brandishing" a weapon and "threatening to use" it overlap considerably. Indeed, in construing a different guideline that uses both terms, we previously distinguished those concepts by effectively treating brandishing as a particular *type* of threat, *viz*., one involving a visual *display* of the weapon. *United States v. Chee*, 110 F.3d 1489, 1493 (9th Cir. 1997) (construing

§ 2A2.2(b)(2)(C), which applies a 3-level enhancement in aggravated assault cases if a dangerous weapon "was brandished or its use was threatened"). That particular distinction is no longer valid in light of a 2000 amendment to the guidelines that expressly expanded the concept of "brandishing" to include situations in which the "presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person." U.S.S.G. § 1B1.1, app. note 1(C); *see also United States v. Bolden*, 479 F.3d 455, 462–63 (6th Cir. 2007) (holding that, in light of the 2000 amendment, "brandishing" now includes both "explicit and implicit *threats*" (emphasis added)). It may thus be that, at least in the context of defendants who threaten to use a weapon in their possession, there is now an almost total overlap between the guidelines' current broadened definition of "brandishing" and the ordinary understanding of "threatening to use." We therefore reject Thorn's contention that we must depart from what otherwise would be the ordinary meaning of the phrase "[a weapon's] use was threatened" so as to give that phrase a meaning that is distinctively different from the guidelines' broad concept of "brandishing."

We turn, then, to what it means to say that a weapon's "use was threatened." As we have explained in discussing the elements of the § 372 offense of conviction, a "threat" is generally understood as a communication, by words or actions, that a reasonable person would foresee would be interpreted by its targets as "a serious expression of intent to harm or assault," *Keyser*, 704 F.3d at 638, and that is made with the requisite scienter, *Elonis*, 575 U.S. at 737–40; *Counterman*, 600 U.S. at 76–77. In the context of this case, in which Thorn has been found guilty of conspiring to

impede federal officers by threats and intimidation, the enhancement in § 2A.4(b)(1)(B) therefore applies if, *inter alia*, Thorn's own offense conduct consisted of using a firearm to make such a "threat."

Focusing on Thorn's own actions, the district court properly concluded that it was "common sense" that Thorn's visible display of a firearm in the watchtower during a "well-publicized" occupation was intended to prevent anyone other than the occupiers and their supporters from entering the refuge. *See United States v. Gerhard*, 615 F.3d 7, 12, 34–35 (1st Cir. 2010) (applying the same enhancement to the display of firearms "during a well-publicized, nine-month standoff with federal authorities"). Thorn's conduct thus satisfied the components of a "threat" to use the firearm. And the fact that the impeded federal officers were not physically onsite to directly see Thorn's threat to use a firearm is not dispositive where, as here, the nature of the occupation, and its use of firearms, was amply publicized by the occupiers themselves. In *Chee*, we specifically endorsed the Eighth Circuit's rejection of a comparable argument that "threatening to use a weapon" is limited to situations in which the defendant "*directly* threatened the victim with the gun." 110 F.3d at 1494 (emphasis added) (citing *United States v. Sims*, 952 F.2d 1014, 1016–17 (8th Cir. 1991)).

## D

The offense levels of both Thorn and Patrick were increased by the district court pursuant to an upward departure under application note 4 of § 3A1.4 of the guidelines, which addresses terrorism-related offenses. Both defendants contest these adjustments on appeal, but we reject their challenges.

Section 3A1.4 provides that, for a "felony that involved, or was intended to promote, a federal crime of terrorism," (1) the offense level shall be increased by 12 levels or to level 32, whichever is higher, and (2) the criminal history category shall be VI. *See* U.S.S.G. § 3A1.4(a)–(b). The combined effect of these adjustments would produce a sentencing range (absent further adjustments) of 210–262 months. The application notes provide that, as used in § 3A1.4, the term "federal crime of terrorism" is defined to have the same meaning given to that phrase in 18 U.S.C. § 2332b(g)(5). *Id.* § 3A.1.4, app. note 1. That statute, in turn, defines a "[f]ederal crime of terrorism" to mean an offense that meets the following two requirements: (1) the offense "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"; and (2) the offense is a violation of one of a lengthy list of specifically enumerated statutory provisions. *See* 18 U.S.C. § 2332b(g)(5)(A)–(B). Neither 18 U.S.C. § 372 nor § 930(b)—the relevant offenses of conviction here—are on § 2332b(g)(5)'s list, and so the second requirement is not met in this case. Accordingly, Thorn's and Patrick's offenses do not count as "federal crimes of terrorism," and neither defendant was eligible for the specific terrorism-based upward adjustment set forth in § 3A1.4.

However, application note 4 to § 3A1.4 provides that "there may be cases," *inter alia*, in which the offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"—*i.e.*, the first requirement of § 2332b(g)(5) is met—but "the offense involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C.

§ 2332b(g)(5)(B)"—*i.e.*, the second requirement is not met. "In such cases," the note states, "an upward departure would be warranted, except that the sentence resulting from such a departure may not exceed the top of the guideline range that would have resulted if the adjustment under this guideline had been applied." *See* U.S.S.G. § 3A1.4, app. note 4. Invoking this application note, the district court enhanced Thorn's offense level by two levels and Patrick's by four levels.

Thorn and Patrick first contend that the upward departure recognized in application note 4 violates the explicit statutory instructions given to the Sentencing Commission in § 730 of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, § 730, 110 Stat. 1214, 1303 (1996), 28 U.S.C. § 994 note. That section directed the Commission to "amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism *only applies to Federal crimes of terrorism*, as defined in section 2332b(g) of title 18, United States Code." *Id.* (emphasis added). According to Thorn and Patrick, the Sentencing Commission's instruction in application note 4 to apply terrorism-based upward departures to offenses that do *not* meet the criteria of § 2332b(g)(5) violates the statutory directive that the relevant chapter 3 adjustment shall apply "only" to offenses that meet § 2332b(g)(5)'s definition. They therefore contend that the application note is void. *See Stinson v. United States*, 508 U.S. 36, 38 (1998) (holding that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline"). This argument fails.

When enacted in April 1996, AEDPA § 730's reference to "the chapter 3 adjustment relating to international terrorism" was plainly a reference to § 3A1.4 of the 1995 Guidelines Manual, which was titled, "International Terrorism." *See* U.S.S.G. § 3A1.4 (1995 ed.). The substance of § 3A1.4 (in terms of increases in offense level and criminal history category) was the same in the 1995 guidelines manual as it is today, but those adjustments applied to a "felony that involved, or was intended to promote, *international terrorism*." *See id*. (emphasis added). The phrase "international terrorism" was defined to have the meaning specified in "18 U.S.C. § 2331," *see* U.S.S.G. § 3A1.4, app. note 1 (1995 ed.). Section 2331's definition of "international terrorism"—which remains the same under the current criminal code—was in some senses broader, and in some senses narrower, than the definition of "federal crime of terrorism" in § 2332b(g)(5). While "international terrorism" includes terrorist "activities" that violate, or (if committed within the relevant jurisdiction) would violate, *any* federal or statute criminal law, those activities must also meet the further requirement that they "occur primarily *outside* the territorial jurisdiction of the United States, or transcend national boundaries." *See* 18 U.S.C. § 2331(1)(C) (emphasis added).[24]

---

[24] The full definition is as follows:

[T]he term "international terrorism" means activities that—

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

Against this backdrop, it seems clear that § 730 was an instruction to the Commission to ensure that *the existing adjustment*, applicable to international terrorism, with its particularly severe consequences, would now be applied "only" to the specifically enumerated crimes in § 2332b(g)(5), and then only if the additional requirements of § 3A1.4 were met. But that instruction does not establish the very different proposition that the new version of § 3A1.4, revised in accordance with Congress's instructions, but also expanded to cover domestic as well as international terrorism, comprehensively covered the entire subject of "terrorism" activities as a relevant sentencing factor. The general background rule pertinent to the application of the guidelines is that, subject to certain additional restrictions in the context of "child crimes and sexual offenses," the sentencing court may depart from the otherwise applicable guideline range if "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." *See* 18 U.S.C. § 3553(b)(1);

---

(B) appear to be intended—
    (i) to intimidate or coerce a civilian population;
    (ii) to influence the policy of a government by intimidation or coercion; or
    (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum[.]

18 U.S.C. § 2331(1).

*see also* U.S.S.G. § 5K2.0(a). Nothing in AEDPA § 730 precludes a court from concluding, particularly in the context of a specific offense that does *not* involve international terrorism, that the circumstances of that offense present a terrorism-related factor that was "not adequately taken into consideration" in the guidelines.

To be sure, in making that determination, the court must take into account § 3A1.4 and the limitations that Congress has imposed on that provision. That might, for example, lead to the conclusion that an upward departure that approaches the severity of § 3A1.4 would not properly be applied to offenses other than the ones Congress has specified; in such cases, the "circumstance" looks more like one that the Commission *has* "adequately taken into consideration" in formulating the guidelines. 18 U.S.C. § 3553(b)(1). Conversely, a court might properly conclude that, in the context of offenses and adjustments that differ from what is covered in § 3A1.4, a particular case may present a terrorism-related feature that was not adequately taken into account by the guidelines, including § 3A1.4. *See*, *e.g.*, *United States v. Tankersley*, 537 F.3d 1100, 1113 (9th Cir. 2008) (holding that, although § 3A1.4 did not apply to the defendant's "terrorist activities directed at private conduct," § 730 did not prohibit the district court from applying an upward departure that mirrored § 3A1.4's 12-level increase *without* mirroring § 3A1.4's severe increase in the criminal history category). In short, nothing in AEDPA § 730 states that § 3A1.4 completely exhausts the subject of terrorism, such that terrorism-related issues can never be found, in a particular case, to present a ground for departure. *See id*. (stating that nothing in § 730 "prohibit[s] the Sentencing Commission from promulgating a guideline that enhanced an offender's sentence based on that offender's

intent to use terrorist activities to influence *private* conduct").

The question remains, then, whether the district court in this case properly departed upwards under application note 4 to § 3A1.4.  Thorn and Patrick assert that the departure factor identified in application note 4—*viz.*, that "the offense was calculated to influence or affect the conduct of government by intimidation or coercion"—is already taken into account in setting the offense level for § 372, because that offense has, as an element, that the defendant conspired to impede Government officers "by force, intimidation, or threat."  18 U.S.C. § 372.  This argument overlooks the fact that the guideline that defines the offense level for a § 372 violation—namely, § 2A2.4—also covers a wide range of offenses that involve obstruction of officers, including the simple act of resisting arrest.  *See*, *e.g.*, *United States v. Beckner*, 983 F.2d 1380, 1383 (6th Cir. 1993).  Accordingly, the fact that § 2A2.4 takes into account the impeding of a federal officer does not mean that that guideline has fully taken into account a situation in which that impeding is done for the *further* purpose of having an additional and broader effect on the policy and actions of the Government that goes beyond the impeding of one or more officers.  *Cf.* U.S.S.G. § 2A2.4, app. note 3 (noting that the "base offense level" in § 2A2.4 "does not assume any significant disruption of governmental functions," and such disruption might warrant an upward departure).  Here, the district court properly concluded that Thorn and Patrick had participated in the occupation for the purpose of coercing the Government either to show leniency to the Hammonds or to turn the refuge over to private ownership.  Based on that determination, the court properly departed upwards by two levels for Thorn and four for Patrick—each of which was

much less than the twelve-level increase provided for in §3A1.4—to take account of this factor, which was not adequately considered under § 2A2.4.

Finally, we reject Thorn's and Patrick's argument that an upward departure would be warranted here only if their conduct could be said to constitute "terrorism" in the sense that it involved "acts dangerous to human life." 18 U.S.C. § 2331(5) (defining "domestic terrorism" to require this element). Even assuming that their conduct did not involve "acts dangerous to human life," that conduct still involved an attempt to change Government policy through "intimidation or coercion," *see* U.S.S.G. § 3A1.4, app. note 4. For the reasons we have explained, that factor is not adequately taken into account by § 2A2.4 and warranted a tailored upward departure.

## E

The district court did not abuse its discretion in applying a two-level aggravating-role enhancement to Patrick under U.S.S.G. § 3B1.1(c).

Section 3B1.1 provides for a sliding scale of upward adjustments, from two to four levels, depending upon the nature of the defendant's role in the offense and the scope of the relevant criminal activity in which he was involved. To qualify for any of the adjustments under § 3B1.1, a defendant must have been an "organizer, leader, manager, or supervisor" of the criminal activity. *See* U.S.S.G. § 3B1.1(a)–(c). An "organizer or leader" is a more significant and culpable role than a "manager or supervisor," *see id*. § 3B1.1(a)–(b) (providing for a higher adjustment for the former than the latter in the context of comparably extensive criminal activity), but the least common denominator needed to establish *any* such role is that the

defendant "exercised some control over others involved in the commission of the offense or was responsible for organizing others for the purpose of carrying out the crime," *United States v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012) (citation omitted).  *See United States v. Doe*, 778 F.3d 814, 823 (9th Cir. 2015) (stating that the "leader" and "organizer" roles are distinct, and that "a defendant who has the 'organizational authority' necessary to coordinate the activities of others to achieve a desired result is an 'organizer' for purposes of the enhancement" (citation omitted)); *see also United States v. Vinge*, 85 F.4th 1285, 1290 (9th Cir. 2023) (clarifying that "[t]hese softer forms of authority or control are sufficient for a determination that a defendant is an organizer").

The district court did not clearly err in finding that Patrick exercised sufficient authority to organize the other participants.  As the Government explained at sentencing in advocating for a role adjustment, Patrick was listed prominently in an ad hoc list of key occupation personnel that Ammon Bundy kept in the "Notes" section of his iPhone.  Specifically, in listing persons in charge of various tasks, such as "Defense," "Security," and "Food," Ammon Bundy identified Patrick as being in charge of "Organization" and "Moral[e]."  Moreover, in a video recorded by Patrick during a key meeting at the refuge after the occupiers learned that Finicum had been killed, Patrick led the discussion among those present, urged the participants to stay and peacefully to continue the occupation, and called for a vote on that proposal.  In light of this evidence, the district court's conclusion that Patrick exercised sufficient authority during the occupation to organize others is "plausible in light of the record viewed in its entirety," and we therefore "cannot reverse" that finding

even if we might "have found differently." *United States v. McCarty*, 648 F.3d 820, 824 (9th Cir. 2011).

## VIII

Finally, Appellants challenge various orders by which the district court precluded access to certain sealed materials. They also renew their motion in this court to unseal certain materials that were included in a volume of the Government's supplemental excerpts of record that was filed *ex parte* and under seal.

## A

In a motion filed in the district court after the case was already on appeal, Thorn sought an order allowing *only* his counsel to review the cooperation agreement between the Government and Jason Blomgren, a non-testifying co-defendant.[25] The district court did not abuse its discretion in concluding that Thorn had failed to justify this requested order.

Thorn sought access to the cooperation agreement solely on the ground that it might be relevant and helpful in preparing his appeal. The district court reasonably

---

[25] In its publicly filed, redacted answering brief, the Government asserted that it would neither name the relevant cooperator publicly nor "identify[] the ECF Nos. associated with his plea and sentencing." Despite that disclaimer, the body of the redacted brief did exactly that by identifying the relevant events concerning the cooperator's plea as "ECF Nos. 723, 724, 779." The public docket shows that ECF Nos. 723 and 724 correspond, respectively, to the minutes of the change of plea hearing for "Jason Charles Blomgren" and to his plea agreement. Because Blomgren's identity has thus been indirectly disclosed in the public docket for several years and Appellants' sealed opening brief confirms that Appellants know his identity, we decline to treat it as confidential.

concluded that the agreement has no conceivable relevance to this appeal.[26]  Blomgren did not testify at trial, so there can be no pertinent contention that his cooperation agreement might have been relevant for purposes of cross-examination.  *Cf. Amado v. Gonzalez*, 758 F.3d 1119, 1134 (9th Cir. 2014) (recognizing that, under *Giglio v. United States*, 405 U.S. 150, 154 (1972), the Government "must disclose all material impeachment evidence" concerning prosecution witnesses, including "evidence relating to cooperation agreements").  Moreover, as the Government notes, Blomgren did not begin cooperating until *after* the events at issue, and there is therefore no concern that information concerning him might be relevant on the theory that he was acting as a Government agent *during* the occupation.  In addition, we have reviewed the sealed copy of Blomgren's cooperation agreement and the district court's order sealing it, and we discern nothing in them that has any conceivable relevance to Thorn's appeal.  Although the specific privilege recognized in *Roviaro v. United States*, 353 U.S. 53 (1957), is no longer applicable when (as here) the identity of the cooperator has become generally known "to those who would have cause to resent" the cooperation, *see United States v. Long*, 533 F.2d 505, 507 (9th Cir. 1976) (quoting *Roviaro*, 353 U.S. at 60), the district court did not abuse its discretion in concluding that Blomgren and the

---

[26] Thorn asserts for the first time in his opening brief that the district court's order infringes on the *public's* right of access to Blomgren's cooperation agreement under the standards set forth in *In re Copley Press, Inc.*, 518 F.3d 1022, 1026 (9th Cir. 2008) (recognizing a "qualified First Amendment right of access" to the "cooperation addendum" to a "plea agreement" in that case).  Because this argument was not raised by Thorn in his motion seeking access in the district court or in Appellants' renewed motion to unseal in this court, we decline to consider it.

Government nonetheless "retain[ed] an interest in the [cooperation agreement's] privacy" and that this interest, even if modest, outweighed Thorn's essentially non-existent need to examine the document.

## B

We also reject Appellants' contention that the district court improperly denied discovery of certain memoranda concerning information learned from Government informants.

During the first trial, the defendants in that trial sought discovery of unredacted copies of any memoranda concerning 15 "confidential human sources" with whom the defendants may have had contact. At a hearing on October 14, 2016 in connection with that motion, the Government represented that the reports concerning two informants— Mark McConnell and Terri Linnell—had already been turned over. At that hearing, the district court ordered the Government to submit *ex parte* and *in camera* unredacted copies of the memoranda that the Government had previously provided to the defendants, in redacted form, concerning the 13 informants who had had direct contact with one or more defendants while those defendants were at the refuge and whose identities had not been disclosed to defendants. Of the 15 relevant informants, nine were "personally present" at the refuge at some point during the occupation, and of those nine, three were ultimately identified during the trial (*viz.*, McConnell, Linnell, and a third individual, Fabio Minoggio). Minoggio and Linnell testified at the first trial as defense witnesses; McConnell did not testify.

After conducting an *in camera* review of the memoranda and of an accompanying declaration from an Assistant U.S.

Attorney ("AUSA") that provided the names of the informants (who were identified only by numbers in the unredacted reports), the district court denied the motion for discovery. Citing *United States v. Henderson*, 241 F.3d 638, 645 (9th Cir. 2000), the district court concluded in its written order that there was no information in "the un-redacted versions of the human source reports that was 'relevant and helpful' to any defense." In its oral comments during a further hearing on the motion on October 17, 2016, the court added that, "when [it] compared the redacted to the unredacted versions, apart from identity, there was very little substance that was redacted," meaning that "[m]ost" of the redactions removed information that "went to identifying who the person was."

The district court stated before the second trial that all pretrial "rulings that were not specific to the [first] trial"—which would include this order denying discovery of these materials—would be applicable to the defendants at the second trial. Appellants here may properly challenge that earlier ruling in this appeal. In addition, Thorn's post-trial motion sought disclosure of these same sealed materials in connection with his appeal. The district court denied that request, holding that it would adhere to its prior October 2016 orders on that subject, "in which it concluded the government need not disclose unredacted versions of confidential human source reports to Defendants."

To make an appropriate record of its review, the court had sealed, in connection with the first trial, the copies of the memoranda and the AUSA declaration that it had reviewed.

At our direction, those materials have been provided to this court.[27]

The district court did not abuse its discretion in declining to require the Government to provide the defense with the unredacted memoranda concerning these informants. *See Henderson*, 241 F.3d at 645–46. We have reviewed these unredacted memoranda, and we agree with the district court's conclusion that they do not contain information that is "'relevant and helpful' to [the] defense, or that [would] be essential to a fair trial." *Id*. Half of the reports contain no substantive redactions at all, and the remainder reflect redactions of information that the district court reasonably concluded is not material to any Appellants' defense.

Patrick and Thorn raise the specter that, because the jury did not know which of the many people at the refuge were Government agents, the jury may have unwittingly and improperly convicted them of conspiring with someone who was actually a Government agent, in violation of the district court's instructions. To underscore this possibility, their appellate brief lists at least two dozen persons who were mentioned at the trial and who, in their view, may have been among the persons with whom the jury found they conspired. The Government contends that, "[g]iven the extensive evidence in this case that more than 20 individuals who were actually charged took over and occupied the refuge," there is no basis to suspect that the jury based its verdicts on a finding that Patrick and Thorn conspired with Government agents.

---

[27] The Government represented in the district court that it had submitted 112 reports but the materials forwarded to us by the district court contain only 107 reports.

We need not decide by what standards we should assess the parties' competing contentions on this score. Having reviewed the unredacted memoranda in the context of the record as a whole, we conclude beyond a reasonable doubt that the jury could not have improperly rested its verdict on the view that Patrick and Thorn conspired with a Government agent.[28]

## C

Thorn, Patrick, and Ryan also sought to have their appellate counsel gain access to five sealed documents that were made part of the district court record. These documents consist of transcripts of three hearings from which Thorn, Patrick, and Ryan were excluded and two related orders. A special "filter team" handled the Government's opposition to that particular unsealing request. Over the defense's objection, the team was permitted to file that opposition *ex parte* and under seal. Although defense counsel has not seen these five sealed documents, they are aware that these documents concern proceedings relating to certain underlying material that the Government obtained from another person. A discussion relating to that underlying material occurred at a sealed hearing during the trial at which Appellants and their counsel were present. No request for a court order requiring production of that underlying material was made in the district court, and no issue concerning its discoverability is before us. The only question raised on appeal concerns whether counsel should have been granted

---

[28] For the same reasons discussed earlier, we conclude that Appellants have failed to preserve any contention that the public's right of access to judicial proceedings requires unsealing of these materials. *See supra* note 26.

access to these particular five sealed documents and to the filter team's *ex parte* opposition to their unsealing.

We conclude that, while the district court order that is contained in the Government's supplemental excerpts of record at pages 193–94 should remain under seal at this time, that document should be disclosed to Appellants' counsel under an appropriate protective order.  The order's reasoning for declining to take any action with respect to the underlying material discussed in the order rests critically on the premise that the situation had been explained to all counsel, including Appellants' counsel, in the manner described in the order.  We perceive no proper basis for declining to allow defense counsel to review representations made to the court about the nature and substance of *disclosures that were assertedly made to all defense counsel*. Moreover, having reviewed the sealed order in the context of the parties' sealed appellate briefing on these issues, we are unpersuaded that the Government has shown that the order contains any details that, to the extent they are not already known to defense counsel, should not now be disclosed to them.

With respect to the other challenged items, we agree that at this time they should remain under seal and should not be disclosed to Appellants or their counsel.  *Cf.*, *e.g.*, *United States v. Harmon*, 833 F.3d 1199, 1205 (9th Cir. 2016) (upholding use of *ex parte* and *in camera* proceedings to address discoverability of information).  But our ruling on this score is without prejudice to reconsideration of that matter on remand in the district court after the disclosure of the sealed order discussed above.

## IX

We affirm Appellants' convictions and sentences. With respect to the sealing and discovery issues, we remand to the district court with instructions to disclose to Appellants' counsel only, subject to an appropriate protective order, the sealed order that is contained at docket entry number 768. After that order has been disclosed, the district court shall, if requested, and after receiving any appropriate input from the parties, reexamine the remaining restrictions on the disclosure of that order and on the disclosure of the other specific sealed documents that are referenced above concerning the filter team. If, in the judgment of counsel, the disclosed materials reveal any basis for seeking a new trial or other appropriate relief, counsel may then file any appropriate motion. In all other respects, we affirm the district court's denial of discovery and its sealing orders, and we deny Appellants' requests for unsealing in this court.

**CONVICTIONS AND SENTENCES AFFIRMED; REMANDED.**

BERZON, Circuit Judge, concurring in part and concurring in the judgment in part:

I agree with the majority opinion in full except for Part II, addressing Defendants' claims that the district court's *ex parte* dismissal of 430 prospective jurors violated Defendants' rights to counsel and to presence. As to those issues, I concur in the result and some of the reasoning, but would reach that result differently in certain respects.

As the majority concludes, there is no doubt that the district court in this case, for reasons hard to fathom, disregarded its own assurances that the parties would—as is required—be able to weigh in through counsel as to any excusals for cause before they occurred. The majority concludes that the district court's error does not require automatic reversal under *United States v. Cronic*, 466 U.S. 648, 658 (1984), because (1) the use of paper juror questionnaires suffices for meaningful review of the excusals, Majority Op. at 49–50, and (2) there is "no reasonable doubt" that the nine jurors in question were properly excluded. *Id.* at 52. I agree, but for reasons other than those relied upon by the majority, that *Cronic* does not require automatic reversal on the particular facts of this case, and that the district court's error in determining excusals for cause without input from Defendants through counsel was harmless.

The majority also concludes that Defendants' due process-based right to presence claim "necessarily fail[s]" because Defendants were not owed an in-court hearing as to the excusal of prospective jurors. *Id.* at 46. I depart from the majority in its characterization of Defendants' right to presence claim, but agree that reversal is not required

because any violation of Defendants' right to presence was harmless.

I therefore concur in affirming on these issues but write separately principally to clarify the parameters of the right-to-counsel and right-to-presence claims.

## I

## A

Defendants contend that the district court infringed upon their right to counsel by dismissing potential jurors without the participation of counsel in the excusal process. As the majority explains, the district court decided to excuse potential jurors based on only paper questionnaires, seeking no input from the parties before striking potential jurors for cause.[1] Our closest case on this issue, *United States v. Bordallo*, 857 F.2d 519, 522–23 (9th Cir. 1988), *as amended on rehearing*, 872 F.2d 334 (9th Cir. 1989), analyzes a similar instance of juror dismissal without the input of the parties or counsel as a denial of the right to due process. The parties and the majority in this case, though, have framed the issue principally as concerning a right to counsel, so I proceed on that premise.

Central to my critique of the majority's analysis is my conviction that a district court decision on for-cause challenges to jurors is almost always a discretionary one. *See United States v. Kechedzian*, 902 F.3d 1023, 1027, 1031 (9th Cir. 2018). The majority does not address this precept, although it is well settled law and is relevant to our analysis here.

---

[1] I agree with the majority that the district court's excusals for hardship were appropriately conducted. Majority Op. at 35–37.

Before explaining why the discretionary nature of most excusals for cause matters here, a brief review of juror bias and pertinent for-cause removal principles is helpful.

Trial courts generally enjoy broad discretion in structuring, supervising, and conducting jury selection. "Voir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1985)). It is the judge's "responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence." *Morgan v. Illinois*, 504 U.S. 719, 729–30 (1992) (quoting *Rosales-Lopez v. United States,* 451 U.S. 182, 188 (1981) (plurality opinion) (quotation marks omitted)). If a prospective juror "can[not] lay aside [the person's] impression or opinion and render a verdict based on the evidence presented in court," that person cannot be impartial. *Lockhart v. McCree*, 476 U.S. 162, 176 (1986) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961) (quotation marks omitted)).

In determining which jurors are unable to be impartial, courts recognize two categories of bias: actual and implied. *See United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000). Actual bias is defined as "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Id.* at 1112 (quoting *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997) (quotation marks omitted)). Actual bias is "typically found when a prospective juror states that [the person] cannot be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether [the person] could be fair and impartial despite that view." *Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007). Actual bias is often discerned "in

large part upon demeanor," *Gonzalez*, 214 F.3d at 1112, and, as such, is "a question of fact," *Fields*, 503 F.3d at 767.

The Supreme Court has allocated the dismissal of a juror for actual bias to the trial court's discretion for at least a century. *See Holt v. United States*, 218 U.S. 245, 248 (1910) ("The finding of the trial court upon the strength of the juryman's opinions and his partiality or impartiality ought not to be set aside by a reviewing court unless the error is manifest."). In doing so, the Supreme Court has "stressed" the "broad discretion" of trial courts in assessing and responding to the actual bias of prospective jurors. *Dennis v. United States*, 339 U.S. 162, 168 (1950). This court, in turn, has recognized that "[f]ew aspects of a jury trial are more committed to a district court's discretion than the decision whether to excuse a prospective juror for actual bias." *Kechedzian*, 902 F.3d at 1031 (quotation omitted); *see also, Gonzalez*, 214 F.3d at 1112. ("Because determinations of impartiality may be based in large part upon demeanor, this court typically affords deference to the district court's determinations, and reviews a court's findings regarding actual juror bias 'for manifest error' or abuse of discretion.").

A judge nonetheless has discretion over the removal of jurors only to a certain extent. Under certain "exceptional circumstances," *Fields*, 503 F.3d at 766, a juror's bias may be "implied" or "presumed," and the juror *must* be excused, *Dyer v. Calderon*, 151 F.3d 970, 984–85 (9th Cir. 1998). *See also Sanders v. Lamarque*, 357 F.3d 943, 948–49 (9th Cir. 2004). Bias is presumed when "the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in [the person's] deliberations under the circumstances." *Gonzalez*, 214 F.3d at 1112 (quoting

*Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990) (quotation marks omitted)).  Classic situations that give rise to implied bias are when a juror or a close family member has been a victim of the same crime for which a defendant is being tried, or when the juror or family member had an experience "similar to or identical to the fact pattern" at issue.  *Id.* at 1112–13; *see also Fields*, 503 F.3d at 766.  Other instances of implied bias include when the potential juror has been involved in the incident that gave rise to the crime or has a close relationship to the victim or defendant.  *See United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977); *Smith v. Phillips*, 455 U.S. at 209, 222 (1982) (O'Connor, J., concurring).  Implied bias is determined under an objective standard as a mixed question of law and fact and so is *not* reviewed with deference to the trial court, *see Gonzalez*, 214 F.3d at 1112–13.

Generally, we and other circuits have cautioned against too liberally implying bias or creating *per se* disqualifying criteria when deciding whether jurors should be dismissed for cause.  "[P]rudence dictates that courts answering this question should hesitate before formulating categories of relationships which bar jurors from serving in certain types of trials." *Fields*, 503 F.3d at 772 (quoting *Tinsley*, 895 F.2d at 527 (quotation marks omitted)); *see also Torres*, 128 F.3d at 46.

Where the narrow implied bias rubric is inapplicable but a juror has stated grounds that could give rise to partiality, a court ordinarily abuses its discretion by not conducting inquiry before excusing the juror for cause.  Perhaps the best example of this requirement concerns individuals with moral scruples regarding the death penalty.  In *Witherspoon v. Illinois*, 391 U.S. 510, 515, 521–23 (1968), the Supreme Court held that excusal during the penalty phase of

individuals who "acknowledged having 'conscientious or religious scruples against the infliction of the death penalty' . . . without any effort to find out whether their scruples would invariably compel them to vote against capital punishment" was error, resulting in a partial jury and reversal of the death penalty.[2]  Outside the death penalty context as well, "presum[ing] that personal beliefs automatically render one unable to act as a juror is improper" and "a district court cannot dismiss jurors for cause based solely on their acknowledgement that they disagree with the state of the law that governs the case." *United States v. Padilla-Mendoza*, 157 F.3d 730, 733 (9th Cir. 1998).  Where a juror has indicated some disagreement with the governing law or a personal belief that may affect the case, "[t]he court *must make some effort* to determine whether the jurors could, despite their beliefs, perform their duties as jurors." *Id.* (emphasis added).

This effort typically takes the form of in-court, oral judicial inquiry during voir dire.  Inquiry often reveals that a juror *is* able to perform their duties despite reported beliefs or personal experiences that may suggest otherwise.  For example, in *United States v. Alexander*, 48 F.3d 1477, 1482–84 (9th Cir. 1995), two jurors who were previously robbed were held to have been properly empaneled on a jury for a robbery trial.  One of the jurors had unequivocally said the person could put aside their experience; the other said she "believed" she could be fair despite having herself been robbed.  *Id.* at 1482–83.  We deferred to the discretion of

---

[2] *Witherspoon* held that the death-qualifying of prospective jurors without further inquiry does not necessitate reversal of the conviction, because the exclusion of jurors opposed to capital punishment does not necessarily create an unrepresentative jury on the question of guilt.  *See id.* at 518; *see also, infra* at 13.

the trial court to assess the genuineness of those statements and retain the jurors. *Id.* at 1484.

Additionally, exposure to even a large amount of media coverage regarding a case is not *per se* disqualifying of a prospective juror. As early as 1961, the Supreme Court recognized that with "swift, widespread and diverse methods of communication . . . scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of [a] case." *Irvin*, 366 U.S. at 722. Yet, a juror does not need to "be totally ignorant of the facts and issues involved" in a trial, "particularly . . . in criminal cases." *Id.* at 722–23. So, for example, where a juror admitted to accepting newspaper statements as factual and to holding an opinion "derived from the papers," but stated that "evidence [at trial] would change [his opinion] very easily," a court did not abuse its discretion by empaneling the juror. *Holt*, 218 U.S. at 248. Similarly, we held in *United States v. Olsen*, 704 F.3d 1172, 1194–95 (9th Cir. 2013), that even where a juror had expressed strong opinions about a case a year before the trial based on extensive press consumption, it was not an abuse of discretion to allow that person to serve on the jury. The upshot is that even a large amount of press exposure does not *require* a judge to excuse a juror.

Here, only eight of the prospective jurors dismissed for cause before trial in this case were specifically identified by Defendants after reviewing the district court's notes on the juror questionnaires of dismissed jurors. Looking at the questionnaires filled out by those jurors—which are all we can look at, as nothing else about them was developed in the record—I cannot agree that "there is no reasonable doubt that these eight jurors were properly excluded" and "would and should have been released in any event." Majority Op.

at 52, 53 (quoting *Bordallo*, 857 F.2d at 523 (quotation marks omitted)). Excusal may have been provident in some instances, but all but one excusal was likely within the trial judge's discretion.

Specifically, only one of the prospective jurors would likely be disqualified for implied bias. That juror requested to be excused from the jury pool because her husband was a member of the SWAT team deployed to the Malheur National Wildlife Reserve during the occupation at issue in the trial. This type of close personal relationship with someone involved in the actual events of the trial is precisely the kind of connection to a prospective trial that gives rise to a presumption of implied bias, requiring dismissal as a matter of law and without need for further inquiry. *See Dyer*, 151 F.3d at 981–82; *Smith*, 455 U.S. at 222 (O'Connor, J., concurring).

The remaining prospective jurors exhibited familiarity with the case from some amount of media exposure or made equivocal or strong statements of bias for Defendants or the government. The juror excused for familiarity with the case did just 90 minutes of googling about the case and defendants. He expressed no bias as a result. Although the trial court might have appropriately exercised its discretion by dismissing the juror, the juror's exposure was certainly less than that which this court deemed acceptable in *Olsen*— extensive media consumption and strong opinions. 704 F.3d at 1172. So the district court had discretion to retain or— perhaps after further inquiry—dismiss the juror; and so input from Defendants through counsel therefore could have affected that decision.

Two other jurors expressed mild bias. One said it would be "difficult" for her to be impartial. Another stated on her

juror questionnaire that she had some familiarity with the events leading to the charges and some bias against the government, but she also indicated that she did not have any opinion about the case that would affect her ability to be impartial, and she checked boxes indicating a willingness to follow the law. These prospective jurors would certainly ordinarily require an actual bias inquiry and could well be rehabilitated after questions from the court.[3] With regard to the prospective juror who expressed views critical of the government but otherwise checked boxes indicating a willingness to be impartial, an excusal without inquiry would have been in tension with the *Witherspoon* and *Padilla-Mendoza* rules requiring inquiry before dismissing someone for their political, moral, or religious views. *See Witherspoon*, 391 U.S. at 515, 521–23; *Padilla-Mendoza*, 157 F.3d at 733.

The four remaining prospective jurors who indicated a strong bias for one party over the other would be excusable if at all for *actual*—not implied—bias. None provided any information about the person's professional engagements, personal relationships, or life experiences that would give rise to a presumption of bias so severe as to *require* excusal; the district court could have conducted further inquiry if the parties did not agree on recusal.

In sum, only one of the challenged removed jurors was likely required to be removed. The other seven jurors at

---

[3] As explained by the majority, Defendants did not and do not now object to the original procedure ordered by the district court. Majority Op. at 26. That procedure did not assure, although it seemingly allowed for, opportunity for live in-court rehabilitation for prospective jurors dismissed for cause. Defendants did not waive the opportunity to object to dismissal for cause before it occurred, including urging the district court to conduct further inquiry of specific jurors.

issue showed only gradations of possible actual bias.  The
district court judge could have exercised its discretion to
dismiss *or retain* any one of them.  *See, e.g.*, *United States
v. Mitchell*, 568 F.3d 1147, 1152–54 (9th Cir. 2009) (finding
no abuse of discretion when a trial court did not dismiss a
prospective juror for actual bias in spite of her personal
experience related to the trial matter).

## B

I nonetheless would hold that the district court's
grievously erroneous procedure for excusing jurors is not a
basis for reversal, albeit not for the reason the majority
provides.  The majority applies the stringent *Chapman*
standard to conclude that the nine challenged prospective
juror excusals without the assistance of counsel were proper.
Majority Op. at 51.  In doing so, the majority appears to
assume that if any of the jurors' dismissals was an abuse of
discretion, reversal would be required.  In my view, as I have
said, the excusal of all but one of the jurors was
discretionary, so proceeding without the input of Defendants
through counsel was an abuse of discretion, as well as a
constitutional violation.  I therefore cannot go along with the
majority's holding that the involvement of counsel and their
clients in the excusal process for the eight identified jurors
clearly made no difference.  *Id.* at 53.  As to the seven
discretionary excusals, the trial court may have been
persuaded to exercise its discretion differently than it did had
there been input from Defendants through counsel.

Even so, I would find harmless error, for a reason not
identified by the majority.

The majority does not correctly characterize the nature
of the challenged decisions.  Our caselaw assesses the
pertinent harm from improper for-cause excusals from the

jury (as opposed to improper for-cause *retention* on the jury) as partiality of the jury actually empaneled; individual, erroneous juror excusals are not cognizable prejudice and so not a ground for reversal as long as the overall jury venire and the empaneled jury are not skewed or biased. *See Holland v. Illinois*, 493 U.S. 474, 478–481 (1990); *Padilla-Mendoza*, 157 F.3d at 734.

In *Padilla-Mendoza*, for example, the defendant challenged the court's excusal of two individuals who indicated that they believed marijuana should be legalized. 157 F.3d at 732–33. The defendant contended that the dismissals, without further inquiry as to the ability of those potential jurors to be impartial, were an abuse of discretion that prejudiced the defendant, by inadvertently creating a "pro-government jury." Appellant Opening Br. at 28, *Padilla-Mendoza*, 157 F.3d 730 (9th Cir. 1998) (No. 96-550597); *Padilla-Mendoza*, 157 F.3d at 733. We agreed that the district court erred. *Padilla-Mendoza*, 157 F.3d at 733. But, reframing defendant's prejudice claim, we stated that "[t]he *core question* here is whether defendant's constitutional right to an impartial jury has been violated." *Id.* at 734 (emphasis added). As the defendant in *Padilla-Mendoza* "presented no evidence that any of the jurors that found him guilty were unable or unwilling to properly perform their duties[,] . . . [t]he district court's dismissals did not leave a presumptively biased jury," and no reversal was required. *Id.* The "core" consideration as to whether an erroneous excusal for actual bias requires reversal, we said, is whether the resulting jury was "unable or unwilling to properly perform [its] duties." *Id.*

We have repeatedly followed this approach to reviewing juror excusals that constituted manifest error, "requir[ing] [defendants] to show that the jurors as empaneled were not

impartial." *Id.* at 734; *See United States v. Lindsey*, 634 F.3d 541, 553–54 (9th Cir. 2011) ("Even if the district court had abused its discretion [in dismissing two prospective jurors], the dismissal . . . did not result in a prejudiced jury panel."); *see also Alexander*, 48 F.3d at 1483–84 ("[Defendants] have not asserted that the jury which finally tried them was in any way biased or prejudiced. Consequently, they have not shown any prejudice from the court's denial of their challenges for cause."); *Evans v. Lewis*, 855 F.2d 631, 635 (9th Cir. 1988) ("[T]he juror's removal, even if for insufficient cause, did not violate Evans' impartial jury right as Evans has not shown that as a result an empaneled juror failed to 'conscientiously apply the law and find the facts.'").[4] This approach follows the Supreme Court's holding in *Witherspoon* that even manifestly erroneous dismissals of prospective jurors do not require reversal in the guilt phase of a trial in the absence of a showing of inability of the empaneled jurors to perform their duties impartially. *See Witherspoon*, 391 U.S. at 517–18.

---

[4] This rule of harmlessness has become so embedded in our jurisprudence that we have routinely applied it in unpublished decisions. *See also United States v. Salcedo*, 840 Fed. App'x 184, 185 (9th Cir. 2021) ("Even were these dismissals manifest error or an abuse of discretion, reversal would still not be warranted because the 'core question' is whether [the defendant's] constitutional right to an impartial jury has been violated, and he 'presented no evidence that any of the jurors that found him guilty were unable or unwilling to properly perform their duties.'" (quoting *Padilla-Mendoza*, 157 F.3d at 734)); *United States v. Cruz*, 172 Fed. App'x 168, 170 (9th Cir. 2006) ("We need not determine whether the district court abused its discretion in improperly removing the five veniremembers because even if it did so, we cannot say that the dismissals 'presumptively resulted in a prejudiced jury panel.'" (quoting *Padilla-Mendoza*, 157 F.3d at 734)).

*Bordallo* is not to the contrary. *Bordallo* observed a danger in a district court's *ex parte* dismissal of prospective jurors: "circumstances could arise in which a judge, either consciously or inadvertently, excused a disproportionate percentage of a juror population, such as women or minorities, or otherwise adversely affected the neutrality of the juror pool." 857 F.2d at 523 (citation omitted). But where, as here, the excusals were exclusively on written questionnaires, it would be possible to discern at least the possibility of such bias, statistically or otherwise. There was no attempt to do so in this case.

Defendants make no specific allegation of prejudice concerning the makeup of the empaneled jury or of the jury venire; they complain only that the district court's error caused the removal of an opportunity for counsel to "meaningfully shape[] the jury pool." Thus, while the risk of bias, conscious or otherwise, underscores the severity of the constitutional error in dismissing jurors without the input of counsel or parties, it does not alone determine the feasibility of identifying the impact of the constitutional error.

Defendants here have identified only eight individual jurors, of an initial jury pool of 1,000, as improperly excused for cause. Of those, as I have said, one was properly excused for implicit bias. With regard to the rest, Defendants have not suggested that the for-cause excusals were uniformly based upon pro-government bias, and it appears that they were not. Nor have Defendants challenged any member of the empaneled jury as biased, by considering the jury questionnaires or any in-court voir dire. Finally, Defendants do not identify any pattern to the challenged for-cause excusals that skewed the empaneled jury (or the jury venire) along racial, ethnic, gender lines or any other proscribed

criterion. The jury questionnaires and the district court's excusal notes on them were available, so such arguments could have been made, statistically or otherwise, on the paper record. Defendants have thus waived any argument that would require a review of bias of the actually empaneled jury (or jury venire). Under our case law, the erroneous excusals were therefore harmless. *Padilla-Mendoza*, 157 F.3d 730.

I note that the *Chapman* standard well could preclude a harmless error ruling under other circumstances. For example, had this case involved a more extensive challenge to the on-paper for-cause excusals without lawyer or defendant input—for example, by identifying hundreds of prospective jurors dismissed for-cause without the parties' involvement—the risk of unconscious bias in those excusals would greatly increase in magnitude, making it harder to review the excusals by comparing the excluded group with the empaneled jury or the original venire. Because of the possible impact of this risk, I repeat what the majority emphasizes—the process used by the district court to dismiss potential jurors should never recur. *See* Majority Op. at 54.

## II

As to whether *United States v. Cronic* 466 U.S. 648 (1984) applies here to the right-to-counsel claim and requires automatic reversal: The above analysis of the right-to-counsel claim illustrates why, on the specific facts before us, *Cronic* does not apply.

To conclude there was not complete denial of counsel with respect to a critical stage requiring a *Cronic* reversal on the particular facts of this case, the majority correctly states that "we are presented with an initial threshold question as to what standard of review we should apply in examining the

correctness of the district court's for-cause excusals." Majority Op. at 50. The majority's application of *Cronic* then turns on whether it is reliably feasible to determine on the "discrete paper record" that the absence of counsel could not have caused cognizable harm. *Id.* at 50, 53. To that point, I agree with the majority's analysis. My disagreement with the majority's *Cronic* analysis is the same one I have already identified, concerning the nature of the harmless error inquiry where the contention is that a small number of identified available jurors were improperly excluded.

Again, the majority's harmless error analysis hinges on the propriety of the district court's for-cause dismissal of the eight challenged individual jurors. *Id.* at 51–53. As I have already explained, this mode of review is incorrect. The approach to assessing harmless error on the facts in this case depends not on the propriety of the excusal of individual jurors, but on whether the jury actually empaneled (or the jury *venire* from which it was drawn) was skewed or otherwise unfairly constituted.

Still, for reasons also already explained, the proper prejudice analysis can be reliably conducted on the present record, given Defendants' failure to claim any bias in the jury venire or the empaneled jury and their ability to do so given the data available to them.

As I have explained, precisely the same harmless error inquiry is done when the challenge is on the merits to the excusal of the jurors. I see no reason there is any more difficulty in ascertaining prejudice as to the bias of the seated jury (or jury venire) where the problem is denial of counsel prior to excusal. As a result, the *Cronic* consideration critical here—whether a reliable prejudice analysis is available under the circumstances despite the violation of the

right to counsel—cuts strongly in favor of conducting that analysis rather than automatically reversing the convictions. I therefore concur in the majority's conclusion that *Cronic* automatic reversal is not appropriate here. *See, e.g.*, *Musladin v. Lamarque*, 555 F.3d 830 (9th Cir. 2009) (concluding *Cronic* automatic reversal not required); *United States v. Benford*, 574 F.3d 1228 (9th Cir. 2009) (same); *Cf. United States v. Hamilton*, 391 F3d 1066 (9th Cir. 2004) (concluding *Cronic* automatic reversal required on facts unrelated to this case).

## III

I additionally diverge from the majority in its analysis of Defendants' claim that the district court's *ex parte* dismissal of the prospective jurors violated Defendants' right to presence.

I note, as a preliminary matter, that contrary to the majority's account, I do not understand Defendants to argue that they were owed an in-court hearing. Majority Op. at 42. Defendants do not in any of their briefs maintain that they had the right to presence at an oral hearing regarding the juror dismissals, nor did they advance any such contention at oral argument. Instead, their objection is that they had no meaningful opportunity, on paper *or* in person, to review and contest the district court's dismissals for cause based on the questionnaires.

The majority is correct that Defendants draw heavily on *Bordallo* to argue that the court improperly excused jurors outside their presence. As the majority notes, *Bordallo* dealt with in-court questioning of potential jurors. 857 F.2d at 522. Defendants' analogy to *Bordallo*, however, focuses on the after-the-fact disclosure of the juror dismissal, and the

private vetting and striking of jurors for case-specific reasons.

Despite the limited nature of Defendants' presence challenge, I would hold that the right to presence, broadly construed, was violated by the procedure the district court used. We have never ruled that the right to presence protection applies only to in-court proceedings, rather than to a defendant's opportunity to present the court with a position regarding the retention or excusal for cause of jurors, whether directly or through conferral with counsel in advance of presentation of a position to the court. *See United States v. Reyes*, 764 F.3d 1184, 1194 (9th Cir. 2014); *United States v. Gagnon*, 470 U.S. 522, 526 (1985). Nor would any such ruling be proper.

A criminal defendant's right to presence during criminal proceedings involving neither witnesses nor evidence is grounded in the Fifth Amendment guarantee of due process. *Gagnon*, 470 U.S. at 526–27 (1985). The right permits "the defendant to contribute in some meaningful way to the fair and accurate resolution of the proceedings against him." *Reyes*, 764 F.3d at 1191 (quoting *United States v. Gonzales-Flores*, 701 F.3d 112, 118 (4th Cir. 2012)). Defendants are generally provided the right to be present during jury selection because it is one instance in which their presence, and ensuing insights and control, "ha[ve] a relation, reasonably substantial, to the fullness of [the defendants'] opportunity to defend against the charge." *Snyder v. Com. Of Massachusetts*, 291 U.S. 97, 105–106 (1934), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964). Defendants can meaningfully contribute "knowledge of facts about [themselves] or the alleged crime . . . which may become important as the individual prejudices or inclinations of the jurors are revealed" and "[defendants]

'may also be [] member[s] of the community in which [they] will be tried and might be sensitive to particular local prejudices [their] lawyer does not know about.'" *Reyes*, 764 F.3d at 1194 (quoting *United States v. Rolle*, 204 F.3d 133, 137 (4th Cir. 2000). As a result, defendants ordinarily have a statutory and constitutional right to be physically present during voir dire and the empaneling of the jury. *See Gagnon*, 470 U.S. at 526–29.

A defendant's contributions are so important to jury selection that, even during discrete parts of the jury selection proceedings at which courts have determined a defendant does not have the right to be physically present, other safeguards protect the defendant's Fifth Amendment right to meaningfully shape the process. Courts have held, for example, that the constitutional right to presence does not entitle a defendant to be physically present at brief interactions between judges and prospective jurors or interactions in which a defendant's presence might be counterproductive. *See Gagnon*, 470 U.S. at 526. Defendants also do not have even a statutory right to be physically present at conferences where the question whether to excuse a juror for cause is at stake, as the defendant would not reasonably have had anything to add beyond the contributions of counsel. *See Reyes*, 764 F.3d at 1190–91. In so ruling, courts have been careful to emphasize several considerations that mitigate the need for physical presence—the defendant's knowledge of the juror's statements and communications, ability to confer with counsel ahead of excusals, and ability to confirm that the correct excusals have been made. *See, e.g.*, *Reyes*, 764 F.3d at 1191–92, 1197.

*Reyes,* for example, held that under certain circumstances, a defendant does not have a statutory or

constitutional right to be present at side bar conferences between a judge and counsel to exercise for-cause and peremptory strikes. *Id.* at 1192–93, 1196–97. Addressing the defendant's statutory right to presence, *Reyes* reasoned that such conferences involved questions of law within the special meaning of that term in Rule 43, and that the defendant's presence would not have been helpful. *Id.* The side bar exchanges in *Reyes*, however, involved "arguments based on facts that had already been *elicited in [the defendant's] presence*" and the court "permitted [the defendant's] lawyers to confer with their client before making decisions, thereby giving his counsel an opportunity to explain the government's position . . . after the side bar exchanges." *Id.* at 1191–92 (emphasis added). The defendant in *Reyes* was present for the general questioning of jurors and had the ability to confer with counsel before each sidebar exchange. *Id.* at 1186. As a result, the court emphasized, the defendant "was able to observe the composition of the jury on an ongoing basis and correct any mistakes made by his lawyer in exercising his peremptory challenges because the district court struck each juror in open court." *Id.* at 1997. *Reyes* also concluded that the judge's questioning of one juror without the defendant present did not violate the defendant's Sixth Amendment rights, reasoning that no violation occurred because "[t]he exchange between the court and [juror] was brief, and [the defendant's] attorney could have offered his client a full account of the conversation . . . given the brevity of the exchange and the court's willingness to permit them to confer throughout voir dire." *Id.* at 1194. In sum, critical to *Reyes's* holding that the defendant's statutory and constitutional right to presence was not violated by exclusion from side bars between a judge and counsel (and the

harmlessness of the brief questioning of one juror outside the defendant's presence) was the ability of the defendant to witness voir dire, confer repeatedly with counsel, and confirm that counsel acted appropriately based on the defendant's input by witnessing the striking of jurors in open court. *Id.* at 1191–92, 1194.

*Gagnon* similarly held that given the brevity of the interaction, court questioning of a juror outside the presence of the defendant to assess bias did not violate the defendant's constitutional right to presence. 470 U.S. at 527. There, the Supreme Court emphasized that the "encounter between the judge, the juror, and Gagnon's lawyer was a short interlude in a complex trial." *Id.*

In contrast to the circumstances in *Reyes* and *Gagnon*, it is undisputed that Defendants did not have access to the responses of prospective jurors before the court issued for-cause excusals; the questioning of the jurors was extensive (the questionnaire is more than 40 pages long); and the proceeding involved more than 1,000 juror questionnaires (although, again, we do not know the number of for-cause excusals); and Defendants were not given the opportunity to confer with counsel before the court issued the dismissals. In short, this *is* "a case where the defendant was [both physically *and* virtually] absent when jurors were excused or when the jury was impaneled." *Reyes*, 764 F.3d at 1197.

The above considerations, particularly including the ability to confer with counsel before conferences with the court regarding prospective jurors, underscores the way the rights to counsel and to presence are closely linked, as the Supreme Court has recognized. "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Geders*, 425

U.S. 80, 88–89 (1976) (internal quotation marks omitted) (quoting *Powell v. Alabama*, 287 U.S. 45, 68–69 (1932) ; *see also Oyler v. Boles*, 368 U.S. 448, 452 (1962) ("Although these cases were specifically concerned with the right to assistance of counsel, it would have been an idle accomplishment to say that due process requires counsel but not the right to reasonable notice and opportunity to be heard.").

In this case, neither Defendants nor their lawyers were permitted to review juror questionnaires; represented in the in camera proceeding in which 430 prospective jurors were dismissed; or able to verify, both initially and when the error could have been remedied, which jurors were dismissed. So Defendants were not provided a full "opportunity to defend against the charge." *Snyder*, 291 U.S. at 105–106. Absent other safeguards, Defendants had a right to be heard themselves, in some manner, as to the excusal of prospective jurors.

I nonetheless agree with the majority that "there was no prejudicial impingement on . . .the due process right to be heard with respect to these strikes,"—albeit, once more, my prejudice analysis differs from the majority's. Majority Op. at 53. As I have explained, when Defendants challenge the propriety of a district court's dismissal of jurors for cause, the core consideration for prejudice purposes is the character of the resulting jury (or jury venire). *See Padilla-Mendoza*, 157 F.3d at 734. Because Defendants do not allege that any empaneled juror (or jury venire) was not impartial, and do not contend that the district court's excusals impermissibly skewed the jury venire or the empaneled jury, the district court's erroneous failure to provide Defendants an opportunity to be heard regarding the excusals, did not, beyond a reasonable doubt, affect the verdict. *See id.*

\*          \*          \*

Because I ultimately agree with the majority that *Cronic* does not apply on the particular facts before us and that the district court's violation of Defendants' rights to counsel and presence were harmless, I concur in the result of Part II of the majority opinion. I concur in full in the remainder of the opinion.